## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

```
------------------------------------------------------------X
JOHN DOE,                              :      Civ. No.
                                       :
               Plaintiff,              :
                                       :      COMPLAINT
          -against-                    :
                                       :
BROWN UNIVERSITY                       :      JURY TRIAL
  in Providence in the State of Rhode Island  :   DEMANDED
  and Providence Plantations,          :
                                       :
               Defendant.              :
------------------------------------------------------------X
```

## I.    The Nature Of This Action

1.    Plaintiff John Doe[1] seeks relief against Defendant Brown University ("Brown") following Brown's wrongful and unjustified imposition of sanctions based on a fellow student's false and unproven allegations of sexual misconduct.  This injustice was the direct result of Brown's failure to (1) conduct an adequate investigation, (2) provide Plaintiff with due process as defined by Brown's own policies and (3) its excessive focus on the concerns and interests of the female complainant and the convenience of the University to the total exclusion of the rights and interests of the male respondent Plaintiff John Doe.

2.    Brown's precipitous and unjustified actions violated its contract with John Doe, the applicable standard of care under State law and the requirements of Title IX of the Education Amendments of 1972.

3.    Brown's arbitrary and capricious findings and action have derailed John Doe's education, tarnished his reputation and permanently damaged his future career and educational prospects.

---

[1]    Plaintiff files herewith a motion for leave to use pseudonyms.

## II.    Parties

4.    Plaintiff John Doe ("John Doe") is a natural person residing in Frisco, Texas. During the events described herein, John Doe was a student at Brown University and resided on the Brown University campus in Providence, Rhode Island.

5.    Upon information and belief, Defendant Brown University is a non-profit corporation organized under the laws of the State of Rhode Island operating as a private liberal arts university located in Providence, Rhode Island.

6.    John Doe and Defendant Brown are sometimes hereinafter collectively referred to as the "Parties".

## III.    Jurisdiction and Venue

7.    This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) John Doe and Defendant Brown are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the claims herein arise under federal law; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

8.    This Court has personal jurisdiction over Defendant Brown on the grounds that Defendant Brown is conducting business within the State of Rhode Island.

9.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

IV.   <u>**Factual Allegations**</u>

10.   In the spring of 2013, Defendant Brown University offered John Doe admission to the Class of 2017 based on, among other things, his outstanding academic record and extensive public service achievements. John Doe accepted Brown's offer with the goal of obtaining a quality liberal arts education to prepare him for a career in neuroscience. As part of its admissions packet, Brown provided John Doe with copies of its school policies, including the 2013-2014 Code of Student Conduct at Brown University (the "Code").   Upon information and belief, the relevant portions of the 2013-2014 version of the Code remained unchanged in the 2014-2015 version of the Code, which is the version that Brown applied at the time of John Doe's disciplinary action. A copy of the Code is annexed hereto as **<u>Exhibit A</u>**.

11.   John Doe's freshman year at Brown was fulfilling and productive, as he earned straight A's while becoming a respected member of his social and academic community.   John Doe returned in the fall of 2014 to begin his sophomore year with much anticipation and enthusiasm.

A.   <u>**The Evening of October 11, 2014**</u>

12.   On or about October 11, 2014, John Doe and Jane Doe met at a party held in the dormitory, Barbour Hall, at around 10:30 p.m.   He was unaware if Jane Doe had been drinking, but did not perceive her to be intoxicated or functioning in an impaired state.   They began an extended, friendly conversation.   When the party came to an end, the two students began kissing.

13.   The couple continued their intimate conversation and public displays of affection among a group of mutual friends in another dormitory room down the hall.   During this time, Jane Doe texted her friends, stating she might be about to "hook up" with John Doe.

14.   Shortly after midnight, John Doe and Jane Doe decided to head toward John Doe's dormitory room in Marcy House.  Jane Doe remained willing and clear-headed.

15.   When they entered John Doe's room, the couple continued their intimacy on John Doe's bed, kissing and touching one another over their clothing. Jane Doe participated passionately, first kissing John Doe's neck and then biting it, leaving a noticeable bruise.  At all times, Jane Doe expressed her consent and pleasure with these activities.  She did not express in actions or words that she was uncomfortable or withdrawing her consent.

16.   After 10-15 minutes, Jane Doe stated that she did not think they should go any further than that tonight, implying that sex was not "on the table."  John Doe said okay, and they continued kissing each other.  When someone knocked at John Doe's unlocked door, the couple jumped up out of embarrassment.  After a pause, they resumed their mutual kissing.

17.   The couple moved to the couch, and lay down together.  John Doe turned off the lights.  He began to rub Jane Doe over her underwear and at some point he "fingered" her.  To confirm Jane Doe's consent, John Doe asked her "Do you like this?"  Jane Doe nodded and responded, "Yes," guiding his hand with hers and asking him to rub her a certain way.  When John Doe complied, Jane Doe moaned in pleasure, telling John Doe she reached orgasm.

18.   Jane Doe then rose from the couch and stated that she did not want to go any further that night, stating "I'm sorry if I seem selfish." John Doe asked whether he did anything to cause her to want to stop, to which she responded, "No, it was nothing you did."  She did, however, mention that she told a friend that they would meet up that evening.  When he asked her if he would see her again, she replied, "Yes, you'll see me at my birthday party tomorrow and you'll see me around campus."  She kissed John Doe on the lips goodbye and left the room.

19.  In the week that followed, John Doe was unaware that Jane Doe considered herself the victim of sexual misconduct.

**B. John Doe First Learns of Jane Doe's Allegations of Sexual Misconduct; John Doe Was Presumed Guilty Before The Investigation Started**

20.  On Saturday, October 18, 2014 at approximately 7:00 p.m., John Doe received a telephone call from Associate Dean of Student Life and Director of Student Conduct Yolanda Castillo.  She informed him that Brown had issued a no-contact order against him with respect to Jane Doe based on an allegation of sexual misconduct against him.  She advised him he could not leave his dorm room until he met the next morning with her and Maria E. Suarez, the Associate Dean and Director of Student Support Services.  Dean Castillo did not provide John Doe with any information about the alleged misconduct that precipitated the order, and did not allow him any opportunity to respond to the allegations of which he was not informed.

21.  It later turned out that Dean Castillo based the no-contact order upon the October 11, 2014 incident; however, she telephoned John Doe to issue the order more than an hour before the University received a written complaint from Jane Doe.  When John Doe learned of this sequence later on, it raised significant questions about whether Brown University was acting as Jane Doe's advocate and representative even before beginning its investigation.

22.  John Doe was stunned by this turn of events, as he remembered his evening with Jane Doe as a mutually intimate, pleasurable and completely consensual experience.

23.  At their meeting the next morning, Deans Castillo and Suarez informed John Doe that Jane Doe had made a "serious allegation of sexual misconduct" supported by "evidence of bruising."  They refused John Doe's request to tape record his account of what happened, stating they would "remember it in their heads."  He described the evening in detail, recounting how he

5

obtained consent from Jane Doe at all relevant times and never used force, violence or aggression against her. The Deans stated their disbelief, referring again to unexplained "evidence of bruising."  The Deans then informed him that Margaret Klawunn, the University's Vice President of Student Affairs (who was not present) had ordered his immediate removal from campus for the safety of the community, and that they would help him book a flight back home.

24.  Devastated and frightened, John Doe asked the Deans to wait while he telephoned his father in Texas.  His father asked the Deans to identify the evidence on which Brown based its sudden and severe punishment.  They limited their response to saying there were "serious allegations and alleged bruising."  John Doe's father scheduled a meeting with the Deans and with Vice President Klawunn for later that evening, and took the next flight up to Providence.

25.  On Sunday, October 19 at 7:00 p.m., John Doe and his father met with the Deans and with Vice President Klawunn.  They handed John Doe a pre-written, signed letter dated on the same date (October 19) from Vice President Klawunn informing him he was banned from campus effective immediately and indefinitely.  A copy of the letter is attached as **Exhibit B.**

26.  In this way, Brown University decided to ban John Doe from the University campus prior to hearing his version of the events based on the authority of a person was not even present at the meeting to hear John Doe's version of the allegations earlier that morning.  Through its actions, Brown University denied John Doe the presumption of innocence and the opportunity to respond to the charges against him, in violation of his due process rights spelled out in Brown's Code, "To be assumed not responsible of any alleged violations unless she/he is so found through the appropriate student conduct hearing."  See Code (**Exhibit A**), p. 7.

27.  Even though the October 19 letter states Brown "does not in any way presume to hold you responsible for these allegations," (**Exhibit B**) Brown's immediate banishment of John

Doe from the University community, prior to any investigation or explanation of the reasons for its decision, deprived John Doe of his due process rights under the Code.

28.  The Code limits the authority to order student separations to five officials, namely the President, the Dean of the College, the Dean of the Graduate School, the Dean of Medicine and Biological Sciences, and Senior Associate Dean for Student Life.  See Code, p. 9, **Exhibit A**. At the time she ordered John Doe's immediate removal from the Brown Campus, Vice President Klawunn held none of these authorized positions.  Furthermore, Vice President Klawunn's current position description (as posted on Brown's website) does not include this authority.

29.  Notwithstanding the University's stated policies to support respondents during the complaint process, Brown did not offer John Doe off-campus housing or any other alternative housing arrangement, a departure from Brown's practice in a prior case.  Brown University declined to offer any alternative means for John Doe to pay for his food or lodging, expenses he previously paid Brown for but were effectively forfeited by Brown's order, or any relief from the transportation expenses he was now forced to incur.  Instead, Brown forced John Doe to spend the remaining two months of the semester in a downtown Providence hotel without convenient transportation to and from campus.

**C.  Complainant's Weak And Inconsistent Case**

30.  On October 20, 2014, Brown University sent John Doe a notice of the allegations against him ("Notice of Allegations," **Exhibit C**, attached) and "A Guide to the Investigation Process," ("Investigation Guide," **Exhibit D**, attached).

The Notice of Allegations charged him with:

Offense II(a):    Actions that result in or can be reasonably expected to result in physical harm to a person or persons.

Offense III(a):     Sexual Misconduct that involves non-consensual physical contact of a sexual nature.

Offense III(b):     Sexual Misconduct that includes one or more of the following: penetration, violent physical force, or injury.

Offense V(a):     Illegal possession or use of alcohol

(collectively, the "Charges".)

31.   The Notice of Allegations informed John Doe of his right to an advisor.  He selected his academic advisor MaryLou McMillan, who knew of his academic success and good standing.

32.   The  Investigation Guide provided, in relevant part, as follows:

Upon Brown's receipt of a complaint that alleges serious offenses, the Senior Associate Dean for Student Life may decide, if the allegations are true, that it is appropriate to separate the student from Brown.

Students under investigation have the right to be assumed not responsible of any alleged violation.

Students under investigation have the right to be informed of the evidence upon which a charge is based and accorded an opportunity to offer a relevant response.

After the case administrator has collected information about the incident from the responding student, the complaining student, and any witnesses, the case administrator will provide the case materials to the Senior Associate Dean for Student Life.  The Senior Associate Dean for Student Life will use the materials to determine whether or not there is a reasonable basis to file student conduct charges.

Investigation Guide, **Exhibit D**, pp. 1-4.

33.   Around this time, John Doe asked Dean Castillo (through Dean Suarez) for specific information about Brown's process, including a clear explanation of the steps Brown took from the time it learned of Jane Doe's allegations to its first contact with John Doe on October 18, 2014.  Dean Castillo's general responses did not answer John Doe's specific questions.

8

34.  On October 21, 2014, John Doe received a copy of Jane Doe's October 17, 2014 interview with Brown Department of Public Safety Detective Jeanne Peck ("Oct. 17 Public Safety Report"), and Jane Doe's October 18, 2014 formal complaint to Brown about the evening of October 11 ("Oct. 18 Complaint").  Jane Doe's accounts contained stunning departures from John Doe's recollection, almost as if the two of them inhabited alternative universes while attending the same party that night.

35.  Jane Doe's fearful accounts of John Doe's claimed predations were replete with numerous incongruities and inconsistencies, such as the following:

(i)     To support her claim she had "had a few bad interactions with [John Doe] in the past," she noted a single time he allegedly called her "spacey."

(ii)    In spite of these prior, unnamed "bad interactions," she did not explain why that night she talked with John Doe in the first place, chose to "make out" with him and she stayed with him for more than two hours.

(iii)   Despite Jane Doe's claim that only John Doe knew the location of a second party, the rest of their group continued onto that party after John Doe and Jane Doe drifted off.

(iv)    Though Jane Doe stated she wanted to stay with her friends and avoid being alone with John Doe, she never explains why she never picked up and left, despite having the opportunity to do so during the entire evening.

(v)     While Jane Doe was together with John Doe inside his room, her friend (A.D.) called to warn her that her friends got "bad vibes" from John Doe, and she should make an excuse to leave.  Despite this, Jane Doe told A.D. she was fine and could take care of herself, and texted him that John Doe wasn't that horrible.

(vi)    In the Oct. 18 Complaint, Jane Doe states John Doe wrapped his arms around her, told her she was "so beautiful" and led her to the bed; however, in the Oct. 17 interview, she claims John Doe walked towards her, forced her to walk backward and pushed her on the bed.

(vii)   Facebook photographs of Jane Doe less than 24 hours after their encounter later show no visible marks on her lip or neck that would indicate any biting or aggression occurred the prior evening, contradicting her claims

9

that John Doe kept biting her lip, bit her neck really hard and "gnawed at the skin and pulled away so that it really hurt."

(viii)   In the Oct. 18 Complaint, she states that she lay on top of John Doe when they kissed, but in her Oct. 17 interview, she states that John Doe climbed on top of her, continued to kiss her, and bit her lips and neck several times in an aggressive nature.

(ix)   In her Oct. 18 Complaint, Jane Doe stated she felt "threatened" without specifying the reason(s) why that was the case, that she "felt more and more unsafe" but didn't know how to leave, and that she never asked to leave.   Yet in her Oct. 17 interview, Jane Doe claims that she "asked to leave several times and was not allowed to go" without also acknowledging that (1) the door was unlocked, (2) she could have stated her objection to continuing, (3) she was free to leave at any time and (4) she did not voice any of these purported thoughts to John Doe at any time.

(x)   In the Oct. 18 Complaint, Jane Doe states that John Doe began to "finger" her on his couch. However, in her Oct. 17 Public Safety Report, Jane Doe claims that the "fingering" occurred on his bed, and makes no mention of a couch.

(xi)   In her Oct. 17 Public Safety Report, she claims she told John Doe to "stop" fingering her. Yet, Jane claims in the Oct. 18 Complaint that she told John Doe she "liked it."

(xii)   In the Oct. 18 Complaint, Jane Doe states that it "hurt so bad that I couldn't let him continue," but then admits that she reached down and moved his hand on her genital area and instructed John Doe to go slower and softer, instead of telling him "no" or to "stop."

(xiii)   Jane Doe never states in either her Oct. 17 Public Safety Report or Oct. 18 Complaint that she said "stop" or "I don't want to do this." However, her witness, L.S., states that Jane Doe told her she said both of these things to John Doe.

(xiv)   Jane Doe acknowledges that John Doe confirmed that her consent was still ongoing when he asked if she liked him "fingering" her, to which she responded that she did.

(xv)   Claiming that John Doe wanted to make her achieve orgasm, Jane Doe stated, "I thought that if I made it seem like I had he would stop and I could leave" and proceeded to make noises like she was having an orgasm.   She now claims that her outward expressions and statements were all a lie at the time.

10

(xvi)   In her Oct. 18 Complaint, Jane Doe claims that she left John Doe's room in a rush and "put her shoes on without socks."   However, no socks (belonging to Jane Doe) were ever located in John Doe's room following the incident. Jane Doe made no mention of leaving in a rush or leaving without socks in her Oct. 17 Public Safety Report.

(xvii)   The day after the incident, Jane Doe texted a friend (L.S.) that she got "rapey vibes," left "so we didn't have sex" and that she is "covered in bruises." However, none of the Facebook photographs of Jane Doe taken less than 24 hours after the incident show bruises on her lips or neck, i.e. the alleged areas of attack.  Jane Doe's medical records do not report any bruising on her lips or neck, and the exam noted "normal external female genitalia," "no skin abrasions," and that an internal exam was "declined by patient."

36.   Taken aback by these outrageous and unfounded allegations, John Doe believed that a proper investigation would exonerate him from the charges set forth in the Notice of allegations.

**D.   John Doe's Attempts To Focus Brown On His Evidence**

37.   On or about October 29, 2014, John Doe submitted to Dean Castillo his personal written statement, a list of five witnesses and eight Facebook photographs of Jane Doe taken the night after the incident, which show the absence of any bruises on her neck and lips, which were the areas she claims were "attacked" in her Oct. 17 Public Safety Report and Oct. 18 Complaint.

38.   Among the list of witnesses in support of his defense of the Charges were L.B., V.P., E.S., T.V. and A.C.  John Doe advised Dean Castillo that all of the witnesses were present with John Doe and Jane Doe on October 11 or witnessed relevant events thereafter, or both.  She assured John Doe that Brown would contact these witnesses and consider their statements.

39.   Despite Dean Castillo's assurances, Brown did not contact any of the witnesses John Doe listed.  By the time these material witnesses received emails asking for their statements, John Doe had already received notification that he was being formally charged with four Code

violations.   In contrast, Brown contacted all of Jane Doe's witnesses and collected statements from them prior to providing John Doe with formal notice of the Charges against him.

40.   At all times, Dean Castillo acted as the investigator and case administrator of John Doe's case.   In these roles, it was her responsibility to be fair and impartial to both accuser and respondent;   however, Dean Castillo utterly failed to perform her responsibilities either competently or fairly, as the following examples demonstrate:

a.   While the Code requires case administrators to "respond to requests from respondents and complaining witnesses during the pre-hearing phases of the student conduct procedures" (See Code, p. 10, **Exhibit A**), Dean Castillo either never responded or when she did respond, did not address John Doe's questions about the process, concerns about the lack of evidence gathering, requests to view evidence or requests for additional time to prepare his defense.

b.   While her duties obliged Dean Castillo to investigate *both* sides of the story, Dean Castillo approached her task with the bias of her previous career as an attorney who defended domestic violence victims. In a prior case (*McCormick v. Dresdale)*, in which Brown was sued for its alleged failure to fairly investigate charges of sexual misconduct against an accused male student, the plaintiff alleged that Dean Castillo had a conflict of interest because she both assisted in the investigation of the claim and in the hearing to decide it.

E.   **Brown's Defective and Unfair Prehearing Procedures**

41.   In a letter dated November 5, 2014 (**Exhibit E**, referred to below as "Notice of Charges"), Brown notified John Doe that he was formally charged with the four Code violations set forth in the Notice of Allegations (**Exhibit C**), and that a Student Conduct Board would hear the charges on November 14**,** 2014 at 9:00 a.m. ("Hearing").

42.   During the course of the student conduct process, Jane Doe admitted she consumed alcohol that night as a minor; however, upon information and belief, Brown saw fit *not* to charge her with this University offense even while pursuing the same charge against John Doe based on the same evidence.   The only difference between John Doe and Jane Doe is their gender.

43.   In the Notice of Charges, Brown provided John Doe with the evidence on which the Charges were based:

- The Oct. 17 Public Safety Report;

- The Oct. 18 University Complaint

- Personal Statement from John Doe

- Eight unsigned, unsworn witnesses statements from the Complainant's witnesses; and

- Eight photographs of Jane Doe on the evening of October 12.

44.   Brown did not include any statements from John Doe's witnesses, even though he submitted his list on October 29.  By (apparently) failing to contact John Doe's witnesses prior to issuing the Notice of Charges, Brown violated its duty to review materials collected from all parties to determine whether to file student conduct charges.  Investigation Guide, **Exhibit D**, p. 3

45.   In her Oct. 17 Public Safety Report, Jane Doe agreed to submit all text messages between herself and her friends A.D. and L.S. from the evening of October 11.  However, the inventory of evidence did not include any of these messages, such as the ones witnesses described in which Jane Doe stated that John Doe wasn't that horrible, or that she got "rapey vibes" (and, as a result, did not have sex) or that she was "covered in bruises."  The inventory of evidence also lacked any further evidence to support of Jane Doe's statement she allegedly "had bad interactions with [John Doe] in the past" other than that he once called her "spacey."  When John Doe requested via letter a copy of this evidence, Brown failed to respond.

46.   Due to a personal family medical issue, John Doe requested a 2-week continuance so that he could sufficiently focus his time on preparing his defense of the Charges.  Instead, Dean

Castillo granted a 1-week continuance and rescheduled the Hearing to November 21, 2014. When John Doe subsequently learned his parents could not attend the November 21 Hearing due to the persistence of the family medical issue, he renewed his request for a second week of continuance. Even though John Doe was already separated from the campus and therefore only he (and not Jane Doe) was harmed by such a delay, Brown denied the request a second time.

47.   While John Doe's Hearing was pending, Brown announced on November 14, 2014 the anticipated issuance in December of an Interim Report from a Sexual Assault Task Force. It is likely that the individuals who sat on John Doe's panel were aware of Brown's increased vigilance prior to making a decision on the Charges, including the Department of Education's investigation of Brown's handling of sexual misconduct cases.

48.   The Interim Report (issued on December 17, 2014) recommended changes including the following:

- Training and utilizing professional investigators/fact-finders to investigate student conduct complaints of sexual misconduct.

- Requiring all decisions to state the rationale for findings and sanctions.

- Developing extensive campus-wide education and training programs for sexual misconduct.

- Providing additional annual funding dedicated to respond to the needs of complainants and respondents.

- Adopting a new "Sexual Harassment, Sexual Violence, Relationship Violence and Stalking Policy" that provides a 1.5 page definition of "Consent," which includes an "outward demonstration" in "words or actions" and will be evaluated by a "reasonable person" standard.

49.   The Code provides that respondents will have seven business days to review all materials that will be presented at a disciplinary hearing. See Code, p. 16, **Exhibit A**. Despite

this, Brown waited until November 17, 2014 at 5:17 p.m., less than four days before the hearing, to provide a package of 80 pages of critical evidence and procedural information.  The package included 23 additional unsigned, unsworn statements, an addendum by Jane Doe and an addendum by K.R.; text messages between John Doe and K.R. from October 12, 2014, and Jane Doe's medical records from Brown Health Services from her visit on October 15, 2014.

50.   The November 17 package also contained an Opening and Questioning Timeline describing the agenda for the Hearing, and the sequence of when each party and witness would have the opportunity to speak. The Opening and Questioning Timeline indicated when John Doe would have the opportunity to make his opening, midpoint and closing statements.

51.   The enclosed text messages between John Doe and K.R. were assembled in an anachronistic and confusing sequence which created the false appearance that John Doe was apologizing for his actions on October 11, when in fact, he was actually apologizing for not realizing Jane Doe was upset and for not speaking to her the next day.  By withholding this evidence until barely three days prior to the Hearing, Brown University violated the 7-day advance notice rule contained in the Code.

52.  In Jane Doe's addendum, she stated, "But I thought that maybe if I put my boundaries in terms he could understand he would listen, so I agreed that I 'just wasn't that type of girl,' and said that 'this just isn't something I do,' **referring to sex**" (emphasis added).  In this way, Jane Doe acknowledged telling John Doe a set of "boundaries" he stayed within during their time together.

53.   When reviewing the packet, John Doe learned that Brown had redacted a critically relevant portion of one of his witnesses' statements. In the redacted portion, a witness described her prior physical experience with John Doe, bolstering the credibility of his defense.  When

15

John Doe asked for an explanation for this redaction, he was advised that Dean Castillo redacts material that she deems irrelevant and cited "University policy." However, Brown's redaction of L.B.'s statement was a violation of John Doe's right to be "accorded an opportunity to offer a relevant response," which is also University policy. <u>See</u> Sections (E), Code, p. 7, **<u>Exhibit A</u>**.

54. Dean Castillo excluded the majority of John Doe's character witness letters from the record on the grounds that the authors had "no connection to Brown University" and did not possess information directly relevant to the case. This exclusion was unreasonable, arbitrary and prejudicial in light of the fact that virtually all of John Doe's character witnesses were teenage women who have known John Doe for many years and have observed his conduct with other females in intimate and casual settings to be gentlemanly and not aggressive. Brown's preclusion of John Doe's character witness statements constituted a violation of John Doe's right to be "accorded an opportunity to offer a relevant response." <u>See</u> Sections (E), Code, p. 7, **<u>Exhibit A</u>**.

55. On the inventory list of the final case file packet, Dean Castillo indicated that there were 15 character witnesses for John Doe, which included 6 character witnesses who were non-Brown University students. However, the actual statements for the 6 non-Brown University students were not included in the packet and never forwarded to the student conduct board.

56. For a third time, John Doe requested that the Hearing be rescheduled for a later date, this time so that he could adequately prepare for his defense at the Hearing with the minimum window of time Brown should have provided as a due process right under the Code. Specifically, John Doe needed time to consult with medical professionals to thoroughly examine and decipher the diagnostic codes contained in Jane Doe's medical records to (a) evaluate and investigate Jane Doe's claims of sexual assault; and (b) evaluate and investigate the size, shape, color, severity and possible cause of her bruises.

16

57.  However, Dean Castillo denied John Doe's reasonable request for more time and, citing to the upcoming Thanksgiving holiday, advised that the Hearing would proceed on November 21, 2014 as scheduled.

58.  Dean Castillo gave no reason for this prejudicial decision.  The Code (See Code, p. 11, **Exhibit A**) specifically provides that "[a] hearing or deliberations may be conducted on a Saturday, a Sunday, or a University holiday."  The Code also provides that hearings shall be conducted within sixty calendar days from the receipt of the complaint. See Code, p. 11, **Exhibit A**. Jane Doe's initial complaint to Brown was dated on October 17, 2014, which was a mere 35 days earlier than the scheduled hearing date on November 21, 2014. Furthermore, John Doe was banished from campus, so he alone bore the cost of delay, while Jane Doe was fully protected due to the prior, draconian exclusion order.  As a result, there was no rational basis for denying John Doe a reasonable extension of time to thoroughly evaluate and investigate his belated receipt of such additional evidence.

59.  It should be noted that during this time, the stress of the student conduct process and defense of the allegations took its toll on John Doe's education, causing him to drop a class he would have otherwise completed.

60.  Dean Castillo's denial was a clear violation of Brown's regulations, which require that the respondent will receive a copy of all case materials at least 7 days before the hearing. Code, p. 16.  In the Code, Brown defines "days" to mean business days, not "weekends or University holidays".  See Code, p. 11, **Exhibit A**.  Dean Castillo's refusal also constituted a violation of John Doe's rights and responsibilities to "have a reasonable length of time to prepare a response to any charges," "to be informed of the evidence upon which a charge is based and

accorded an opportunity to offer a relevant response," and "be given every opportunity to articulate relevant concerns and issues…"  <u>See</u> Sections (D), (E) and (F), Code, p. 7, **Exhibit A**.

61.   Brown's unjustified denial of John Doe's request for more time to prepare his defense was prejudicial to his defense, as there were medical records from Brown Health Services and Women and Infants Hospital of Rhode Island included in the packet of evidence that he could not decipher in time for the Hearing.  Ultimately, this was compounded by the fact that none of the witnesses from Women and Infants Hospital of Rhode Island would end up appearing at the Hearing.

62.   The day before the Hearing, Brown informed John Doe that it was appointing Senior Associate Dean of Residential and Dining Services Richard Bova as a substitute member of the hearing panel.  Brown's lack of timely notice deprived John Doe of adequate time to exercise his right under the Code to investigate the last-minute panelist for possible conflicts of interest. <u>See</u> Code, p. 9, **Exhibit A**. Had John Doe been allowed sufficient time, he would have learned that Mr. Bova was named in a previous federal lawsuit (*McCormick v. Dresdale*, *supra*) by a Brown student who claimed his rights were violated in a sexual misconduct investigation.

63.   Notwithstanding Brown's denial of his right to an adequate opportunity to prepare a defense, John Doe made a good faith effort to prepare for the Hearing.

**F.  Brown's Unfair Hearing, Erroneous Decision & Disproportionate Sanction**

64.   On November 21, 2014, Brown held a Student Conduct Board Hearing on all four charges.  The hearing panel consisted of: (i) Professor and Interim Chair of French Studies Gretchen Schultz; (ii) Senior Associate Dean of Residential and Dining Services Richard Bova; and (iii) Undergraduate student Yao Liu (collectively, the "Panel").  Apparently, Dean Castillo was also present and took an active role as the case administrator of the Hearing process.

18

65. The Code prescribes unequal rights of representation to the Complainant and Respondent at the hearing. As the Complainant, Jane Doe was provided a University Advocate, who sat next to her, regularly communicated with her and participated in the hearing. Jane Doe also was allowed an advisor, who was allowed to communicate with Jane Doe, address Dean Castillo and interrupt John Doe's testimony. Jane Doe was allowed to appear with an attorney, but her attorney was not allowed to speak during the Hearing.

66. In contrast, John Doe was not provided with a University Advocate. He was allowed to engage his own attorney; however, the Code prohibited his attorney from assisting him during the Hearing. See Code, p. 15, **Exhibit A**. The Hearing Panel did not allow John Doe to speak with his attorney.

67. Instead, John Doe's only representative at the hearing was his faculty advisor, Ms. McMillan, who lacked the training and skills to provide John Doe with adequate assistance in a hostile, adversarial process.

68. The two parties were not treated equally when they testified. Jane Doe went first. She was allowed to speak for 20 minutes, punctuated occasionally by calm, non-aggressive questions. Nobody asked her about the numerous inconsistencies in her statements. Any explanations she provided, no matter how irrational, were taken at face value as the truth. When she admitted to underage drinking, that night, nobody made an issue of it despite the fact that John Doe had been charged for discipline for the exact same conduct. It was also clear from her use of "buzz words" in her testimony that she was well prepared by the University Advocate and her advisor.

69.   Ms. McMillan's cross-examination of Jane Doe was ineffective, in part because she refused to make use of an extensive outline from John Doe that detailed the multiple inconsistencies in the Complainant's three accounts of the event.

70.   The Hearing Panel also failed to perform its duty to ask Jane Doe questions to assess her credibility.  The Panel questioned Jane Doe for a mere 15-20 minutes in a respectful, calm and conversational manner, avoiding, among other things, the several serious gaps in her testimony.  For example, Jane Doe's account of the injuries she suffered that evening was at odds with the physical evidence before the Panel:

- Jane Doe's medical report noted several yellow bruises, but they were not in the locations where she claimed to have been bruised.

- The medical reports noted that she had no bruises on her neck, even though her written and oral testimony referred John Doe's alleged "biting and gnawing" at her neck at least four different times, which, if true, would have resulted in noticeable marks and/or bruising.

- The photographs taken at Women and Infants Hospital of Rhode Island, which allegedly depicted Jane Doe's bruises were "lost" and not introduced at the Hearing.

- Although two witnesses from Women and Infants Hospital of Rhode Island were slated to provide testimony about Jane Doe's medical exam, Brown's lawyer stated that he "could not get a call back" so the witnesses would not be showing up for the Hearing.

- Eight Facebook photographs submitted by John Doe reflecting no bruising on Jane Doe's neck or cuts on her lips less than 24 hours after the incident. Instead, the Panel dismissed these photographs as inappropriate invasions of Jane Doe's privacy.

71.   The Panel failed to explore the countless inconsistencies between and within Jane Doe's October 17 and October 18 statements, as well as the inconsistencies between her account

and those of her witnesses, John Doe and John Doe's witnesses.  For example, the Panel failed to

ask Jane Doe:

    a.   Why she was okay with John Doe's "fingering";

    b.   Why she reached down and moved his hand on her genital area instead of pulling his hand away;

    c.   Why she asked John Doe to "go slower" at this time;

    d.   Why she never said, "I don't want to do this" or "Stop," or even "No" that night to John Doe;

    e.   Why her timeline of events diverged materially from the consensus timeline provided by both her own witnesses and John Doe;

    f.   Why she had engaged in illegal underage drinking that evening;

    g.   Why she did not call out for help when someone knocked on the door.

72.  The Panel also indulged Jane Doe's convenient, unconventional definitions of

commonly used terms. When one Panel member asked what she meant in her October statements

by "John Doe pushed me," Jane Doe admitted that she did not mean "push" in the physical sense

but, rather, in the verbal sense.  When questioned what she meant by her "hook up" group text

message sent just an hour before her intimacy with John Doe, Jane Doe claimed that she meant

"just kissing." The Panel bolstered Jane Doe's claim by stating that "studies show" "hook up"

can mean anything. The Panel flatly ignored contradictory evidence of Jane Doe's written

addendum (received on November 17) where she states "But I thought that maybe if I put my

boundaries in terms he could understand he would listen, so I agreed that I just wasn't that type

of girl, and said that this just isn't something I do, **referring to sex**" (emphasis added).

73.  Finally, the Panel allowed her to justify inconsistencies by accusing Detective Peck

of erroneously transcribing her verbal testimony in her Oct. 17 Public Safety Report.  Jane Doe's

testimony was accepted as gospel and remained unchallenged. The Panel failed to ask Jane Doe basic questions to demonstrate their quest for the truth.

74. In contrast, the Panel did not provide John Doe an adequate opportunity to testify. The Opening and Questioning Timeline (provided to John Doe on November 17) allowed John Doe the opportunity to provide an opening statement (before Jane Doe testified) and a midpoint statement afterwards.  Because Jane Doe had the burden of proof, John Doe elected to make a brief opening statement, and use his midpoint statement to provide an extensive response to Jane Doe's extended testimony.  To his surprise and harm, however, the Panel denied John Doe an adequate opportunity to defend himself.   Instead, Jane Doe's advisor requested (without stating any justifying reason) that John Doe be shut down only a few seconds into his mid-point testimony, and the Panel granted this request.  As a result, John Doe was prevented from responding to Jane Doe's 20-minute testimony about her version of the events on October 11.

75. Additionally, when John Doe sought to explain the correct sequence and order of the text messages between himself and K.R. on October 18, the Panel looked at John Doe with confusion and quickly dismissed his explanation and moved on.

76. In contrast to the Panel's supportive treatment of Jane Doe, the Panel questioned John Doe for 90 minutes in a caustic tone.  At one point, the questioning became so contemptuous and outrageously irrelevant that the Panel allowed Jane Doe's advisor to pose a question about his hypothetical proclivity toward anal intercourse.

77. The Panel also failed to investigate potential motives or biases of any witnesses named by Jane Doe, including K.R., who demonstrated her premature judgment of John Doe before a formal complaint was ever filed. C.L., another friend of Jane Doe's, testified that he observed injuries on Jane Doe after the incident, which was a material fact never mentioned in

his written statement during the investigation.  When John Doe's advisor confronted him about this significant omission, C.L. took a long pause and stated, "Uhh…I don't know."  This was a significant failure in light of the lack of physical evidence or disinterested witnesses.

78.  John Doe had no material opportunity to defend the allegations against him.  It was clear from the selective use of the evidence, witness statements and medical reports, and slanted view of the facts in favor of the complainant that the Panel did not intend to get to the truth. The Hearing was a mere formality to conclude John Doe's predetermined guilt.

79.  Credibility and character of the accuser is critical when the accused is faced with a charge that amounts to nothing more than "he said, she said".  However, Brown failed to perform any analysis of credibility of Jane Doe and failed to do the same for her witnesses, including K.R.

80.  Also, without a definition of "Consent" under the Code, John Doe was prevented from adequately defending against the uncontested fact that Jane Doe did not voice any objections to John Doe during their encounter on October 11; whatever thoughts or feelings Jane Doe claimed she had that she did not consent to him "fingering her" were in direct contravention with her outward actions of "faking" an orgasm, moving his hand on her genital area instead of pulling it away, and statements that she liked what he was doing and told him to go slower, instead of "stop."

81.  Upon information and belief, Brown erroneously placed the entire burden on John Doe to prove his innocence, instead of setting forth competent evidence to demonstrate how John Doe allegedly engaged in non-consensual "fingering" and physical force.

82.  Ultimately, on December 2, 2014, John Doe was found "responsible" for all four Charges, namely: (i) Actions resulting in physical harm to others; (ii) Sexual Misconduct: non-

consensual sexual contact; (iii) Sexual Misconduct: non-consensual sexual penetration; and (iv) illegal possession or use of alcohol ("Decision").   The Decision was signed by Margaret Klawunn, who, once again, was not even present for the Hearing.

83.   As a result of being wrongfully found "responsible" for violating Brown's policies, John Doe was sanctioned to a 2.5 year suspension, notwithstanding his otherwise unblemished disciplinary record ("Sanction"). There was absolutely no rationale provided for the Sanction.

84.   Yet, in a widely publicized 2014 sexual misconduct case brought by Brown student, Lena Sclove, involving allegations of "strangulation and rape," the accused student was found "responsible" and sanctioned to a one-year suspension.  See U. Mishandled Sexual Assault Case, Victim Says, *available at* http://www.browndailyherald.com/2014/04/23/u-mishandled-sexual-assault-case-victim-says/ (last visited March 30, 2015). In reply to Ms. Sclove's public outcry, standing behind Brown's Sanction of the accused student, Margaret Klawunn stated that "the precedent of similar cases needed consideration" when making a sanctions determination. See U. Mishandled   Sexual   Assault   Case,   Victim   Says,   *available   at* http://www.browndailyherald.com/2014/04/23/u-mishandled-sexual-assault-case-victim-says/ (last visited March 30, 2015). Notwithstanding, no such consideration was made in the instant case involving allegations of a dramatically lesser scale (alleged non-consensual touching) when Brown decided that a 2.5 year suspension was warranted against John Doe.

### G.  Appeal of the Sanction

85.  On December 9, 2014, John Doe filed an appeal of the Decision, citing disproportionate sanctions, procedural errors, and an utter disregard for due process ("Appeal").

86.  On December 22, 2014, Deputy Provost Joseph Meisel upheld the Decision and denied John Doe's Appeal on the following reasons:

(1)     John Doe was advised on October 27 to submit additional witness statements, but he failed to do so.

(2)     The "hook up" group text message sent by Jane Doe is irrelevant.

(3)     The Facebook photographs of Jane Doe less than 24 hours after the incident are irrelevant.

(4)     Jane Doe's statement "I don't think we should go further than this tonight" was referring to kissing.

(5)     The redacted portion of L.B.'s statement regarding her prior physical experience with John Doe was redacted as a matter of standard university policy.

(6)     John Doe was only entitled to one character witness statement as a matter of standard university policy.

87.  In fact, however, all six of the Deputy Provost's stated reasons were materially flawed.

88.  Contrary to Reason (1), John Doe did, in fact, submit a witness list on October 29, but his witnesses were still not contacted by November 5.

89.  Contrary to Reason (2), the "hook up" group text was relevant because it refuted her claim that she went to John Doe's room to only kiss, and corroborated her November Addendum statement that she "thought that maybe if I put my boundaries in terms he could understand he would listen, so I agreed that I 'just wasn't that type of girl,' and said that 'this just isn't something I do,' **referring to sex**" (emphasis added).

90.  Contrary to Reason (3), the Facebook photographs, which show an absence of any bruises on Jane Doe's neck or cuts on her lips less than 24 hours after the incident, refute her claim that she suffered bruising as a result of physical force by John Doe.

91.  Contrary to Reason (4), Jane Doe stated in her October 18 Complaint that she told John Doe she "liked it" when John Doe continued touching her that night.

92.   Contrary to Reason (5), L.B.'s statement regarding her prior physical experience with John Doe was relevant to support his credibility in defense of the Charges.  Also, Brown can point to no policy prohibiting the introduction of this evidence as a "defense" to charges of sexual misconduct, because no such policy exists.

93.   Contrary to Reason (6), Brown's policy on the allowable number of character witness statements is "unlimited," and is not limited to merely one character witness statement. Brown's claim that this was a basis for denying the Appeal also ignores the fact that six of the character witnesses statements in support of John Doe were missing from the case evidence packet and never forwarded to the student conduct board at all.

### H.   Brown's Gender Bias Toward Male Students Accused Of Sexual Misconduct

94.   Upon information and belief, numerous past and present employees of Brown, including professors, administrators and coaches, perceive an inherent and systematic gender bias against male students accused of sexual misconduct at Brown which prevents male students from a receiving fair and impartial hearing when a complaint of sexual assault is made against them by a female student.

95.   Upon information and belief, the student conduct board hearing process is dominated by female administrators, and is, undoubtedly, in favor of female students.

96.   Upon information and belief, Brown promotes an institutional "regime of fear" surrounding the issue of sexual assault, in which administrators and employees are deterred from advocating on behalf of male accused students out of concern for their job security, as reported in the May 26, 2012 issue of the *Brown Spectator*.

97. Upon information and belief, Brown promotes an atmosphere of bias against male students accused of sexual misconduct, including the common notion that any male athlete accused of sexual misconduct will be found responsible and thrown out of school.

98. Upon information and belief, one former Brown employee stated that Brown treats male students as "guilty, until proven innocent," that Brown has "loaded the dice against the boys" and that the fact-finding process in cases of sexual misconduct at Brown operates under the assumption that it's always the "boy's fault."

99. Upon information and belief, Brown treats male students as "adults" who have a "choice" and, thus, are the "responsible" party in sexual encounters, yet, they treat female students as "children" who "never have a choice" in sexual encounters so "they are never responsible" in sexual encounters.

100. Upon information and belief, one Brown professor stated that "there is gender bias that is overwhelming at Brown" when referencing sexual misconduct cases at Brown.

101. Upon information and belief, in December 2014, a Brown professor held a debate to discuss rape issues on campus. During the debate, one female debater remarked that males are "bad" and females are "victims" when it comes to sexual misconduct. The Brown professor stated that these remarks are consonant with the culture of thinking on Brown's campus.

**I.   John Doe's Entire Future is Severely Damaged by Brown's Actions**

102. As a result of Brown's blind acceptance of the accusations made by Jane Doe, defective procedures and unfair punishment, John Doe's reputation is tarnished, his educational career is blocked and his future career prospects are ruined.

103.     Brown's sanction of suspension for 2.5 years has not only interrupted his education, but has also left a stain on his record that will limit his choices to  transfer to another educational institution, and may ultimately block his plans to attend medical school.

104.     As a result of Brown's actions, John Doe's parents' financial resources used to provide John Doe with an education at an esteemed four-year institution have been squandered.

105.     Any attempt to move on with his future in the face of Brown's arbitrary and capricious decisions will be met with great resistance and little success; it is a known fact that the likelihood of his acceptance as a transfer student for an undergraduate degree at an institution with a similar academic reputation and to a graduate institution or medical school of high caliber is reduced in light of the high number of applicants and stiff competition, let alone the social stigma associated with being found responsible for "sexual misconduct."

## V.     Causes of Action

### FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972
### (Erroneous Outcome)

106.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

107.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

108.     Upon information and belief, Brown receives federal funding for research and development.

109.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance

28

procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

110.   In January, 2001, the United States Department of Education, Office for Civil Rights, published a set of compliance standards for Title IX educational institutions to apply in sexual harassment matters, including standards for "Prompt and Equitable Grievance Procedures" and "Due Process Rights of the Accused."  66 F.R. 5512 (referred to below as "OCR Standards").

111.   The OCR Standards require schools not only to "ensure the Title IX rights of the complainant," but also to "accord [] due process to both parties involved."

112.   The OCR Standards require schools to adopt "prompt and equitable" procedures that "accord due process to both parties involved" including, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint..."

113.   The OCR Standards require Title IX schools to ensure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

114.    Brown's overall sexual misconduct complaint program fails to comply with the

OCR standards in several ways, including (but not limited to):

a.    Adopting procedures that afforded greater prerogatives and protections to the (female) accuser than to the (male) accused.

b.    Failing to include a meaningful definition of the term "consent."

c.    Failing to provide adequate training, but instead conducting group meetings for staff in which they participate in "academic exercises" to discuss hypothetical scenarios involving student misconduct.

115.    In its pre-hearing investigation of the complaint against John Doe, Brown

University failed to comply with Title IX's due process standards generally, and the OCR

Standards in multiple ways, including without limitation:

a.    Imposing the interim remedy of banishing John Doe from campus as a "safety threat" before obtaining even a minimum amount of evidence from both sides.

b.    Shutting John Doe out of the Brown community without allowing him an adequate opportunity to review and contest the specific allegations, without conducting a full and fair investigation to corroborate the numerous false charges, and treating him as "guilty" before holding a hearing on the charges.

c.    Failing to perform a thorough and impartial investigation of all evidence from both parties.

d.    Gathering witness statements via email, and failing to confirm the authenticity of authorship.

e.    Failing to interview John Doe's named witnesses.

f.    Failing to investigate beyond the materials voluntarily provided by the parties.

g.    Failing to retrieve documentary evidence (text messages) referred to by witnesses A.D. and L.S. but not provided.

h.    Failing to obtain the testimony of hospital witnesses to review critical physical evidence (medical records).

30

     i.     Ignoring and/or summarily rejecting John Doe's reasonable requests for additional discovery or continuances, resulting in the discovery of major evidentiary gaps at the hearing which could not be addressed appropriately at that time.

116.    In its conduct of the adjudicatory hearing, Brown University failed to comply with Title IX's due process standards generally, and the OCR Standards in multiple ways, including without limitation:

     a.     Effectively presuming John Doe's guilt before an investigation into the Charges was underway.

     b.     Failing to challenge Jane Doe's numerous inconsistencies in her statements or to consider seriously the lack of corroborating photographic evidence of her claims of violence.

     c.     Failing to adequately consider exculpatory evidence or interview key witnesses in support of John Doe's defense.

117.    In reaching its decision and imposing sanctions on John Doe, Brown University deprived John Doe of the due process and equal protection rights required by the OCR Standards by, among other things:

     a.     Finding John Doe responsible as charged under flawed procedures notwithstanding the lack of evidence to corroborate Jane Doe's allegations.

     b.     Finding John Doe responsible of non-consensual "fingering," despite extensive evidence of consent including John Doe's statement, corroborating witnesses, Jane Doe's concessions in her testimony of providing consent and significant issues with Jane Doe's credibility.

     c.     Imposing sanctions on John Doe for underage drinking while excusing his accuser, Jane Doe, of the exact same offense that she freely admitted committing as part of her complaint against John Doe.

     d.     Failing to investigate or charge Jane Doe with violation of the Code for misrepresentation during the course of the student conduct board hearing process (Offense X(a) and (b)), notwithstanding evidence that Jane Doe's

accounts on October 17 and October 18 varied greatly, and contained internal inconsistencies.

e.     Failing to provide a written statement of the reasons for its finding of John Doe's responsibility, or the basis for the sanctions it imposed.

f.     Imposing sanctions that were unwarranted and disproportionate to the severity of the charges levied against him and without any consideration of his clean disciplinary record at Brown, the submission of numerous character statements by individuals who have known John Doe for years.

118.   Brown has deprived John Doe, on the basis of his sex and association with his historic all-male residential fraternity, of his due process and equal protection rights through the promulgation of guidelines and regulations that are unfair and imbalanced, and the failure to implement the limited protections that appear in those guidelines and regulations

119.   Brown's violations were knowing, as the University had notice of the flaws in its sexual misconduct program from multiple sources, including:

a.     A previous lawsuit naming Dean Castillo, Dean Klawunn and Dean Bova for similar alleged transgressions in *McCormick v. Dresdale*, *supra*.

b.     The information gathered by Brown's Sexual Assault Task Force, which proposed several revisions to the Code to address the flaws in John Doe's case, including (i) utilizing trained professional investigators/fact-finders to investigate student conduct complaints of sexual misconduct; (ii) including a rationale for all decisions and sanctions; (iii) developing extensive campus-wide education and training programs for sexual misconduct; (iv) dedicating additional annual funding to respond to the needs of complainants and respondents and (v) establishing a clear definition of the term "consent" to mean "outward demonstration" in "words or actions" to be evaluated by a "reasonable person" standard.

120.   On information and belief, Brown's flawed program and mishandling of John Doe's case were symptomatic of a broader culture of inherent, systematic and intentional gender bias against male students accused of sexual misconduct, through which male students are unable

to receive a fair and impartial student conduct process when a complaint of sexual assault is made against them by a female student.

121.   On information and belief, Brown sacrificed John Doe's rights to the expediency of accommodating institutional pressures.  During the pendency of John Doe's case, Brown was under investigation by the Department of Education Office of Civil Rights for its handling of sexual misconduct cases under Title IX, and faces severe financial consequences if the Department determines that Brown does not deal with sexual assault in a way the Department feels is appropriate

122.   Brown has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt.  Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Brown on the basis of his sex.

123.   Upon information and belief, Brown's handing of John Doe's case fits within a pattern of showing gender bias toward female students in cases of sexual misconduct, including its conduct in: (i) *McCormick v. Dresdale*, *supra*; (ii) a sexual misconduct case against former Brown student Adam Lack (Class of 1997); and (iii) other instances documented in the *Brown Daily Herald* (April 29, 2010) and the *Brown Spectator* (May 26, 2012).

124.   Upon information and belief, former and present Brown employees and/or administrators

   a.   recognize the great miscarriage of justice to the male accused students in sexual misconduct cases at Brown, but are unable to change things because they are fearful of losing their jobs.

   b.   recognize that Brown treats males as "guilty until proven innocent" in cases of sexual misconduct and have a pattern and practice of taking the

female student's allegations at face value and banishing male students
from campus without first hearing the male student's version of the story.

125.    Brown's policies effectuate a failure of due process for the student population, especially the male student population, in their current state because they encourage and facilitate the reporting of potentially false reports of sexual misconduct and/or other grievances without any recourse for those who may be falsely accused.

126.    Brown University's program disproportionately affects the male student population of the Brown community as a result of the higher incidence of female complainants against male respondents (as opposed to male complainants against female respondents) for allegations of sexual misconduct. Brown's intent to discriminate against male students accused of sexual misconduct is evident in, *inter alia*, Brown's notice and knowledge of this significant gender-based statistical disparity, and its insistence on maintaining policies that carry out these pro-complainant and anti-respondent biases.

127.    Male respondents in sexual misconduct cases at Brown are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

128.    Brown's gender-biased policies also suits its institutional convenience, accommodating pressures imposed upon it by the recent national media focus on campus sexual misconduct and Brown's investigation by the Department of Education Office of Civil Rights.

129.    Based on the foregoing, Brown engaged in a series of actions that ultimately resulted in the Panel's erroneous finding that John Doe was responsible for physical harm to Jane Doe and sexual misconduct. The Panel's Decision was the result of disparate treatment of John Doe on the basis of his male gender.

34

130.    In addition to the lack of evidence against John Doe, there were numerous procedural flaws that resulted in the Panel's erroneous outcome. For instance, Brown failed to retrieve documentary evidence (text messages) referred to by Jane Doe's witnesses where she advised her friends that she felt safe with John Doe.  Brown failed to interview John Doe's named witnesses before initiating formal charges of misconduct against John Doe. Also, Brown failed to challenge Jane Doe's numerous inconsistencies in her statements or seriously consider the lack of corroborating photographic evidence of her claims of violence.  Contrary to Jane Doe's claim to have sustained physical harm and bruising, Facebook photographs of Jane Doe taken less than 24 hours after the incident do not show bruises on the alleged areas of attack. Jane Doe concedes that she provided consent from an objective perspective when she admitted, "I thought that if I made it seem like I had he would stop and I could leave" and proceeded to make noises like she was having an orgasm.

131.    Moreover, while John Doe and Jane Doe provided evidence that Jane Doe's outward actions demonstrated consent, Brown still proceeded to find John Doe responsible of sexual misconduct and assault.

132.    In the face of such damning contradictory evidence, the Panel's finding that John Doe was responsible for the misconduct alleged is fatally flawed.

133.    The erroneous outcome of the Hearing and Appeal can therefore only be attributed to gender bias against males in cases involving allegations of sexual misconduct. This bias is reflected in the patterns of decision making and procedural missteps demonstrated by Brown throughout the entire investigative process.

134.    Moreover, upon information and belief, in virtually all cases of campus sexual misconduct at Brown, the accused student is male and the accusing student is female. Brown has

35

created an environment in which it is impossible for a male student accused of sexual misconduct to receive the due process guaranteed by Title IX. This significant gender-based disparity demonstrates discrimination against male students on the basis of their sex. In fact, Brown treats male students accused of sexual misconduct as "guilty until proven innocent" based on invidious gender stereotypes.

135.    Brown is primarily concerned with its image and reputation to potential incoming students, rather than its obligations to provide a fair and equitable investigative process.

136.    Therefore, John Doe suffered an erroneous outcome when the Panel found him responsible for physical harm to Jane Doe and sexual misconduct. The Panel's Decision was the result of disparate treatment of John Doe on the basis of his male gender.

137.    Brown's violations of its obligations under Title IX proximately caused John Doe to sustain tremendous damages, including, without limitation, emotional distress, economic injuries, reputational damages, and the loss of educational opportunities and other direct and consequential damages.

138.    John Doe is entitled to compensatory damages for the harm he suffered as a result of Brown's violation of its Title IX obligations.

139. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**SECOND CAUSE OF ACTION**
**<u>Violation of Title IX of the Education Amendments of 1972</u>**
**(Deliberate Indifference)**

140. John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

141. On December 9, 2014, John Doe filed his Appeal of the Decision to Dean Deputy Provost Joseph Meisel citing disproportionate sanctions, procedural errors, and an utter disregard for due process.  As a result, Brown had actual notice of the procedural errors committed by Vice President Klawunn, Dean Castillo, and the Panel members, their investigative and procedural missteps, failure to engage in impartial fact finding, failure to fairly weigh evidence presented by John Doe vs. Jane Doe, and overall institutional gender bias against John Doe as the male student accused of sexual misconduct during his student conduct proceeding, all of which led to the erroneous Decision.

142. Despite this actual notice of Brown's misconduct and the resulting harm to John Doe, Deputy Provost Joseph Meisel failed and refused to take any steps to correct the misconduct and resulting harm to John Doe despite that he had the authority and obligation to take such corrective measures.

143. Deputy Provost Joseph Meisel's failure and refusal was the result of gender bias against John Doe as the male student accused of sexual misconduct.

144. John Doe sustained and continues to sustain the effects of Brown's deliberate indifference.  Brown's failure and refusal constitutes unlawful discrimination against John Doe on the basis of his male gender in violation of Title IX.

145.  Brown's failure and refusal proximately caused John Doe to sustain tremendous damages to his educational career and future employment prospects, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

146.  As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## THIRD CAUSE OF ACTION
### Breach of Contract

147.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

148.    Brown's Code (**Exhibit A**) represents a contractual commitment to John Doe.

### A.  Breach of Covenant to Uphold Individual Integrity

149.    Brown's policy on individual integrity requires that members of the Brown community will be truthful and forthright. See Code, p. 1, **Exhibit A**. Brown expects that community members will not engage in behavior that has serious ramifications for the safety, welfare, academic well-being, or professional obligations of others.  **Id**.

150.    Brown has failed to hold Jane Doe accountable for individual integrity, which has caused serious ramifications for the welfare and academic well-being of John Doe in violation of Brown's guidelines and regulations.

151.    In committing egregious violations of John Doe's rights during the student conduct board hearing process, Dean Castillo and Dean Klawunn failed to act with individual integrity, which has caused serious ramifications for the welfare and academic well-being of John Doe in violation of Brown's guidelines and regulations.

152.    Brown's failure to hold Jane Doe, Dean Castillo or Dean Klawunn accountable for individual integrity breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### B.  Breach of Covenant Not to Discriminate Against John Doe

153.    Brown agreed to allow its community members to live in a discrimination- and harassment-free environment. See Code, p. 3, **Exhibit A**.

154.    On Brown committed numerous investigative and procedural missteps, failed to engage in impartial fact finding, failed to fairly weigh evidence presented by John Doe vs. Jane Doe, and harbored an overall institutional gender bias against John Doe as the male student accused of sexual misconduct during his student conduct proceeding, all of which led to the erroneous Decision.

155.    Brown's discrimination of John Doe on the basis of his male gender breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### C.  Breach of Covenant to Uphold its Alcohol Policy

156.    Brown prohibits the illegal possession or use of alcohol, which is considered an Offense V(a). See Code, p. 4, **Exhibit A**.

157.    During the course of the student conduct process, Jane Doe admitted she consumed alcohol that night as a minor; however, upon information and belief, Brown saw fit *not* to charge her with this University offense even while pursuing the same charge against John Doe based on the same evidence.  The only difference between John Doe and Jane Doe is their gender.

158.    Brown's failure to investigate or charge Jane Doe with a violation of the alcohol policy breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### D.  Breach of Covenant to Uphold its Misrepresentation Policy

159.    It is a violation of the Code to make material misrepresentations to a University official, including during the course of a student conduct hearing. See Code, pp. 5-6, **Exhibit A**.

Lying in the course of a student conduct hearing constitutes an offense that is immediately actionable. **Id**.

160.    Failing to investigate or charge Jane Doe with violation of the Code for misrepresentation during the course of the student conduct board hearing process (Offense X(a) and (b)), notwithstanding evidence that Jane Doe's accounts on October 17 and October 18 varied greatly, and contained internal inconsistencies.

161.    Brown's failure to investigate or charge Jane Doe with a violation of the Code for misrepresentation breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### E.  Breach of John Doe's Student Rights and Responsibilities As the Accused Student

162.    When a student is charged with violations of the Code, he or she is entitled to, inter alia, (i) be assumed not responsible of any alleged violations unless she/he is so found through the appropriate student conduct hearing; (ii) have a reasonable length of time to prepare a response to any charges; (iii) be informed of the evidence upon which a charge is based and accorded an opportunity to offer a relevant response; (iv) be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer; and (v) request that a hearing officer or member of a hearing body be disqualified on the grounds of personal bias. See Code, p. 7, 9, **Exhibit A**.

163.    Both respondent and complainant have the right to provide the case administrator with a written list of witnesses they would like to appear at the hearing so long as the list is provided four days prior to the hearing by 9:00 a.m.  See Code, p. 16, **Exhibit A**.

164.    Brown has deprived John Doe, of his contractual rights to due process and equal protection through the improper administration of the student conduct board hearing process in violation of Brown's guidelines and regulations.

165.    Brown failed to protect John Doe by standards of justice and fairness during the investigation of the Charges and the Hearing.

166.    Brown wrongfully banned John Doe from campus upon notice of Jane Doe's allegations, without receiving John Doe's version of the events, or performing a minimum level of investigation in violation of the Brown's commitment to separate a student from Brown only if the allegations are true pursuant to the Investigation Guide.

167.    Brown failed to provide John Doe with at least seven days' notice of all the evidence that would be presented at the Hearing prior to the Hearing date. John Doe was provided with merely three days to review and respond to the newly submitted evidence against him in advance of the Hearing.

168.    Brown failed to provide John Doe with an opportunity to perform a conflict check of panel member, Senior Associate Dean of Residential and Dining Services Richard Bova prior to his service at the Hearing.

169.    Dean Castillo, as case administrator, failed to support John Doe or respond to John Doe's requests during the student conduct, and she did not grant reasonable continuances to John Doe due to family circumstances and new evidence.

170.    Brown's incomplete and arbitrary actions breached the Student Rights and Responsibilities, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### F.  Breach of Covenant to Provide Alternative Housing

171.    Brown failed to offer alternative housing arrangements such as University-owned off-campus housing as promised by Brown's pledge to support an accused student during the complaint process. <u>See</u> Support for Students Named in a Complaint, *available at* http://brown.edu/about/administration/student-life/sexual-misconduct/support-students-named-complaint (last visited February 19, 2015).

172.    Brown's failure to provide alternative housing arrangements to John Doe during the complaint process breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

173.    Through these actions, Brown University breached its express and/or implied contractual obligations to John Doe.

174.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, economic injuries, reputational damages, and the loss of educational opportunities and other direct and consequential damages.

175.    John Doe is entitled to recover damages for Brown's breach of the express and/or implied contractual obligations described above.

176.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**FOURTH CAUSE OF ACTION**
**<u>Covenant of Good Faith and Fair Dealing</u>**

177.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

178.    Based on the aforementioned facts and circumstances, Brown breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe by meting out a disproportionate sanction of 2.5 year suspension against John Doe, notwithstanding the lack of evidence in support of Jane Doe's claim of non-consensual "fingering" and bruising caused by John Doe's physical force.  The sanction is also disproportionate considering that John Doe had no prior history of misconduct.

179.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

180.    John Doe is entitled to recover damages for Brown's breach of the express and/or implied contractual obligations described above.

181.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## FIFTH CAUSE OF ACTION
### Promissory Estoppel

182.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

183.    Brown's various policies constitute representations and promises that Brown should have reasonably expected to induce action or forbearance by John Doe.

184.    Brown expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Brown would not tolerate, and John Doe would not suffer,

harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of Brown's Regulations.

185.    John Doe relied to his detriment on these express and implied promises and representations made by Brown.

186.    Based on the foregoing, Brown is liable to John Doe based on Estoppel.

187.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

188.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**SIXTH CAUSE OF ACTION**
**<u>Negligence</u>**

189.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

190.    Brown owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of harassment and sexual assault against him.

191.    Brown breached its duties owed to John Doe.

192.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

193.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment

194.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

195.   Brown has committed numerous violations of the Parties' contracts and of federal and state law.

196.   John Doe's education and future career have been severely damaged.  Without appropriate redress, the unfair outcome of the Hearing and 2.5 year suspension sanction will continue to cause irreversible damages to John Doe's educational career and future employment prospects, with no end in sight.

197.   As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of John Doe's formal student record at Brown.

198.   By reason of the foregoing, John Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that (i) Brown University's sexual misconduct investigation of John Doe violated his contractual rights and his due process and equal protection rights, (ii) Brown University's findings of misconduct are illegal, null and void, and (iii) Brown University's current rules, regulations and guidelines are illegal in violation of Title IX.

## EIGHTH CAUSE OF ACTION
### Injunctive Relief

199.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

200.    By virtue of Brown University's violation of his contractual, due process and equal protection rights, John Doe has suffered irreparable harm for which money damages are inadequate.

201.    To address that harm, John Doe is entitled to injunctive relief from this Honorable Court ordering Brown to (i) reverse the outcome and findings made by Brown at John Doe's Hearings; (ii) expunge all negative references contained in John Doe's disciplinary record; (iii) remove all references of John Doe's 2.5 year suspension from his education file and (iv) permanently destroy any record of John Doe's Hearing.

## VI.    Prayer for Relief

**WHEREFORE,** for the foregoing reasons, John Doe demands the following relief from defendant Brown University:

(i)     An award of compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional distress, economic injuries, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    A judicial declaration that: (i) the outcome and findings made by Brown at John Doe's Hearings were erroneous and illegal; (ii) John Doe's disciplinary record is clear and free of misconduct and (iii) Brown's rules, regulations and guidelines are illegal as applied;

(iii)   The issuance of an injunction ordering Brown University to (i) reverse the outcome and findings made by Brown at John Doe's Hearings; (ii) restore John Doe's good standing at the University; (iii) expunge any negative references from John Doe's disciplinary record; (iv) remove the record of John Doe's deferred suspension from his education file and (v) permanently destroy any record of John Doe's Hearing.

(iv)    An award of the costs and expenses of suit;

(v)     Attorney's fees; and

(vi)    Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

**Dated:   New York, New York**
**April 13, 2015**

**Respectfully submitted,**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff John Doe*

**By: /s/ Andrew T. Miltenberg**
**Andrew T. Miltenberg, Esq.(*pro hac vice***
**pending)**
**Kimberly C. Lau, Esq. (*pro hac vice***
**pending)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**klau@nmllplaw.com**
**amiltenberg@nmllplaw.com**

**-and-**

*local counsel for Plaintiff John Doe,*

**By: /s/ Samuel D. Zurier**
**Samuel D. Zurier, Esq. (Bar No. 3576)**
**55 Dorrance Street, Suite 400**
**Providence, RI 02903**
**(401) 861-0200**
**sdz@zurierlaw.com**