UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
JOHN DOE,                               )
                                        )
          Plaintiff,                    )
                                        )
          v.                            )     C.A. No. 15-144 S
                                        )
BROWN UNIVERSITY,                       )
                                        )
          Defendant.                    )
_____)

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

Before the Court is a motion to dismiss (ECF No. 10) filed by Defendant Brown University ("Brown").  Plaintiff John Doe ("John" or "Doe") filed an Opposition (ECF No. 15) and Brown filed a Reply (ECF No. 17).  The parties also filed subsequent letters to the Court concerning supplemental authority (ECF Nos. 18-21).  After careful consideration, the Court hereby GRANTS IN PART and DENIES IN PART Brown's motion for the reasons that follow.

I.  Background

This case concerns an issue that has been the subject of increasing attention and controversy, particularly in academia, and which has garnered much recent media and

scholarly commentary:[1] the manner in which colleges and universities handle allegations of sexual assault. This case is one of a number of recent actions in the federal district courts in which a male student has sued a university that found him responsible for committing sexual assault after an allegedly flawed and deficient disciplinary proceeding.[2] None have yet to reach the circuits.

---

[1] See, e.g., Max Kutner, The Other Side of the College Sexual Assault Crisis, Newsweek (Dec. 10, 2015, 5:33 a.m.), http://www.newsweek.com/2015/12/18/other-side-sexual-assault-crisis-403285.html?rel=most_read2; Charles M. Sevilla, Campus Sexual Assault Allegations, Adjudications, and Title IX, The National Association of Criminal Defense Lawyers: Champion, Nov. 2015, at 16-20; 28 Members of the Harvard Law School Faculty, Opinion, Rethink Harvard's Sexual Harassment Policy, The Boston Globe (Oct. 15, 2014), https://www.bostonglobe.com/opinion /2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/ story.html; Vanessa Grigoriadis, Meet the College Women Who Are Starting a Revolution Against Campus Sexual Assault, New York Magazine (Sept. 21, 2014, 9:00 p.m.), http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html; Stephen Henrick, A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses, 40 N. Ky. L. Rev. 49 (2013).

[2] See, e.g., Doe v. Salisbury Univ., CIVIL NO. JKB-15-517, 2015 U.S. Dist. LEXIS 110772, at *41-*42 (D. Md. Aug. 21, 2015) (denying motion to dismiss); Doe v. Washington and Lee Univ., No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (denying motion to dismiss); Doe v. Univ. of Massachusetts-Amherst, Civil Action No. 14-30143-MGM, 2015 WL 4306521, at *7 (D. Mass. July 14, 2015) (granting motion to dismiss); Sahm v. Miami Univ., Case No. 1:14-cv-698, 2015 U.S. Dist. LEXIS 65864, at *12 (S.D. Ohio May 20, 2015) (granting motion to dismiss); Doe v. Columbia Univ., 101 F. Supp. 3d 356, 374-76 (S.D.N.Y. 2015)(granting motion to dismiss); Wells v. Xavier Univ., 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) (denying motion to dismiss).

This wave of litigation arises in the wake of the 2011 "Dear Colleague Letter," promulgated by the U.S. Department of Education's Office for Civil Rights ("OCR"), which instructs that a university must "promptly investigate" any allegation of sexual harassment or assault when it "knows, or reasonably should know, about possible harassment" of a student, regardless of whether the harassed student actually makes a complaint. Russlynn Ali, Dear Colleague Letter, U.S. Dept. of Educ. at 4 (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague -201104.pdf. The Dear Colleague Letter further requires universities to employ the "preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred)," reasoning that "[t]he 'clear and convincing' standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred) . . . [is] 'inconsistent with the standard of proof established for violations of . . . civil rights laws." Id. at 11. Many of the recent cases, including this one, allege that the pressure on universities from the OCR has caused a backlash against male students accused of sexual assault. The basis for this contention is that, while the OCR does not have the authority to "require" universities to take specific actions, it holds the specter of loss of federal funds as a

sword over the universities' heads in the event it were to find that the university failed to comply with Title IX.

In this action, Doe's version of the events is as follows.[3] After a party on Brown's campus on October 11, 2014, Jane Doe ("Jane") went back to John's room and they engaged in kissing and sexual touching. (Compl. ¶¶ 12-17, ECF No. 1.)  According to John, "[t]o confirm Jane Doe's consent, John Doe asked her 'Do you like this?' Jane Doe nodded and responded, 'Yes,' guiding his hand with hers and asking him to rub her a certain way.  When John Doe complied, Jane Doe moaned in pleasure, telling John Doe she reached orgasm."  (Id. ¶ 17.)  When Jane left that evening, John was "unaware that Jane Doe considered herself the victim of sexual misconduct." (Id. ¶ 19.)

On October 17, Jane reported that she was sexually assaulted by John and was interviewed by Brown Department of Public Safety Detective Jeanne Peck, who wrote a report ("Oct. 17 Public Safety Report").  On October 18, Jane filed a formal complaint concerning the events on the evening of October 11 ("Oct. 18 Complaint").  According to John, this complaint

---

[3] Because this is a motion to dismiss and the Court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences therefrom," Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002), this section presents the facts as alleged by Doe.

contains numerous discrepancies with the Oct. 17 Public Safety Report, including that the Oct. 18 Complaint admits that Jane told John she "liked" him touching her and never told him to stop. (Id. ¶¶ 34-35.) That evening, John received a phone call from Dean Castillo. She informed him that Brown had issued a no-contact order against him with respect to Jane based on an allegation of sexual misconduct against him. Dean Castillo also advised John that he could not leave his dorm room until he met with her and Maria E. Suarez, the Associate Dean and Director of Student Support Services, the next morning. (Id. ¶ 20.) At that meeting, Deans Castillo and Suarez informed John that Jane had made a "serious allegation of sexual misconduct" supported by "evidence of bruising." They then informed him that Margaret Klawunn, the University's Vice President of Student Affairs, who was not present at the meeting, had ordered his immediate removal from campus for the safety of the community, and that they would help him book a flight back home. (Id. ¶ 23.) Doe's father flew to Providence immediately, and the next day, he and John met with Dean Castillo, Dean Suarez, and Vice President Klawunn. During that meeting, John was given an official letter from Vice President Klawunn informing him he was banned from campus "for an indefinite period of time,"

5

effective immediately.  (Id. ¶ 25; Ex. B to Compl., ECF Nos. 1-2, 1-8 (redacted).)

On October 20, 2014, Brown sent John a notice of the allegations against him (Ex. C to Compl., ECF Nos. 1-3, 1-9 (redacted)) and "A Guide to the Investigation Process" (Ex. D to Compl., ECF No. 1-4).  (Compl. ¶¶ 30-32, ECF No. 1.) John claims that he asked Associate Dean of Student Life and Director of Student Conduct Yolanda Castillo for specific information about Brown's process, including a clear explanation of the steps Brown took from the time it learned of Jane's allegations to its first contact with John on October 18, 2014; however, Dean Castillo's general responses did not answer John's specific questions.  (Id. ¶ 33.)  On October 21, John received a copy of the Oct. 17 Public Safety Report and the Oct. 18 Complaint.  (Id. ¶ 34.)  On October 28, he submitted to Dean Castillo his personal written statement, a list of five witnesses and eight Facebook photographs of Jane Doe taken the night after the incident. John claims that the photos contradicted Jane's contention that her neck and lips had been bruised by John.  (Id. ¶ 37.) Brown did not contact any of John's witnesses until after he had been formally charged, despite assuring John that it would do so.  (Id. ¶ 38-39.)

On November 5, 2014, Brown sent John a letter (Ex. E to Compl., ECF Nos. 1-5, 1-10 (redacted)) notifying him that he was formally charged with the four Code violations set forth in the Notice of Allegations, and that a Student Conduct Board would hear the charges on November 14, 2014 at 9:00 a.m. (Compl. ¶ 41, ECF No. 1.) John requested a copy of certain evidence, including text messages, that were not in the inventory of evidence he had been provided. Brown failed to respond. (Id. ¶ 45.) Due to a personal family medical issue, John requested a two-week continuance so that he could sufficiently focus his time on preparing his defense of the charges. Instead, Dean Castillo granted a one-week continuance and rescheduled the Hearing to November 21, 2014. When John subsequently learned his parents could not attend the November 21 Hearing due to the persistence of the family medical issue, he renewed his request for a second week of continuance. Brown denied the request a second time. (Id. ¶ 46.) Around this same time, Brown announced that it anticipated issuing an Interim Report from a Sexual Assault Task Force that December. (Id. ¶ 47.)

At 5:17 p.m. on November 17, Brown provided John a package of 80 pages of evidence and procedural guidelines for the hearing. The package included 23 additional unsigned, unsworn statements; an addendum by Jane and another witness,

7

K.R.; text messages between John and K.R. from October 12,
2014; and Jane's medical records from Brown Health Services
from her visit on October 15, 2014.  (Id. ¶ 49.)  When
reviewing the packet, John learned that Brown had redacted a
portion of one of his witnesses' statements, in which the
witness described her prior physical experience with John,
which he claims bolstered the credibility of his defense.
When John asked for an explanation for this redaction, he was
advised that Dean Castillo redacts material that she deems
irrelevant pursuant to "University policy." (Id. ¶ 53.) Dean
Castillo also excluded the majority of John's character
witness letters from the record on the grounds that the
authors had "no connection to Brown University" and did not
possess information directly relevant to the case. (Id. ¶
54.)  On the inventory list of the final case file packet,
Dean Castillo indicated that there were 15 character
witnesses for John, which included six character witnesses
who were non-Brown University students. However, the actual
statements for the six non-Brown University students were not
included in the packet and never forwarded to the student
conduct board.  (Id. ¶ 55.)  For a third time, John requested
that the hearing be rescheduled for a later date, this time
so that he could adequately prepare for his defense at the
hearing.  In particular, John needed time to consult with

8

medical professionals concerning Jane's medical records; his request was again denied. (Id. ¶¶ 56-57.)

On November 20 – the day before the hearing - Brown informed John that it was appointing Senior Associate Dean of Residential and Dining Services Richard Bova as a substitute member of the hearing panel.  John was thus unable to exercise his right under the Brown Student Code of Conduct ("Code") to investigate the last-minute panelist for possible conflicts of interest.  According to John, had he had timely notice, he would have uncovered that Dean Bova was involved in a prior sexual assault case at Brown that was allegedly mishandled and resulted in a lawsuit, McCormick v. Dresdale.[4]  (Id. ¶ 62.)

Brown went forward with the hearing on November 21, 2014. John alleges a number of procedural deficiencies in the hearing process including:

- His faculty advisor's cross-examination of Jane was ineffective, in part because the advisor refused to make use of an extensive outline from John that detailed the multiple inconsistencies in Jane's reports.  (Id. ¶ 69.)

---

[4] McCormick v. Dresdale was a tort case brought in this Court by a Brown student accused of sexual assault, but it did not include claims under Title IX. The parties settled in December 2011. (C.A. No. 09-474, ECF No. 143.)

• Jane's advisor requested (without stating any justifying reason) that John be stopped from speaking only a few seconds into his mid-point testimony, and the Panel granted this request. John had given a very limited opening statement, anticipating that he would present the majority of his arguments in the mid-point statement, after Jane had testified. As a result, John was prevented from presenting many of his arguments. (Id. ¶ 74.)

On December 2, 2014, John was found "responsible" for all four Charges, namely: (i) Actions resulting in physical harm to others; (ii) Sexual Misconduct: non-consensual sexual contact; (iii) Sexual Misconduct: non-consensual sexual penetration;[5] and (iv) illegal possession or use of alcohol. (Id. ¶ 82.) John was sanctioned with a 2.5 year suspension. (Id. ¶ 83.) He subsequently filed an internal appeal, which was denied by Deputy Provost Joseph Meisel. (Id. ¶¶ 85-86.)

II. Discussion

It is worth stating at the outset that ensuring allegations of sexual assault on college campuses are taken seriously is of critical importance, and there is no doubt

---

[5] Under Rhode Island law, non-consensual sexual penetration is considered first-degree sexual assault, which carries a minimum sentence of 10 years in prison, and up to life in prison. R.I. Gen. Laws. § 11-37-2; id. § 11-37-3.

that universities have an exceedingly difficult task in handling these issues. Equally important is the fact that claims of "sexual misconduct" may in some cases, like this one, also be accusations that constitute serious felonies under virtually every state's laws, which carry penalties ranging from years to life in prison. While there is a fundamental question whether the way in which universities have chosen to respond to allegations of sexual misconduct in response to the Dear Colleague Letter is appropriate given the criminal nature of some of the allegations involved, the issue before the Court at present is only whether – taking the facts pled in the Complaint as true and making all reasonable inferences in favor of the plaintiff – he has stated a claim that is "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Supreme Court has explained that:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at 678 (quoting Twombly, 550 U.S. at 556-57).  This is
the standard that the Court must adhere to; it may not weigh
evidence at this stage.  See Twombly, 550 U.S. at 556 ("[O]f
course, a well-pleaded complaint may proceed even if it
strikes a savvy judge that actual proof of those facts is
improbable . . . .");  Garcia-Catalan v. United States, 734
F.3d 100, 103 (1st Cir. 2013) ("[I]t is manifestly improper
to import trial-stage evidentiary burdens into the pleading
standard.").

     The  First  Circuit  has  instructed  that  "[t]he
plausibility inquiry necessitates a two-step pavane."  Id.
(citing Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53
(1st Cir. 2013)).  The court must first differentiate between
"the complaint's factual allegations (which must be accepted
as true) from its conclusory legal allegations (which need
not be credited)."  Id. (quoting Morales-Cruz v. Univ. of
P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Next, "the court
must determine whether the factual allegations are sufficient
to support 'the reasonable inference that the defendant is
liable for the misconduct alleged.'"  Id. (quoting Haley v.
City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).  Moreover,
the First Circuit has "emphasize[d] that the complaint must
be read as a whole" and thus "[t]here need not be a one-to-
one  relationship  between  any  single  allegation  and  a

12

necessary element of the cause of action." Id. (quoting Rodríguez-Reyes, 711 F.3d at 55). With this standard in mind, the Court now turns to an analysis of Plaintiff's claims.

A.   Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX "is enforceable through an implied private right of action . . . for monetary damages as well as injunctive relief." Yusuf v. Vassar Coll., 35 F.3d 709, 714 (2d Cir. 1994). The analysis of a Title IX violation is similar in many respects to Title VII, with the exception that, unlike a Title VII claim, a Title IX claim may not be premised on the "disparate impact" a policy has with respect to a protected group. Doe v. Columbia Univ., 101 F. Supp. 3d 356, 367 (S.D.N.Y. 2015). Therefore, "[i]t is not enough to show that a policy or practice disproportionately affects one sex"; instead, "a plaintiff must ultimately show that the defendant discriminated against him or her because of sex; that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." Id. (emphasis in original) (citing

13

Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001)).
"It is well established that a school's failure to prevent or
remedy sexual harassment of a student, including sexual
assault, may violate Title IX." Id. at 366.  However, "it is
equally well established 'that Title IX bars the imposition
of university discipline where gender is a motivating factor
in the decision to discipline.'" Id. at 367 (quoting Yusuf,
35 F.3d at 715).

        1.   Erroneous Outcome

     In Yusuf, the Second Circuit developed a framework for
cases attacking university disciplinary proceedings on the
ground of gender bias, which "fall generally within two
categories" – "erroneous outcome" and "selective
enforcement." 35 F.3d at 715.  Although the First Circuit
has not directly confronted the issue, district courts in the
First Circuit have looked to the framework established in
Yusuf, subject to the heightened pleading standard set forth
in Twombly and Iqbal.  See Doe v. Univ. of Massachusetts-
Amherst, No. CV 14-30143-MGM, 2015 WL 4306521, at *8 (D. Mass.
July 14, 2015).

     In the first category, "erroneous outcome" cases, "the
claim is that the plaintiff was innocent and wrongly found to
have committed an offense." Yusuf, 35 F.3d at 715.  A
plaintiff making an erroneous outcome claim must first

"allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." Id. Once the plaintiff has established doubt concerning the accuracy of the proceeding, they must next "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." Id. (citations omitted). The Yusuf court noted that "[s]uch allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Id.

In the second category, "selective enforcement" cases, the "claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Id. Here, Doe has pled a Title IX claim based on an erroneous outcome (Compl. ¶¶ 106-39, ECF No. 1), but not selective enforcement.

On the first prong of Yusuf, the Court finds that Doe has pled "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." Yusuf, 35 F.3d at 715. Taking the facts in Doe's Complaint as true and drawing all reasonable inferences in his favor, Brown ignored exculpatory evidence, including the victim's

15

own testimony in the Oct. 18 Complaint that she had in fact articulated consent. (See Compl. ¶ 35, ECF No. 1.) The question is therefore whether Doe has pled sufficient facts to plausibly allege that Brown discriminated against him based on his gender.

In the wake of Twombly and Iqbal, district courts have struggled to discern the line between "plausibility" and "sheer possibility," and this recent wave of college sexual assault claims has been equally vexatious. In particular, because Yusuf was decided before Twombly and Iqbal, courts lack guidance on what qualifies as "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." Yusuf, 35 F.3d at 715. In Yusuf, the court found that the plaintiff's alleged deficiencies in his disciplinary proceeding coupled with his allegation "that males accused of sexual harassment at Vassar are 'historically and systematically' and 'invariably found guilty, regardless of the evidence, or lack thereof'" to be sufficient. Id. at 716. The court reasoned that:

> Similar allegations, if based on race in employment decisions, would more than suffice in a Title VII case, and we believe they easily meet the requirements of Title IX.
>
> . . . .
>
> The allegation that males invariably lose when charged with sexual harassment at Vassar provides

16

> a verifiable causal connection similar to the use
> of statistical evidence in an employment case.
> See, e.g., Hollander v. American Cyanamid Co., 895
> F.2d 80, 84 (2d Cir. 1990). We need not pause at
> the pleading stage of the proceedings to consider
> issues regarding what statistical sample would be
> significant or what degree of consistency in
> outcome would constitute a relevant pattern.

Yusuf, 35 F.3d at 716. However, courts have split on whether

allegations along these lines – that due to pressure from the

OCR, men accused of sexual assault are invariably found guilty

– pass muster after Iqbal and Twombly. Put another way,

absent any female comparators at the pleading stage, is the

allegation that schools are concerned about appearing too

lenient on male students accused of sexual assault, and

therefore those students are systematically found guilty

regardless of the evidence, a factual allegation – which must

be credited – or a conclusory legal allegation – which does

not get the presumption of truth.

For example, the court in Univ. of Massachusetts-Amherst

granted the defendant's motion to dismiss because "Plaintiff

has not cited examples of any comments that targeted him based

on his gender — as opposed to his status as a student accused

of sexual assault — or any conduct suggestive of gender bias."

2015 WL 4306521, at *8. Likewise, the court in Columbia, on

which Brown heavily relies, found that "while Columbia may

well have treated Jane Doe more favorably than Plaintiff

during the disciplinary process, the mere fact that Plaintiff is male and Jane Doe is female does not suggest that the disparate treatment was <u>because of</u> Plaintiff's sex."  101 F. Supp. 3d at 371 (emphasis in original).  Instead, the court in <u>Columbia</u> determined that:

> the alleged treatment "could equally have been" — and more plausibly was — "prompted by lawful, independent goals," such as a desire (enhanced, perhaps, by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity.

<u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 567).

On the other side of the spectrum, a court in the District of Maryland recently denied a motion to dismiss in a case much like this one, finding that "[o]n balance, Plaintiff has alleged a facially plausible claim of erroneous outcome sex discrimination in violation of Title IX." <u>Doe v. Salisbury Univ.</u>, CIVIL NO. JKB-15-517, 2015 U.S. Dist. LEXIS 110772, at *41 (D. Md. Aug. 21, 2015).  The plaintiffs in that case alleged that, upon information and belief, the university "possesse[d] communications evidencing [its] intent to favor female students alleging sexual assault over male students like Plaintiffs who are accused of sexual assault" and that the university sought "to demonstrate to the United States Department of Education and/or the general

public that Defendants are aggressively disciplining male
students accused of sexual assault." Id. at *39.  The
complaint also attached a number of exhibits concerning the
university's sexual assault awareness program.  Id. at *35.
The court found that while "[p]roof of SU's sexual assault
awareness programs does not, on its own, support a claim for
sex discrimination," the plaintiffs could "have a viable case
if they are able to uncover discoverable and admissible
evidence that Plaintiffs' gender was a motivating factor
behind SU's allegedly flawed disciplinary procedures and
wrongful conclusions."  Id. at *41-*42.

Likewise, in Wells v. Xavier, the plaintiff alleged that
"Defendants were reacting against him, as a male, to
demonstrate to the OCR that Defendants would take action, as
they had failed to in the past, against males accused of
sexual assault."  7 F. Supp. 3d 746, 751 (S.D. Ohio 2014).
The court denied a motion to dismiss the plaintiff's Title IX
claim, finding that:

> taking all inferences in favor of Plaintiff, as it
> is required to do in its consideration of a motion
> to dismiss, Plaintiff's erroneous outcome theory
> survives Defendants' challenge.  Plaintiff's
> Complaint . . . recounts Defendants having rushed
> to judgment, having failed to train UCB members,
> having ignored the Prosecutor, having denied
> Plaintiff counsel, and having denied Plaintiff
> witnesses. These actions came against Plaintiff, he
> contends, because he was a male accused of sexual
> assault.

Id.  The court in Columbia criticized Wells, explaining that
while it "accurately recited the pleading standards set forth
in Iqbal and Twombly, see 7 F. Supp. 3d at 748-49, it does
not appear to have applied those standards to the plaintiff's
Title IX claim."  Columbia, 101 F. Supp. 3d at 374.   In
particular, the court in Columbia noted that:

> [T]he Wells Court appears to have accepted as
> sufficient the mere fact that the plaintiff
> "contend[ed]" that the defendant's actions "came
> against [him] . . . because he was a male accused
> of sexual assault."  . . . [H]owever, that sort of
> subjective belief, devoid of factual support, is
> plainly insufficient after Iqbal and Twombly.

Id. (quoting Wells, 7 F. Supp. 3d at 751).

The court in Doe v. Washington and Lee Univ. struck
somewhat of a middle ground.   No. 6:14-CV-00052, 2015 WL
4647996, at *10 (W.D. Va. Aug. 5, 2015). Relying on Columbia,
the court first noted that "[e]ven if accused students are
inevitably found guilty, and their accusers are not subject
to any real skepticism or scrutiny, such a bias against the
accused may well reflect 'lawful, independent goals.'"  Id.
(quoting Columbia, 101 F. Supp. 3d at 371.)  However, the
court ultimately denied the defendant's motion to dismiss
because the plaintiff alleged that one of the decision-makers
had exhibited gender bias in an article she wrote that
"posit[ed] that sexual assault occurs whenever a woman has

consensual sex with a man and regrets it because she had internal reservations that she did not outwardly express." Id.

One particular challenge in these types of cases is that the best information for discerning whether alleged discrimination was based on the plaintiff's gender as opposed to his status as an accused student is generally in the possession of the defendant: namely, what are the overall outcomes of such cases and, more specifically, how have cases been handled in which the accused student is female and/or the alleged victim is male?  The court in Columbia recognized this:

> [T]he Court does not mean to suggest that, in order to survive a motion to dismiss, a male plaintiff in Plaintiff's position must necessarily be able to allege that a female student charged with sexual assault was treated differently.  Given the allegedly higher incidence of male-on-female sexual assaults (and sexual assault complaints) on campus (see Am. Compl. ¶ 138), that could pose an impossible pleading burden in some cases.

101 F. Supp. 3d at 375 (emphasis in original).  However, the court went on to state that a plaintiff must "at a minimum" present "'data showing that women rarely, if ever, are accused of sexual harassment, coupled perhaps with evidence that women accused of other [university] rules violations are treated differently than men are,'" and ideally would be able to present "'allegations that similarly situated women are or

even men would be treated differently'" and "'comparisons to accounts of other accused students.'"  Id. (quoting Haley v. Va. Commonwealth Univ., 948 F. Supp. 573, 580–81 (E.D. Va. 1996)).

Putting aside for the moment where and how a plaintiff would obtain the referenced data and analysis given the nonpublic nature of the underlying information, the type of evidence called for by the Columbia court is more akin to what would be required at summary judgment.  Indeed, the quoted Haley decision denied the defendant's motion to dismiss the plaintiff's Title IX claim; it instead found there were no genuine issues of material fact and granted summary judgment for Defendants after considering the evidence.  See Haley, 948 F. Supp. at 578 ("As stated above, Haley's complaint properly sets forth a claim for relief under Title IX.  However, the pleadings, affidavits, transcripts, and other evidence now before the Court show that there is no genuine issue of material fact as to Haley's Title IX claim and that VCU is therefore entitled to judgment as a matter of law." (emphasis added)).  Iqbal and Twombly did not convert the standard for surviving a motion to dismiss into a quasi-summary judgment standard.  See Garcia-Catalan, 734 F.3d at 104 ("[S]ummary judgment, like a trial, hinges on the presence or absence of evidence, not on the adequacy of the pleadings.

In light of this important distinction, the standards for granting summary judgment are considerably different from the standards for granting a motion to dismiss."). Moreover, the court in Columbia did not appear to consider how a potential plaintiff would acquire any of this type of information without discovery. Indeed, Brown's counsel conceded at oral argument that Brown would likely be barred by education privacy statutes from turning over information concerning other students' disciplinary proceedings absent a court order.

Likewise, it strikes the Court that the Columbia court's justification that "the alleged treatment 'could equally have been' — and more plausibly was — 'prompted by lawful, independent goals,'" 101 F. Supp. 3d at 371 (quoting Twombly, 550 U.S. at 567), improperly draws an inference in favor of the defendant instead of the plaintiff. Twombly was a conspiracy case; there, the Court found that the complaint failed to allege specific facts connecting certain defendants' actions, which on their own would be benign, to an alleged conspiracy. See Twombly, 550 U.S. at 566 ("[N]othing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy."). Thus, the Court noted that "the defendants' allegedly conspiratorial actions could equally have been

23

prompted by lawful, independent goals which <u>do not constitute</u>
<u>a conspiracy</u>." <u>Id.</u> at 566-67 (emphasis added) (quoting <u>Kramer</u>
<u>v. Pollock-Krasner Foundation</u>, 890 F. Supp. 250, 256
(S.D.N.Y. 1995)).  It is doubtful whether that statement has
any bearing outside the conspiracy context, and if it does,
it does not countenance drawing inferences against a
plaintiff.  In the current case, as in <u>Columbia</u>, there are
allegations that the actions of the defendant were unjust;
whether those actions were driven by a desire to crack down
on students accused of sexual assault of any gender, or on
men specifically, simply may not be a question that can be
resolved at the motion to dismiss stage.

In sum, the Court is not convinced as Brown would have
it that the type of allegation found to be sufficient in <u>Yusuf</u>
– that male students accused of sexual assault are "invariably
found guilty, regardless of the evidence, or lack thereof,"
35 F.3d at 716 – is now insufficient under <u>Iqbal</u> and <u>Twombly</u>
absent some smoking gun evidence set forth in the complaint.
As the court in <u>Yusuf</u> noted, "[s]imilar allegations, if based
on race in employment decisions, would more than suffice in
a Title VII case." <u>Id.</u>  Requiring that a male student
conclusively demonstrate, at the pleading stage, with
statistical evidence and/or data analysis that female
students accused of sexual assault were treated differently,

is both practically impossible and inconsistent with the standard used in other discrimination contexts.

And while it may not contain a smoking gun of the type discovered by the plaintiff in <u>Washington and Lee</u>, Plaintiff's Complaint in this case does include specific allegations related to gender bias as opposed to bias against students accused of sexual assault. Specifically, the Complaint includes the following allegations concerning Brown's gender bias:

- Upon information and belief, one former Brown employee stated that Brown treats male students as "guilty, until proven innocent," that Brown has "loaded the dice against the boys" and that the fact-finding process in cases of sexual misconduct at Brown operates under the assumption that it's always the "boy's fault." (Compl. ¶ 98, ECF No. 1.)

- Upon information and belief, one Brown professor stated that "there is gender bias that is overwhelming at Brown" when referencing sexual misconduct cases at Brown. (<u>Id.</u> ¶ 100.)

- Upon information and belief, in December 2014, a Brown professor held a debate to discuss rape issues on campus. During the debate, one female debater remarked that males are "bad" and females are "victims" when it comes to sexual misconduct. The Brown professor stated that these remarks are consonant with the culture of thinking on Brown's campus. (<u>Id.</u> ¶ 101.)

- Upon information and belief, Brown's handing [sic] of John Doe's case fits within a pattern of showing gender bias toward female students in cases of sexual misconduct, including its conduct in: (i) <u>McCormick v. Dresdale</u>, <u>supra</u>; (ii) a sexual misconduct case against former

25

Brown student Adam Lack (Class of 1997); and
(iii) other instances documented in the <u>Brown
Daily Herald</u> (April 29, 2010) and the <u>Brown
Spectator</u> (May 26, 2012). (<u>Id.</u> ¶ 123.)

Once again, this is a motion to dismiss, not summary judgment;

the question is not whether these examples would be admissible

evidence or sufficient to get to a jury, but rather whether

these facts, taken as true, are enough to state a plausible

claim.  Reading these factual allegations in conjunction with

the Complaint as "as a whole," which alleges numerous and

significant procedural flaws in Plaintiff's disciplinary

proceeding, the Court finds that Plaintiff has "create[d] a

reasonable expectation that discovery may yield evidence of

the [defendant's] allegedly tortious conduct."[6]  <u>Garcia-

Catalan</u>, 734 F.3d at 103.  As the First Circuit has stated –

even after <u>Twombly</u> and <u>Iqbal</u> – "[n]o more is exigible."  <u>Id.</u>

---

[6] That said, the Court agrees with many of Brown's
criticisms of Plaintiff's Complaint.  As Plaintiff's counsel
admitted at oral argument, the Complaint is not lacking in
"bluster."  Furthermore, many of the allegations ask the Court
to draw inferences that are not reasonable.  For example, the
Court fails to see how the allegation that Dean Castillo
previously worked in the domestic violence field supports an
inference of gender bias.  <u>See</u> <u>Columbia</u>, 101 F. Supp. 3d at
371 (allegation that decision-maker had "worked for a women's
resource center in the past" was "plainly insufficient" to
infer gender bias).  Likewise, Plaintiff's allegation that
"the student conduct board hearing process is dominated by
female administrators" does not support his conclusion that
it is therefore "undoubtedly, in favor of female students."
(Compl. ¶ 95.)

The fact that these allegations are pled "upon information and belief" does not, as Brown suggests, make them improper under <u>Twombly</u> and <u>Iqbal</u>. (<u>See</u> Def.'s Mot. 13-14, ECF No. 10-1.) This manner of pleading "is a permissible way to indicate a factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis." <u>Salisbury</u>, 2015 U.S. Dist. LEXIS 110772, at *40; <u>see also</u> <u>Arista Records LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010) ("The <u>Twombly</u> plausibility standard . . . does not prevent a plaintiff from 'pleading facts alleged upon "information and belief"' where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible . . . ."). As the court in <u>Salisbury</u> explained:

> Plaintiffs' erroneous outcome allegations would be insufficient if they had simply stated something akin to: "Upon information and belief, procedural defects were motivated by gender bias." However, in this case Plaintiffs have pleaded <u>specific factual allegations</u>. . . . The fact that they are pleaded upon information and belief is of no moment because the alleged facts are peculiarly within the possession or control of SU Defendants.

2015 U.S. Dist. LEXIS 110772, at *41 (emphasis in original).

Brown also contends that Doe's reliance on the <u>McCormick</u> litigation and the Adam Lack case is misplaced. (Def.'s Mot.

27

11-13, ECF No. 10-1.)  As support, Brown cites to Mallory v. Ohio Univ., which found that "one case [filed six years earlier] by an individual who was subjectively dissatisfied with a result does not constitute a 'pattern of decision-making,' referred to in Yusuf as a basis for finding bias." 76 F. App'x 634, 640 (6th Cir. 2003).  But Mallory was deciding summary judgment, not a motion to dismiss.  Brown also points to Sahm v. Miami Univ., which found that "[m]edia accounts about prior incidents of alleged sexual assault which occurred between 2003 and 2011 do not demonstrate gender bias on the part of the University."  110 F. Supp. 3d 774, 779 (S.D. Ohio 2015).  Yet Sahm also relied on cases that were deciding summary judgment, not a motion to dismiss.  See id. at 779-80 (citing Worthy v. Mich. Bell Tel. Co., 472 F. App'x 342, 347 (6th Cir. 2012); Myers v. Cuyahoga Cty., Ohio, 182 F. App'x 510, 520 (6th Cir. 2006)).  This Court agrees that these prior cases alone would be almost certainly insufficient to prevail at the summary judgment stage.  When taken with the other allegations pled in Plaintiff's Complaint, they are, however, sufficient to get Plaintiff discovery.  Whether the evidence of more recent cases will substantiate his claim of a pattern remains to be seen.

Accordingly, the Court denies Brown's motion with respect to Plaintiff's Erroneous Outcome Claim under Title IX (Count I).

2.   Deliberate Indifference

To establish deliberate indifference, "the recipient's response to the harassment or lack thereof [must be] clearly unreasonable in light of the known circumstances." Doe v. Univ. of the South, 687 F. Supp. 2d 744, 757 (E.D. Tenn. 2009) (quoting Patterson v. Hudson Area Schs., 551 F.3d 438, 446 (6th Cir. 2009)).  Doe's Complaint falls short of this high bar.  Doe asserts that "Deputy Provost Joseph Meisel was on notice of Brown's misconduct in the disciplinary proceedings, yet failed to correct the misconduct [on appeal] because Plaintiff was male." (Pl.'s Opp'n 24, ECF No. 15; see also Compl. ¶¶ 140-46.)  However, Doe fails to plead any facts to support his contention that Meisel knew about Brown's alleged misconduct.

Moreover, as Brown notes in its briefing, deliberate indifference claims are typically brought in cases where a school has ignored a victim's complaint of sexual harassment or assault. (Def.'s Mot. 25-26, ECF No. 10-1.)  Some courts have questioned its application to a case of a disciplined student. See, e.g., Marshall v. Ohio Univ., 2015 U.S. Dist. LEXIS 31272, at *22-*23 (S.D. Ohio Mar. 13, 2015) ("It is

29

unclear as to how exactly this [deliberate indifference] claim applies to the facts of this case, as usually, this claim is asserted by a victim against a school or university official who _failed_ to protect him or her from harassment or otherwise address the alleged misconduct — actions that [Ohio University] officials undisputedly took, to _protect_ the alleged victim from [the accused student]." (emphasis in original)).  The only case of which the Court is aware in which a deliberate indifference claim has been allowed to go forward in a case like this one is _Wells_.  However, as Brown notes, _Wells_ is not only anomalous in its application of deliberate indifference to a challenge of a disciplinary proceeding, but more importantly, it is factually distinguishable. (Def.'s Mot. 27 n.9, ECF No. 10-1.)  In _Wells_, a prosecutor had previously investigated the alleged assault and advised the university's president that he believed the allegations against the male student were unfounded.  7 F. Supp. 3d at 752.  Here, there are no facts concerning Provost Miesel's knowledge of the alleged misconduct.

Accordingly, the Court grants Brown's motion with respect to Plaintiff's Deliberate Indifference Claim under Title IX (Count II).

B.    Claims under Rhode Island State Law

1.    Breach of Contract

Under Rhode Island law, "[a] student's relationship to his university is based in contract." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007) (citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)).   "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." Id.   Rhode Island courts "interpret such contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them." Id. (citing Mangla, 135 F.3d at 83).   Accordingly, "if the university explicitly promises an appeal process in disciplinary matters, that process must be carried out in line with the student's reasonable expectations.   Id. at 34-35 (citing Cloud v. Trs. of Boston Univ., 720 F.2d 721, 724-25 (1st Cir. 1983)).

Whether an expectation is reasonable often hinges on the specificity of the promises in the handbook: courts may not read terms into the contract.   In Schaer v. Brandeis University, the Massachusetts Supreme Judicial Court considered a very similar case, and found that there was no breach of contract.   432 Mass. 474, 478-81 (2000).   There,

31

the Brandeis Handbook stated: "the available facts shall be gathered from the [complainant] and a careful evaluation of these facts, as well as the credibility of the person reporting them, shall be made.  If corroboration of the information presented is deemed necessary, further inquiry and investigation shall be undertaken." Id. at 478-79.  The court noted that "[n]othing in this section requires university officials to obtain an interview from the accused student, to seek evidence from the accused student, or to grant the accused student an opportunity to provide witnesses at the investigatory stage in the proceedings." Id. at 479. Similarly, the court found that Plaintiff's allegation that the record of the proceeding was insufficient did not violate the provision of the handbook requiring there to be a record. Id. at 480-81.  While acknowledging that "[t]he better practice would have been to produce a more complete report," the court noted that "nothing in the contract suggests that disciplinary proceedings will be conducted as though they were judicial proceedings." Id.

Likewise in Havlik, the First Circuit found that the plaintiff's allegation that the appeal officer had been "improperly influenced" by a crime alert concerning his case did not violate the Code's requirement to conduct "further review" of a disciplinary decision. Havlik, 509 F.3d at 35.

The Court found that, "[g]iven the sketchy nature of the appeal provision in the handbook" and "[i]n the absence of any probative evidence that the appeal officer ignored promised protections, improperly consulted certain proof, acted arbitrarily in carrying out the procedures limned in the handbook, or made her decision in bad faith, there has been no showing that the plaintiff's reasonable expectations were thwarted." Id. at 36.

By contrast, in Dempsey v. Bucknell Univ., the court found that the plaintiffs stated a claim for breach of contract based on a student handbook.  Civil Action No. 4:11-cv-1679, 2012 WL 1569826, at *18-*19 (M.D. Pa. May 3, 2012). There, the plaintiffs "alleged that Defendant Bucknell withheld some relevant information that [one of the plaintiffs'] attorney requested" in violation of the student handbook's promise "that Bucknell will provide an accused with a copy of the charges against him, along with supporting information, including the Public Safety department's report and witness statements."  Id.  The court found that "[a]ccepting the allegations of Plaintiffs' complaint as true, Plaintiffs have alleged sufficient facts to support a finding that Defendant Bucknell breached the Student Handbook by failing to turn over some of the information that Plaintiff Reed requested." Id. at *19.

Doe's Complaint alleges six different categories of contract violations (Compl. ¶¶ 149-76), and Doe's opposition identifies 11 different specific violations within these various categories. (See Pl.'s Opp'n 26-29, ECF No. 15.) The question is thus whether any of these allegations, if true, would constitute a violation of Doe's reasonable expectations based on the Code.

Although many of these alleged violations do not pass the test, with respect to several of the identified breaches of Doe's rights as an accused student, he has sufficiently stated a claim based on the language of the Code. Accordingly, the Court denies Brown's motion to dismiss with respect to Doe's allegations of "Breach of John Doe's Student Rights and Responsibilities as the Accused Student" (Id. ¶¶ 162-70); and dismisses Doe's allegations of "Breach of Covenant to Uphold Individual Integrity" (Compl. ¶¶ 149-52); "Breach of Covenant Not to Discriminate Against John Doe" (id. ¶¶ 153-55); "Breach of Covenant to Uphold its Alcohol Policy" (id. ¶¶ 156-58); "Breach of Covenant to Uphold its Misrepresentation Policy" (id. ¶¶ 159-61); and "Breach of Covenant to Provide Alternative Housing" (id. ¶¶ 171-76). For the sake of clarity as the parties move into discovery, the Court will go through each Doe's alleged 11 specific breaches and indicate which survive this motion.

34

(i)   Doe first alleges that Brown failed to conduct a
pre-charge investigation of Jane Doe's complaint prior to
directing Plaintiff's immediate removal from campus. (Pl.'s
Opp'n 26, 28, ECF No. 15.) Doe alleges this to be a violation
of the statement in Brown's Code that "[s]tudents and student
organizations charged with offenses" have the "right[] . . .
[t]o be assumed not responsible of any alleged violations
unless she/he is so found through the appropriate student
conduct hearing." (Ex. A to Compl. at 7, ECF No. 1-1.) Brown
counters that "[n]owhere is there any such restriction
imposed upon Brown regarding interim measures during an
investigation and a disciplinary process.  In fact, the OCR
in its Dear Colleague letter specifically mandates that a
university may invoke interim measures as part of its Title
IX response to sexual harassment allegations." (Def.'s Reply
15, ECF No. 17.)  However, the Code also states that "[a]ll
members of the Brown University Community are entitled to .
. . the right to attend, make use of or enjoy the facilities
and functions of the University subject to prescribed rules."
(Ex. A to Compl. at 3, ECF No. 1-1.)  The question here is
not whether Brown was following the OCR's guidance; it is
whether Brown's actions violated the reasonable expectations
of a student based on its Code.  The Court finds that, taking
Doe's allegations as true, Brown's decision to ban him from

campus prior to conducting an investigation states a plausible claim for a breach of the rights outlined in the Code to be assumed not responsible until proven otherwise, and to enjoy use of Brown's facilities.

(ii) Doe next alleges that Brown failed to "limit the authority to order student separation from the University to five (5) officials – President, Dean of College, Dean of Graduate School, Dean of Medicine and Biological Sciences, and Senior Associate Dean for Student Life" when it "allow[ed] Dean Klawunn to order Plaintiff's immediate removal from campus." (Pl.'s Opp'n 27-28, ECF No. 15; see Ex. A to Compl. at 9, ECF No. 1-1 ("For matters in which individuals pose a danger to themselves or the immediate well-being of the University community, the President, the Dean of the College, the Dean of the Graduate School, the Dean of Medicine and Biological Sciences, and the Senior Associate Dean for Student Life have the authority to separate a student(s) from the University and to impose any additional conditions deemed necessary.").) Brown notes that "Vice President Klawunn is the senior University officer with the 'primary' responsibility for 'planning, setting policies and implementing programs that improve the campus environment for Brown's students,'" that she "has oversight over fourteen departments at Brown, including the Office of Student Life,"

36

and that she "acted within her authority to separate Plaintiff from Brown's campus pending the completion of the disciplinary process." (Def.'s Mot. 30-31, ECF No. 10-1.) That may all be true, but it does not change the fact that nowhere in the record before the Court has Klawunn been identified as the "Senior Associate Dean for Student Life," or any of the other positions that the Code classifies as having the authority to separate a student from campus due to safety concerns. Therefore, Plaintiff has, at this stage, stated a plausible claim that an order from Klawunn separating him from campus violated his reasonable expectations under the Code.

(iii)   Doe further alleges that Brown breached its contract by "failing to provide off-campus housing accommodations or otherwise offset his food and lodging off-campus during the pendency of the student conduct process." (Pl.'s Opp'n 27-28, ECF No. 15.)   This allegation is a different story because, as Brown notes, its policy on providing alternative housing is discretionary. (<u>See</u> Def.'s Mot. 30, ECF No. 10-1 ("When possible, and in coordination with the Office of Student Life and Resident Life, consideration <u>can be given</u> to possible accommodations such as dorm reassignment, off-campus housing permission, changes in meal plans, or access to parking permits." (emphasis in

original) (quoting http:/ /brown.edu/about/administration/
student-life/sexual-misconduct/    support-students-named-
complaint (last visited May 18, 2015)). Thus, the Court finds
no breach of contract based on Brown's failure to provide Doe
with off-campus housing.

(iv)  Doe next alleges that Brown "fail[ed] to support
Plaintiff or respond to Plaintiff's requests to identify the
evidence relied upon to support the interim restriction, to
view the text messages referenced by Jane Doe, or for
additional time to respond to new evidence just 3 days before
the hearing." (Pl.'s Opp'n 28, ECF No. 15.) The "General
Provisions for the Student Conduct Procedures" of the Code
states that "the case administrator will respond to requests
from respondents and complaining witnesses during the
prehearing phases of the student conduct procedures." (Ex.
A to Compl. at 10, 16, ECF No. 1-1 (emphasis added).) The
Court finds that, taken as true, these allegations state a
breach of the Code. Brown chose to write its policy to state
that the case administrator "will respond" to the
respondent's requests; now it must live with that promise.

(v)  Doe veers off course again with his allegation that
Brown "fail[ed] to enforce the alcohol policy against Jane
Doe, notwithstanding her admission to underage drinking, and
only choosing to enforce the alcohol policy against

38

Plaintiff." (Pl.'s Opp'n 27-28, ECF No. 15.) Doe cites to the Code's alcohol policy, but fails to cite to any promise that it will be uniformly enforced. Thus, he has failed to establish that this was a reasonable expectation based on Brown's Code.[7]

(vi) Doe's allegation that Brown "fail[ed] to review evidence/witnesses offered by Plaintiff prior to making the determination to file the Charges" also fails. (Id.) The Investigation Guide states:

> After the case administrator has collected information about the incident from the responding student, the complaining student (if there is one), and any witnesses, she/he will provide the case materials to the Senior Associate Dean for Student Life. The Senior Associate Dean for Student Life will use the materials to determine whether or not there is a reasonable basis to file student conduct charges and, if so, at what venue the matter should be heard.

(Ex. D to Compl. at 3, ECF No. 1-4.) Doe's allegation – that Brown did not properly consider the evidence – does not state a violation of the Investigation Guide's promise to collect evidence.

---

[7] In finding that Doe has failed to state a claim for breach of contract based on the fact that the alcohol policy was not enforced against Jane, the Court does not, at this stage, hold that evidence concerning Brown's failure to uniformly enforce its alcohol policy is irrelevant to his Title IX claim.

(vii)  Doe's next allegation is that "Brown failed to provide all evidence to Plaintiff at least seven (7) business days prior to hearing," as supposedly required by the Code, is not sufficient.  (Pl.'s Opp'n 27, 29, ECF No. 15.)  As Brown notes, the Code provides that an initial file must be submitted seven days before the hearing, but further information can be allowed up to four days before, or even later than that at the discretion of the hearing officer. (See Def.'s Mot. 31, ECF No. 10-1; Ex. A to Compl. at 16, ECF No. 1-1.)  Therefore, Doe's allegation that he did not get seven days' notice of all evidence does not state a claim for breach of contract.

(viii)  Doe next alleges that Brown failed to allow him "an opportunity to offer a relevant response" to the evidence against him, as required by the Code.  (Pl.'s Opp'n 27, 29, ECF No. 15; see Ex. A to Compl. at 7, ECF No. 1-1.) Specifically, Doe contends that Brown:

> improperly redact[ed] relevant information from Plaintiff's evidence, assembl[ed] Plaintiff's text messages out of order and out of context, exclude[ed] the majority of Plaintiff's character witness statements that spoke to his credibility, disallow[ed] Plaintiff from making a full "midpoint" statement, in violation of the Opening and Questioning Timeline, and refus[ed] to consider the Facebook photos showing lack of any "bruising" on Jane Doe based on baseless privacy concerns.

(Pl.'s Opp'n 29, ECF No. 15.)  Although the term "relevant"
is vague and undefined, the Court finds that Plaintiff has –
at the motion to dismiss stage – presented sufficient
allegations to state a claim that he was prevented from
presenting a "relevant" response.  In particular, the fact
that Plaintiff was prevented from making his "midpoint"
statement may be a violation of the Code, depending on what
the facts show.

(ix)  Plaintiff's next allegation is similar: Brown
failed to provide him with "a reasonable length of time to
prepare a response to any charges." (Id. at 27, 29; see Ex.
A to Compl. at 7, ECF No. 1-1.)  Again, "reasonable length of
time" is vague, yet the Court finds that Plaintiff's
allegation that he was given only four days to respond to 80
pages of evidence, including medical records, may be a breach
of this term.  It will be a question of fact for down the
road whether a student would reasonably expect to be given
more time to prepare a response based on the Code's promise
of a "reasonable length of time."

(x)  Doe next alleges a breach of the following Code
provision:

> Students and student organizations charged with
> offenses against the Code of Student Conduct are
> afforded the following rights in University
> proceedings:

41

> . . . .
>
>> To be given <u>every opportunity</u> to articulate
>> relevant concerns and issues, express salient
>> opinions, and offer evidence before the
>> hearing body or officer. (Students have the
>> right to prepare a written statement in
>> matters that may result in separation from the
>> University.)

(Ex. A to Compl. at 7, 16, ECF No. 1-1 (emphasis added).)
Without question, Doe was not – according to his allegations
– given "every opportunity" to participate in the
disciplinary process.  Once again, Brown chose to draft its
Code to give students the right to "every opportunity" to
"articulate relevant concerns" and "offer evidence"; now it
must abide by that decision.

   (xi)   Finally, Doe alleges that Brown "fail[ed] to
provide Plaintiff time to give 2 days' prior notice to request
that Dean Bova be disqualified for lack of impartiality."
(Pl.'s Opp'n 28, ECF No. 15.)  The Code states:

> Students and student organizations charged with
> offenses against the Code of Student Conduct are
> afforded the following rights in University
> proceedings:
>
>> . . . .
>
>> To request that a hearing officer or
>> member of a hearing body be disqualified on
>> the grounds of personal bias.
>
>> . . . .
>
> The request will be made by 9:00 AM no more
> than two (2) days after receiving the charge

42

> letter and the Request to Disqualify Form and
> will include an explanation as to why the
> member is unable to render an impartial
> decision in the case.

(Ex. A to Compl. at 7, 9, ECF No. 1-1.)   This allegation is
also sufficient to state a claim for breach of contract.
Pursuant to the rules of the handbook, Doe had a right to
request that the hearing officer be disqualified, and he had
to make that request no more than two days before.   By
appointing Bova the day before, Doe was precluded from making
a timely investigation and/or request to disqualify.

In sum, the Court finds that following allegations
described on pages 27 to 29 of Plaintiff's Opposition (ECF
No. 15) state a claim for breach of contract: (i), (ii), (iv),
(viii), (ix), (x), and (xi); the remainder do not.

### 2.   Breach of the Covenant of Good Faith and Fair Dealing

Rhode Island law states that "contracts contain an
implied duty of good faith and fair dealing." Havlik v.
Johnson & Wales Univ., 490 F. Supp. 2d 250, 261 (D.R.I. 2007),
aff'd, 509 F.3d 25 (1st Cir. 2007) (quoting Mangla, 135 F.3d
at 84).   "The implication of the duty is that the parties
will act in a manner consistent with the purposes of the
contract." Id. (quoting Lifespan Physicians Prof'l Servs.
Org., Inc. v. Combined Ins. Co. of Am., 345 F. Supp. 2d 214,
225 (D.R.I. 2004)).   Because Doe's Complaint states a

plausible claim for breach of contract, and systematic gender bias, the Court finds that he similarly states a claim that this conduct violated the covenant of good faith and fair dealing inherent in that contract.

### 3. Promissory Estoppel

Both parties acknowledge that a promissory estoppel claim only stands in the absence of a contract. Here, there is no dispute that the student-university relationship is governed by contract, which includes the reasonable expectations of students based on the Code. Accordingly, the Court dismisses Plaintiff's promissory estoppel claim (Count V).

### 4. Negligence

Doe argues that Brown breached its duty to him by failing to provide reasonable care in his disciplinary proceeding. However, as Brown notes in its briefing, Doe "has not pled any factual explanation how his negligence claim differs from his breach of contract claim." (Def.'s Mot. 33, ECF No. 10-1.) If a contract claim and a tort claim "are based upon the same duty, the plaintiff cannot maintain the tort claim." Ciccone v. Pitassi, C.A. No. PB 97-4180, 2004 R.I. Super. LEXIS 150, at *23 (R.I. Super. Aug. 13, 2004) (Silverstein, J.); see Faiaz v. Colgate Univ., No. 5:14-CV-322 (GTS/ATB), 2014 U.S. Dist. LEXIS 164168, at 362 (N.D.N.Y. Nov. 24, 2014)

("[T]he facts alleged in support of the plaintiff's negligence claim are similar to those alleged in connection with his contract claim — that the University breached its duty (contract) with plaintiff to follow its own rules regarding student discipline. [S]imply alleging a duty of care does not transform a breach of contract [claim] into a tort claim." (internal quotation marks and citation omitted)).

Doe relies heavily on a decision from the Eastern District of Tennessee that allowed a negligence claim to go forward based on a disciplinary proceeding. See Doe v. Univ. of the South, No. 4:09-cv-62, 2011 WL 1258104, at *21 (E.D. Tenn. Mar. 31, 2011). However, that case was not decided under Rhode Island law, which does not allow a tort claim to stand based upon the same duty underlying a contract claim. Doe's reliance on Title IX as a source of Brown's duty is similarly unavailing. See id. at *14 (finding that "a federally-created right" cannot "create a state negligence per se claim"); Ross v. Univ. of Tulsa, Case No. 14-CV-484-TCK-PJC, 2015 U.S. Dist. LEXIS 86375, at *7-11 (N.D. Okla. July 2, 2015) (alleged violations of Title IX and implementing regulations cannot support a state law negligence claim). Accordingly, the Court dismisses Doe's negligence claim (Count VI).

### 5.   Declaratory Judgment

Brown argues that Doe's claim for declaratory judgment should be dismissed because "[a]ll of Plaintiff's substantive claims are subject to dismissal" and "[t]he Federal Declaratory Judgment Act is procedural only and does not create an independent cause of action." (Def.'s Mot. 34, ECF No. 10-1.)  Brown is correct that the Declaratory Judgment Act does not create its own substantive cause of action; however, because the Court denies Brown's motion with respect to a number of Doe's claims, he continues to state a claim for declaratory relief.

### 6.   Injunction

"[A] claim for injunctive relief is not a standalone cause of action." Salisbury, 2015 U.S. Dist. LEXIS 110772, at *45 (citing MCS Servs. Inc. v. Jones, Civ. No. WMN-10-1042, 2010 U.S. Dist. LEXIS 105013, 2010 WL 3895380, at *1 n.4 (D. Md. Oct. 1, 2010)); see also Linton v. N.Y Life. Ins. & Annuity Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005) ("[A]llegations [that] actually describe the remedies sought by plaintiff . . . do not constitute actionable claims." (internal quotation marks omitted)).  Accordingly, Count VIII is hereby dismissed; however, this dismissal is without prejudice to the claim for injunctive relief properly laid

out in Plaintiff's Prayer for Relief.  (Compl. Section VI (iii), ECF No. 1.)

IV.  Conclusion

For the foregoing reasons, Brown's Motion to Dismiss is hereby GRANTED IN PART and DENIED IN PART.  Specifically, the Court DENIES Brown's Motion with respect to the following claims: Erroneous Outcome under Title IX (Count I); Breach of Contract (Count III), subject to the limitations outlined in this memorandum; Breach of the Covenant of Good Faith and Fair Dealing (Count IV); and Declaratory Judgment (Count VII).  The Court GRANTS Brown's motion in part and DISMISSES WITH PREJUDCE Plaintiff's claims for Deliberate Indifference under Title IX (Count II); Promissory Estoppel (Count V); Negligence (Count VI); and Injunctive Relief (Count VIII).[8]


IT IS SO ORDERED.

_William E. Smith_

William E. Smith
Chief Judge
Date:  February 22, 2016

---

[8] As noted above, the dismissal of Count VIII is without prejudice to Plaintiff's request for an injunction in his Prayer for Relief.

47