# UNITED STATES DISTRICT COURT

## DISTRICT OF RHODE ISLAND

JOHN DOE,
               Plaintiff,

v.                                    C.A. NO.: 15-144-S

BROWN UNIVERSITY,
               Defendant.

# DEFENDANT BROWN UNIVERSITY'S
# LOCAL RULE 56(a) STATEMENT OF UNDISPUTED FACTS
# IN SUPPORT OF ITS MOTION FOR
# PARTIAL SUMMARY JUDGMENT

BROWN UNIVERSITY
BY ITS ATTORNEY,

STEVEN M. RICHARD (#4403)
NIXON PEABODY LLP
ONE CITIZENS PLAZA, SUITE 500
PROVIDENCE, RI  02903
TEL: 401-454-1020
FAX: 401-454-1030
EMAIL: srichard@nixonpeabody.com

December 7, 2017

## TABLE OF CONTENTS

PAGE

I.      Introduction ...................................................................................................................1

II.     Parties to this Litigation .................................................................................................2

III.    Brown's Sexual Assault Task Force ................................................................................3

IV.     OCR Complaint ..............................................................................................................5

V.      Data Regarding Brown's Hearings Adjudicating Sexual Misconduct Charges
        (Offense III under its Code of Student Conduct)............................................................6

VI.     Training of Student Conduct Board Members During 2014-15 Academic year .............7

VII.    Brown's 2014-15 Code of Student Conduct ...................................................................7

        A.  Offenses under the Code ......................................................................................7

        B.  The Student Conduct Board Hearing Process.....................................................8

        C.  The Appeal Process under the Code ..................................................................13

        D.  The Office of Student Life's Guide to the Investigation Process ......................14

VIII.   Plaintiff's Disciplinary Case ........................................................................................14

        A.  The Student Conduct Responsibilities of Vice President Klawunn and
            Dean Castillo-Appollonio During the 2014-15 Academic Year........................14

        B.  Jane Doe's Reporting of Allegations that John Doe Sexually Assaulted Her ...........17

        C.  Brown's Communications and Meetings with John Doe During the Weekend of
            of October 18-19, 2014 .....................................................................................19

        D.  The Notice of Allegations Served on October 20, 2014 and John Doe's Receipt on
            October 21, 2014 of the DPS Report and Jane Doe's Campus Incident Report........22

        E.  October 21, 2014 - November 5, 2014 ...............................................................23

        F.  The November 5, 2014 Charge letter.................................................................25

        G.  November 5, 2014 – November 21, 2014 ...........................................................26

        H.  The Student Conduct Board Hearing and Decision ..........................................30

        I.  The Denial of John Doe's Appeal......................................................................32

Defendant Brown University ("Brown" or the "University") submits its Local Rule Cv. 56(a) Statement of Undisputed Facts in support of its Motion for Partial Summary Judgment.

# I.  Introduction

This litigation concerns a student sexual misconduct disciplinary case at Brown against Plaintiff John Doe, which arose from Jane Doe's complaint that John Doe sexually assaulted her in his dormitory room on October 11, 2014.  Brown conducted its disciplinary process in accordance with its 2014-15 Code of Student Conduct.  A Student Conduct Board heard the charges against John Doe on November 21, 2014.  The Student Conduct Board adjudicated John Doe as responsible for the charged offenses.  An appeal officer carefully reviewed John Doe's appeal and issued a detailed letter on December 22, 2014 stating the reasons for the appeal's denial. John Doe was suspended from Brown for two and one-half years.

Brown seeks summary judgment on John Doe's remaining Title IX claim (Count I – Erroneous Outcome) because the undisputed material facts show that, as a matter of law, Brown did not engage in any gender discrimination against John Doe.  Also, Brown moves for summary judgment on John Doe's count seeking a declaratory judgment (Count VII).  This Statement sets forth the undisputed material facts upon which Brown bases its dispositive motion.

After identifying the parties in Section II, Brown focuses in Sections III-VI below on topics relating to the University and its campus that John Doe has raised in this litigation, which cast far afield from his disciplinary case.  In Section III, Brown describes the convening of its Sexual Assault Task Force to review University policies.  In Section IV, Brown addresses an administrative complaint that an unidentified complainant filed with the Department of Education's Office for Civil Rights.  In Section V, Brown addresses data that it produced to John Doe during discovery relating to the University's adjudications of student sexual misconduct

1

disciplinary cases over a ten-year period spanning Brown's 2004-05 through 2014-15 academic years.  In Section VI, Brown addresses the training that it provided to Student Conduct Board members at the outset of the 2014-15 academic year.

Turning to the particulars of Plaintiff's disciplinary case, in Section VII, Brown addresses the University's 2014-15 Code of Student Conduct and its Office for Student Life's Guide to the Investigative Process.  In Section VIII, Brown addresses John Doe's disciplinary case – starting with Jane Doe's reporting of allegations in mid-October 2014 that John Doe sexually assaulted her on October 11, 2014 and concluding with the appeal officer's decision on December 22, 2014 that upheld the findings of John Doe's responsibility and the suspension sanction.[1]

## II.  Parties to this Litigation

1.      Brown is a private university of higher education in Providence, Rhode Island.  As a recipient of federal funding, Brown admits that it is subject to Title IX of the Education Amendments of 1972 ("Title IX").

2.      It is undisputed that John Doe was enrolled in Brown as an undergraduate student from the fall 2013 semester through the end of the fall 2014 semester and completed three semesters at the University.  John Doe has enrolled in another university.  (Exhibit 1, Transcript of August 11, 2016 Deposition of John Doe at 21:8-12).

---

[1]      As noted within the Statement, Brown references fifty-three exhibits, including deposition transcripts, record materials relating to the disciplinary process, and email communications exchanged during the course of the disciplinary process.  The Court entered a Stipulated Protective Order on April 28, 2016 (ECF No. 46), which the parties have respected during discovery and court filings.  Most of the exhibits to this Statement are "Confidential" under the Stipulated Protective Order.  Brown has filed a motion to place those exhibits under seal.

### III.  <u>Brown's Sexual Assault Task Force</u>

3.       In the spring of 2014, Brown's President Christina Paxson directed the University's convening of a Sexual Assault Task Force ("Task Force").  (<u>Exhibit 2</u>, Transcript of March 13, 2017 Deposition of Christina Paxson, at 23:18 to 25:2).

4.       The Task Force was charged with reviewing Brown's policies and procedures addressing issues of sexual assault.  (<u>Ex 2</u>, Paxson Tr. at 23:18 to 24:1).

5.       Brown convened the Task Force to coincide with the University's regularly scheduled review of its Code of Student Conduct.  (<u>Ex. 2</u>, Paxson Tr. at 23:18 to 24:1).  President Paxson directed the Task Force "with reviewing [and] making recommendations about fair policies and procedures that [Brown] could employ on campus."  (<u>Id</u>.)  The University convened the Task Force to study and address the Obama administration's increased attention to campus sexual assault issues and the White House's release of guidelines on sexual assault prevention.  (<u>Id</u>. at 24:25 to 25:2).[2]

6.       The Task Force was charged to conduct a data and research informed review of Brown's policies and ensure that their provisions remained consistent with evolving federal guidelines.  (<u>Ex. 2</u>, Paxson Tr. at 53:2-11).

---

[2]       On January 22, 2014, President Obama issued a Presidential Memorandum establishing the "White House Task Force to Protect Students from Sexual Assault."   <u>See</u> <u>https://obamawhitehouse.archives.gov/blog/2014/01/22/renewed-call-action-end-rape-and-sexual-assault</u>.  Also, in January 2014, the White House Council on Women and Girls issued a report titled "Rape and Sexual Assault: A Renewed Call to Action."   <u>See</u> <u>https://obamawhitehouse.archives.gov/sites/default/files/docs/sexual_assault_report_1-21-14.pdf</u>. In April 2014, the White House Task Force to Protect Students from Sexual Assault issued its first report, titled "Not Alone."  <u>See</u> <u>https://www.justice.gov/ovw/page/file/905942/download</u>.  Also, in April 2014, the Department of Education's Office for Civil Rights issued a forty-six page guidance document titled "Questions and Answers on Title IX and Sexual Violence."  <u>See</u> <u>https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf</u>.

7.      Russell Carey, Brown's Executive Vice President for Planning and Policy, and Michelle Cyr, Brown's Associate Dean for Academic Affairs, Alpert Medical School, co-chaired the Task Force.  (Exhibit 3 Transcript of May 18, 2017 Rule 30(b)(6) deposition of Brown (Russell Carey designated to testify regarding the Task Force) at 16:24 to 17:3; 41:16-19).

8.      The Task Force included members of Brown's administration, faculty, staff, and student body.  Student members were selected by the respective student governments of the undergraduate, graduate, and medical school communities.  (Ex. 3, Carey Tr. at 41:1-9).

9.      The Task Force sought broad input and recommendations from the University community regarding Brown's policies.  (Ex. 3, Carey Tr. at 33:24 to 35:3).

10.     As Vice President Carey testified, "[t]he concerns and responsibility of the Sexual Assault Task Force were to look at our policies and procedures in a balanced, fair, and equitable manner, thinking about the well-being, responsibilities, and rights of all of our students."  (Ex. 3, Carey Tr. at 47:12-18).  While "[m]any of the concerns that were being expressed in this time frame were from [the point of view of an alleged victim of sexual assault] . . .," "the general theme" in the Task Force's work focused on "fairness as it applies to all parties."  (Id. at 47:24 to 48:16).

11.     During the 2014-15 academic year, the Task Force met regularly between October 2014 and March 2015.  The Task Force also engaged in campus outreach through public fora and meetings with student organizations.  (Exhibit 4, containing Appendix C to Task Force's December 2014 Interim Report identifying its meetings and public outreach between October 2014-December 2014 and Brown's Responses to Plaintiff's Second Set of Interrogatories, Ans. to Int. No. 12 at pp. 3-5 listing the Task Force's meetings between January 2015 and March 2015).

12.     Among the diverse topics that it reviewed, the Task Force addressed campus discussion that ensued after a Brown female student complainant in a sexual misconduct case held

4

a press conference in April 2013 and made other public statements regarding her experiences in the student conduct process.  (Ex 2, Paxson Tr. at 24:15-18).

13.     The Task Force published its Interim Report in December 2014 and Final Report in March 2015.  See http://brown.edu/web/documents/president/SATF-Interim-Report-December-14.pdf and https://www.brown.edu/web/documents/president/SATF-Final-Report.pdf.

14.     As the Court noted in its decision in John Doe v. Brown University, C.A. No. 16-17-S, "[b]ased upon the Task Force's recommendations, at the outset of the 2015-16 academic year, Brown adopted a new Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy."  210 F. Supp. 3d 310, 316 (D.R.I. 2016).

## IV.  OCR Complaint

15.     In a letter dated July 10, 2014, the United States Department of Education, Office for Civil Rights, Region 1 ("OCR") informed Brown that an unidentified complainant filed an administrative Title IX complaint against the University.  (Exhibit 5, OCR's July 10, 2014 letter to Brown).

16.     In September 2014, Brown responded to OCR's data requests enclosed in the July 10, 2014 letter.  [Exhibit 6, Transcript of June 22, 2017 Rule 30(b)(6) deposition of Brown University (James Green, Esq. designated to testify regarding the OCR complaint) at 71:6-11]. OCR took no action until it contacted Brown in December 2014 to arrange a campus visit during January 2015, which OCR later cancelled and rescheduled to March 2015.  (Id. at 71:12 to 72:16).

17.     Regarding the OCR case, Vice President Carey testified that the Task Force noted that it was pending, but there was not any "any particular guidance or resolution" from OCR that the Task Force could consider in its review of Brown's policies.  (Ex. 3, Carey Tr. at 100:15-24).

## V.  Data Regarding Brown's Hearings Adjudicating Sexual Misconduct Charges (Offense III under its Code of Student Conduct)

18.     In response to Plaintiff's interrogatory number 10, Brown produced a chart listing the adjudications of student sexual misconduct disciplinary cases (Code Offense III) heard between the 2004-05 and 2014-15 academic years.  (Exhibit 7, Brown's Supplemental Ans. to Inter. No. 10, explaining and providing chart).

19.     As Brown stated in its supplemental answer to Interrogatory No. 10, before the 2010-11 academic year, a student charged with sexual misconduct (Offense III) had the option to have the charges heard at an Administrative Hearing (before a single University administrator) or before a body known as the University Disciplinary Council.  Beginning in 2010-11 academic year through the 2014-15 academic year, sexual misconduct charges were heard and adjudicated by a Student Conduct Board.  (Ex. 7).

20.     Contrary to the John Doe's allegation that male students at Brown were "invariably held" responsible as of the 2014-15 academic year for sexual misconduct charges, the chart identifies disciplinary cases in which male respondents were found to be not responsible for sexual misconduct charges.  (Ex. 7).

21.     During the 2014-15 academic year in which John Doe's case was heard, a Student Conduct Board panel found in the fall of 2014 that a male respondent was not responsible for sexual misconduct charges.  (Ex. 7, chart at case no 7).  During the spring 2015 semester, a Student Conduct Board panel likewise found that a male respondent was not responsible for sexual misconduct charges.  (Id., chart at case no. 3).

6

## VI.  Training of Student Conduct Board Members During 2014-15 Academic Year

22.     As addressed in Section VII below, under Brown's 2014-15 Code of Student Conduct, the Student Conduct Board was the hearing body designated to address and adjudicate student conduct disciplinary charges that could result in a charged student's suspension or expulsion from the University and a transcript notation.

23.     Student Conduct Board members, which included administrators, faculty, and students, were trained annually.  (Exhibit 8, Transcript of April 6, 2017 Deposition of Yolanda Castillo-Appollonio at 446:22-447:5).

24.     Early in the 2014-15 academic year, Brown's Office of General Counsel trained the Student Conduct Board members, and the training addressed the topics in the powerpoint presentation attached as Exhibit 9.  The training reviewed the Code's provisions and procedures, factors in evaluating consent, Rhode Island law on sexual assault, equitable and impartial adjudicatory process, and eliciting relevant evidence.  (Id).

## VII.  Brown's 2014-15 Code of Student Conduct

### A.     Offenses under the Code

25.     For the 2014-15 academic year, Brown issued its Code of Student Conduct at Brown University 2014-15 ("Code").  (copy attached as Exhibit 10).

26.     The Code promulgates offenses under which a student may be charged for behaviors contrary to Brown's community standards.  (Code at 3-6).

7

27.     Among the prohibited conduct, the Code proscribes the following offenses:

**Offense IIa:**  Actions that result in or can reasonably expected to result in physical harm to a person or persons;

**Offense IIIa (Sexual Misconduct):**  Sexual misconduct that involves non-consensual physical contact of a sexual nature;

**Offense IIIb (Sexual Misconduct):**  Sexual misconduct that includes one or more of the following: penetration, violent physical force, or injury; and

**Offense V (Drugs or Alcohol):**  Illegal possession or use of drugs and/or alcohol and/or drug paraphernalia.

(Code at 4-5).

28.     Under Offense III relating to sexual misconduct, the Code contains the following

Comment:

> *Offense III encompasses a broad range of behaviors, including acts using force, threat, intimidation, or advantage gained by the offended student's mental or physical incapacity or impairment of which the offending student was aware or should have been aware. Harassment without physical contact will not be deemed sexual misconduct under these provisions.  Violations of Offense IIIb will result in more severe sanctions from the University, separation being the standard.  Note:  Some forms of sexual misconduct may also constitute sexual assault under Rhode Island criminal laws and are subject to prosecution by State law enforcement authorities – which can take place independent of charges under the University's Student Code of Conduct.*

(Code at 4).

29.     Offense V, relating to drugs and/or alcohol, contains a Comment stating that "*The use of any drug, including alcohol, related to any offense will be considered an aggregating circumstance independently of whether the drug was used legally or illegally by the offending party . . . .*"  (Code at 4).

## B.     The Student Conduct Board Hearing Process

30.     The Code delineates Student Conduct Procedures for the filing of a complaint alleging a Code offense, the compiling of witness statements and evidence, the charging of

students for alleged offenses, the adjudication of charges, and the range of sanctions upon findings of responsibility.  (Code at 7-21).

31.     In matters where individuals pose a danger to themselves or the immediate well-being of the University community, the Senior Associate Dean for Student Life is one of the University officers empowered to separate a student from the University and to impose any additional conditions deemed necessary.  (Code at 9).

32.     Members of the University community may file written complaints and reports of information alleging Code violations with Brown's Office of Student Life.  (Code at 11).

33.     The Code identifies the "complaining witness" as the person who files the complaint.  The complaining witness is entitled to be present during the course of the hearing concerning his/her complaint.  (Code at 10).

34.     The Code identifies the respondent as the charged student, who is entitled to be present during the course of the hearing.  (Code at 10).

35.     The Senior Associate Dean for Student Life designates an Office of Student Life official to serve as the case administrator, who manages the student conduct process.  (Code. at 10).  The case administrator conducts formal investigations when requested to do so by the Senior Associate Dean for Student Life.  Id.  Also, the case administrator responds to requests from respondents and complaining witnesses during the pre-hearing phases of the student conduct procedures.  (Id).

36.     In matters, such as sexual misconduct, that may result in separation from the University, the Code delineates the following process:

       a.   The respondent will receive notice of the receipt of a complaint/information regarding the allegations and the corresponding offenses, and that an investigation is underway.

    b.   The complaining witness and the respondent will have the responsibility to provide the names of witnesses.

    c.   The respondent will have the right to prepare a written statement and to have an advisor.

    d.   A case administrator will forward relevant case materials to the Senior Associate Dean for Student Life who will determine whether or not there is a reasonable basis to file charges.  If it is determined that charges will be filed, the Senior Associate Dean for Student Life will refer the matter to the appropriate hearing venue.

(Code at 12).

37.    The Senior Associate Dean for Student Life assigns to a Student Conduct Board matters involving offenses, such as sexual misconduct charges (Offense III), that may involve possible separation from the University and/or a transcript remark.  (Code at 4, 8).

38.    The Code affords a charged student with rights in the disciplinary proceedings, including "[t]o be assumed not responsible for any alleged violations unless she/he is so found through the appropriate student conduct hearing," "[t]o have a reasonable length of time to prepare any response to a charge," "[t]o be informed of the evidence upon which the charge is based and accorded an opportunity to offer a relevant response," and "[t]o be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer."  (Code at 7).

39.    Within two days after the University's filing of charges against a student, the complaining witness and respondent may review the list of Student Conduct Board members and may request the disqualification or exclusion of members from the hearing panel, whom the student believes may be prejudiced by association with the case or the participants.  (Code at 9).

40.    Regarding witnesses, the Code states that individuals who are members of the University community, including respondents, are expected to appear at a hearing if they have knowledge or information of the incident in question and they have been notified to appear.  (Code

4830-2520-0981.2

at 10).  Individuals who are not members of the University community will generally be permitted to appear at a hearing only if they have direct knowledge or information regarding the incident. (Id.)

41.     The Student Conduct Board hearing is expected to commence within sixty (60) calendar days of the University's receipt of a complaint or report of information that forms the basis of the charges against the respondent.  (Code at 11).  The Senior Associate Dean of Student Life may extend this time period upon a written petition by the case administrator, the complaining witness, or the respondent.  (Id.)

42.     The complaining witness and respondent may each have an advisor chosen from the University community, who may make statements and generally assists the student during the hearing.  (Code at 15).

43.     In a matter involving a charge of sexual misconduct, the complaining witness may be accompanied by a University advocate, who provides support to the complaining witness and may not participate in the hearing.  (Code at 15).

44.     In a matter that could constitute a capital/life offense under Rhode Island criminal law, the respondent may be accompanied at the hearing by an attorney, who may not participate in the hearing but who may be present to safeguard the respondent's rights at any subsequent criminal proceeding and may advise the respondent only with respect to his/her testimony.  (Code at 15).  If a respondent intends to be accompanied by an attorney, the complaining witness has the same right to have an attorney present.  (Id. at 16).

45.     At least seven (7) days before the Student Conduct Board hearing, the case administrator provides the complaining witness and respondent with written notification of the charges, the time and place of the hearing, and a copy of the case materials.  (Code at 16).

46.     The complaining witness and respondent will provide the case administrator with a written list of witnesses they would like appear at the Student Conduct Board hearing at least four days before the hearing date by 9:00 a.m.  (Code at 16).  All witnesses must provide a written statement at least four days before the hearing by 9:00 a.m.  (Id.)   After this deadline, if either party believes that there is new information, which may influence the result of the Student Conduct Board hearing, he or she may request of the case administrator that the information be admitted to the Student Conduct Board hearing.  (Id.)

47.     Under the Code's procedures, "days" refer to weekdays, not weekends or University holidays.  (Code at 11).

48.     At the Student Conduct Board hearing, three members constitute a quorum.  (Code at 15).  The presiding Student Conduct Board hearing panel corresponds, in general, to the University status (undergraduate, graduate, and medical) of the charged student.  (Id.)  Each panel will consist of a faculty member, a dean, and a student.  (Id.)  The chair of the panel is responsible for conducting the hearing and deciding matters related to witnesses, evidence, and procedures. (Id.)

49.     The Student Conduct Board reviews the evidence, hears testimony, and receives information.  (Code at 14).  It applies a preponderance of the evidence standard.  (Id. at 10).

50.     The Code states the following order of the proceedings during the Student Conduct Board hearing:

1.     The chair reads the charges and informs the respondent of the right to remain silent,

2.     The case administrator is available to answer questions about the case materials.

3.     The respondent or his/her advisor may make an opening statement.

12

4.      The complaining witness or his/her advisor may make an opening statement.

5.      The Student Conduct Board examines the evidence and the testimony of any witnesses.  The respondent and complaining witness may ask questions of all witnesses.  The chair may require that all questions be directed through the chair.  At the discretion of the chair, witnesses may be recalled.

6.      The complaining witness or his/her advisor may make a closing statement.

7.      The respondent or his/her advisor may make a closing statement.

(Code at 16-17).

51.     Following the closing statements, the Student Conduct Board adjourns to a closed session to (1) determine if the respondent is responsible for the charged violations of the Code and, if so, (2) make a recommendation to the Senior Associate Dean for Student Life regarding an appropriate sanction up to expulsion and consistent with the Code's provisions on "Sanctions" and "Accompanying Terms for Sanctions."  (Code at 17).

**C.      The Appeal Process under the Code**

52.     With five (5) days of notification of the Student Conduct Board hearing outcome, a respondent may appeal in writing with a statement of the reasons.  In sexual misconduct cases, the complaining witness also has a right to appeal.  (Code at 10).

53.     Appeals from the Student Conduct Board determinations are submitted to the Vice President for Campus Life and Student Services or his/her designee.  (Code at 10).

54.     Appeals are normally only considered when (1) there is relevant new evidence that was not reasonably available to be presented to the Student Conduct Board; or (2) when a substantial procedural error by the University or Student Conduct Board is demonstrated and in the reasonable judgment of the appeal officer is sufficient enough that it may have affected the decision of the Student Conduct Board.  (Code at 10).

13

55.     If the appeal officer determines that the appeal has merit, he/she may reduce the severity or terms of a sanction or may remand the matter to the hearing body.  (Code at 11).

**D.     The Office of Student Life's Guide to the Investigation Process**

56.     Brown's Office of Student Life published "A Guide to the Investigation Process." (A copy of the Guide is attached as Exhibit 11).

57.     The Office of Student Life issued the Guide to help students understand the process for investigation of incidents that may possibly result in separation from the University.  (Guide at 2).

58.     The Guide was supplemental to the Code's Student Conduct Procedures.  (Guide at 2).

59.     The Guide describes the role of the case administrator and the process by which the case administrator would forward the case materials to the Senior Associate Dean for Student Life. (Guide at 3).

60.     The Guide indicates that the Senior Associate Dean for Student Life determines whether or not there was a "reasonable basis" to file student conduct charges and, if so, what venue will hear the case.  (Guide at 3).  It notes that a Student Conduct Board hearing resolves matters that may involve a possible separation from the University and/or a transcript remark.  (Id.)

61.     The Guide states that a "student is still assumed not responsible for any violations unless she/he is found through the appropriate student conduct hearing."  (Guide at 3).

## IX.  Plaintiff's Disciplinary Case

**A.     The Student Conduct Responsibilities of Vice President Klawunn and Dean Castillo-Appollonio During the 2014-15 Academic Year**

62.     As of the 2014-15 academic year, Margaret Klawunn served as Brown's Vice President of Campus Life and Student Services.  As a senior University officer, Vice President

4830-2520-0981.2

Klawunn's responsibilities included supervisory oversight of Brown's Office of Student Life. (Exhibit 12, Transcript of February 24, 2017 Deposition of Margaret Klawunn at 39:13 to 40:18). As noted above, under the Code's student conduct procedures, the Vice President of Campus Life and Student Services or an authorized designee was charged with receiving and deciding appeals of the Student Conduct Board findings and any sanctions imposed by the Senior Associate Dean for Student Life.  (See ¶ 53 above).[3]

63.    Within the Office of Student Life, Brown's Senior Associate Dean for Student Life was charged with making several determinations under the Code in the student conduct procedures.  (See ¶¶ 31, 35-37, 41, 50-51 above).

64.    During the fall 2014 semester, the Senior Associate Dean for Student Life position was vacant because the person who previously held that position, Allen Ward, had left the University.  (Ex. 12, Klawunn Tr. at 100:19-23).

65.    Because the Senior Associate Dean for Student Life reported to her, Vice President Klawunn assumed the responsibilities of the vacant position during the fall 2014 semester.  (Ex. 12, Klawunn Tr. at 100:19-23).

66.    Within the Office of Student Life, its Office of Student Conduct addresses student disciplinary matters.  (Ex. 12, Klawunn Tr. at 46:1-4).  Dean Castillo-Appollonio managed the Office of Student Life's student conduct division, and she reported to Vice President Klawunn during the fall 2014 semester.  (Id. at 44:13-17; see also Ex. 8, Castillo-Appollonio Tr. at 24:8-10).

---

[3]    Margaret Klawunn is no longer employed at Brown.  She is the Vice Chancellor for Student Affairs at the University of California – Santa Barbara.

67.     In his Complaint, John Doe alludes to Dean Castillo-Appollonio's prior employment as an attorney who defended domestic violence victims.  (Compl., ECF No. 1 at ¶ 40).  As she testified at her deposition, Dean Castillo-Appollonio graduated from law school in 1998 and worked for six years until 2004 at Legal Services of Southeastern Massachusetts, where she represented low-income clients primarily in domestic violence and housing cases.  (Ex. 8, Castillo-Appollonio Tr. at 12:1 to 14.10).  She represented both male and female clients.  (Id.)

68.     In a prior court filing (ECF No. 28-7) and during discovery, John Doe has alluded to an excerpt from an article that Margaret Klawunn co-authored, while at Rutgers University in the mid-1990's, with Professor David Burns.  The article titled "The Web of Caring: An Approach to Accountability in Alcohol Policy" appeared in a 1997 United States Department of Education publication titled "Designing Alcohol and Other Prevention Programs in Higher Education: Bringing Theory into Practice."   As Margaret Klawunn testified at her deposition, she worked at Rutgers University early in her professional career.  (Ex. 12, Klawunn Tr. at 324:2-6).  She assisted her supervisor, Professor Burns, in the drafting of the piece addressing student safety around alcohol usage.  (Id. at 77:23 to 78:7).  Professor Burns first hired her as a research assistant, and she then worked in his office full time.  (Id. at 324:2-6).  She was not employed at Brown when the "Web of Caring" article was published.  (Id. at 324:16-17).

69.     During discovery, John Doe has also referenced Margaret Klawunn's work as the Director of the Sarah Doyle Women's Center when she joined Brown in the mid-1990s, in addition to teaching in the English Department.  (Ex. 12, Klawunn Tr. at 18:18 to 19:3).  Margaret Klawunn was the Director until the year 2000, before her becoming an associate vice president of campus life until 2004 and the vice president in charge of campus life in 2008.  (Id.)  The mission of the

Sarah Doyle Women's Center focused on "gender equality" in education for female and male students.  (Id. at 23:17-21).

**B.**     **Jane Doe's Reporting of Allegations that John Doe Sexually Assaulted Her**

70.     During the evening of Wednesday, October 15, Bita Shooshani, Brown's Coordinator of Sexual Assault Prevention and Advocacy, informed Dean Castillo-Appollonio that Jane Doe wished to meet with her, and a meeting was set for the next day in Dean Castillo-Appollonio's office.  (Exhibit 13, email communications between Bita Shooshani and Dean Castillo regarding meeting with Jane Doe (Castillo-Appollonio Dep. Ex. 38)).

71.     During the meeting in Dean Castillo-Appollonio's office on Thursday, October 16, 2014, Jane Doe reported that John Doe sexually assaulted her in his dormitory room during the evening of Saturday, October 11, 2014.  (Ex. 8, Castillo-Appollonio Tr. at 144:19 to 145:02).

72.     Dean Castillo-Appollonio observed bruising on Jane Doe and asked whether the bruises related to the incident, and Jane Doe's response was "yes."  (Ex. 8, Castillo-Appollonio Tr. at 144:19 to 145:2).

73.     Dean Castillo-Appollonio advised Jane Doe of the University's policies regarding the reporting of alleged sexual assaults and available academic accommodations to a student alleging a sexual assault.  (Ex. 8, Castillo-Appollonio Tr. at 145:22 to 146:3).

74.     On Friday, October 17, 2014, Brown Department of Public Safety ("DPS") Detective Jeanne Peck and Sergeant John Carvalho met with Jane Doe and Bita Shooshani at Brown's Health Services in response to Jane Doe's request to file a report with DPS.  (Exhibit 14, 10/17/14 Narrative of Jeanne Peck (Peck Dep. Ex. 3)).

75.     Detective Peck wrote and filed a narrative of Jane Doe's report to DPS.  (Ex. 14).

76.     Jane Doe reported to DPS that John Doe used force against her during the October 11, 2014 incident and digitally penetrated her without consent.  (Ex. 14).

77.     Jane Doe reported that, earlier in the week on October 14, 2014, she contacted Brown's Counselling and Psychological Services, which referred her to Ms. Shooshani, Brown's Coordinator of Sexual Assault Prevention and Advocacy.  (Ex. 14).

78.     Jane Doe reported that she and Ms. Shooshani went to Women & Infants' Hospital on October 15, 2014, where a sexual assault examination was performed and photographs were taken of Jane Doe's injuries.  (Ex. 14).

79.     Jane Doe informed Detective Peck and Sergeant Carvalho that, while she wished to document the incident with DPS, she was reserving at that time her option to file a criminal complaint against John Doe.  (Ex. 14).  Jane Doe agreed that she would release all hospital records and evidence to the police if she elected to file a criminal complaint against John Doe.  (Id.)

80.     During the evening of Friday, October 17, 2014, Dean Castillo-Appollonio reported to Vice President Klawunn regarding the information received from her meeting with Jane Doe and DPS's meeting with the student.  (Exhibit 15, Castillo-Appollonio 10/17/14 email to Klawunn (Castillo-Appollonio Dep. Ex. 41)).  Dean Castillo-Appollonio informed Vice President Klawunn that Jane Doe intended to file a complaint in the Office of Student Life against John Doe over the weekend.  (Id.)

81.     On Saturday, October 18, 2014, Dean Castillo-Appollonio met again with Jane Doe and Bita Shooshani.   (Exhibit 16, Castillo-Appollonio 10/18/14 email to Klawunn (Castillo-Appollonio Dep. Ex. 42)).   In an email sent that day at 4:50 p.m., Dean Castillo-Appollonio reported an update to Vice President Klawunn.  (Id.)  Dean Castillo-Appollonio noted that she made Jane Doe aware that the University would issue no-contact orders and would be moving

18

forward with responsive action.  (Id.)  As of that time, Jane Doe was finalizing her written complaint against John Doe to be filed in the Office of Student Life.  (Id.)  Dean Castillo-Appollonio informed Vice President Klawunn that "I confirmed that the bruise I saw on her arm when I met her on Thursday was from the incident the Saturday before."  (Id.)  Dean Castillo-Appollonio requested the Vice President Klawunn inform her of any actions that should be taken over the weekend.  (Id.)

## C.   Brown's Communications and Meetings with John Doe During the Weekend of October 18-19, 2014

82.   During the evening of Saturday, October 18, 2014, Dean Castillo-Appollonio served no-contact orders by telephone to John Doe and Jane Doe.  (Exhibit 17, Castillo-Appollonio 10/18/14 email to Klawunn (Castillo-Appollonio Dep. Ex. 44)).

83.   During her telephone conversation with John Doe, Dean Castillo-Appollonio instructed John Doe to stay in his campus residence hall for the evening and attend a meeting in her office at 10:00 a.m. the next morning.  (Id.)  She offered John Doe support through the AOC (Administrator on Call) or CAPS (Counselling and Psychological Services), but he declined the support.  (Id.)

84.   As the acting Senior Associate Dean for Student Life, Vice President Klawunn concluded that, in the interest of campus safety, there was a reasonably supported basis for the interim action of John Doe's removal from the campus.  (Ex. 12, Klawunn Tr. at 96:22 to 97:16; 188:19 to 190:16; 191:12-16).

85.   On October 18, 2014 at 8:21 p.m., Jane Doe filed her Campus Incident Complaint against John Doe with the Office of Student Life, documenting her allegations that John Doe sexually assaulted her on October 11, 2014 by force and digitally penetrated her without consent.

(Exhibit 18, Jane Doe's Campus Incident Complaint (Castillo-Appollonio Dep. Ex. 45)).  Dean Castillo-Appollonio forwarded the Complaint to Vice President Klawunn.  (Id.)

86.     During the morning of Sunday, October 19, 2014 and before her scheduled meeting with John Doe, Dean Castillo-Appollonio wrote to Vice President Klawunn summarizing the information received as of that time (including the DPS report and Jane Doe's Campus Incident Complaint) and to document their conversations and concerns regarding John Doe's alleged conduct and the safety of the campus.  (Exhibit 19, 10/19/14 Castillo-Appollonio memorandum to Klawunn, (Castillo-Appollonio Dep. Ex. 52)).

87.     During the morning of Sunday, October 19, 2014, Dean Castillo-Appollonio and Dean Maria Suarez met with John Doe.  (Exhibit 20, Transcript of March 8, 2017 Deposition of Maria Suarez at 96:3 to 97:25).  Dean Suarez was Brown's Associate Dean and Director of Student Support Services within the Office of Student Life.  (Id. at 17:17-20).  Dean Suarez attended the meeting as a support dean for John Doe.  (Id. at 100:8 to 101-2).

88.     During the meeting, Dean Castillo-Appollonio informed John Doe of the allegations against him and Vice President Klawunn's decision to remove him from the campus on an interim basis.  (Ex. 8, Castillo-Appollonio Tr. at 313:1-9).

89.     Dean Suarez took notes of the meeting on an intake form, which included information about John Doe's class schedule for the semester so that she would be able to assist John Doe with any requested academic accommodations.  (Ex. 20, Suarez Tr. at 112:1 to 113:24).  Dean Suarez's intake notes state that John Doe described the October 11, 2014 incident as follows: he and Jane Doe socialized at a party that evening before going to his dormitory room, that they were kissing on his bed for 5-10 minutes when Jane Doe told him that she did not "want to go any further tonight," that they continued to kiss as they moved to a couch in his room, that he digitally

4830-2520-0981.2

penetrated her, and that he believed that she expressed consent.  (Exhibit 21, Dean Suarez's intake notes (Suarez Dep. Ex. 1)).

90.     John Doe stepped out of the meeting to telephone his father (James Doe) and speak privately to him.  (Ex. 8, Castillo-Appollonio Tr. (Vol. II) at 313:21 to 314:4).  Upon John Doe's return to the meeting, James Doe indicated that he would travel to Providence to meet that evening with Vice President Klawunn, Dean Castillo-Appollonio, and Dean Suarez. (Id. at 315:5-11).

91.     During the evening meeting, Vice President Klawunn presented the Does with a letter documenting the removal action for "an indefinite period of time pending the outcome of any investigation conducted by (the Office of Student Life)."   (Exhibit 22, 10/19/14 Klawunn letter to John Doe (Klawunn Depo. Ex. 10)).  The letter stated the University's commitment to "conducting an expedited review."  (Id.)  The letter further indicated that the action was based upon the "seriousness of the allegations" against John Doe and that the University did "not presume to hold [him] responsible for these allegations."  (Id.)  Also, the Office of Student Life confirmed that it would work with John Doe to make arrangements with his professors to allow him to continue his academic coursework.  (Id.)

92.     Vice President Klawunn modified the removal action to allow John Doe to attend his classes on campus.  (Ex. 12, Klawunn Tr. at 190:23-25).

93.     In an affidavit filed earlier in this case [ECF No. 29-2], John Doe's father contends that Vice President Klawunn stated during the evening meeting that the Does "should blame Obama."  Vice President Klawunn denies making this statement, and Deans Castillo-Appollonio and Suarez have no recollection of any such statement by Vice President Klawunn.  (Ex. 12, Klawunn Tr. at 167:23-25; Ex. 8, Castillo-Appollonio Tr. at 316:12-15; Ex. 20, Suarez Tr. at 120:5-8)).

**D.** **The Notice of Allegations Served on October 20, 2014 and John Doe's Receipt on October 21, 2014 of the DPS Report and Jane Doe's Campus Incident Report**

94.     As noted in paragraph 36 above, under the Code's Student Conduct Procedures, John Doe was entitled to "notice of the receipt of a complaint/information regarding the allegations and the corresponding offenses, and that an investigation is under way." (Ex. 10, Code at 11-12).

95.     On Monday, October 20, 2014, Brown provided John Doe with the required written notice of the allegations against him, which was signed by Dean Castillo-Appollonio. (Exhibit 23, 10/20/14 notice letter (John Doe Dep. Ex. V))

96.     The notice detailed the alleged October 11, 2014 incident and stated that the allegations may constitute Code violations of Offenses IIa (Actions that result in or can be reasonably expected to result in physical harm to a person or persons); Offense IIIa (Sexual Misconduct that involves non-consensual physical contact of a sexual nature); Offense IIIb (Sexual Misconduct that includes one or more of the following: penetration, violent physical force, or injury); and Offense Va(ii) (illegal possession or use of alcohol). (Ex. 23).

97.     The notice stated that "[i]t has been determined that an investigation into these allegations will be conducted by the Office of Student Life." (Ex. 23). John Doe was afforded the opportunity to provide in writing the names of all persons who may be witnesses or who may have information concerning the incident. (Id.)

98.     John Doe was also afforded the opportunity to submit a written statement by October 22, 2014 at 9:00 a.m. (Ex. 23).

99.     John Doe was also notified of his right under the Code to have an advisor. (Ex. 23).

100.    The notice indicated that his statement and any other information collected would be used to determine whether there was a reasonable basis to file student conduct charges and the venue in which such charges would be heard.  (Ex. 23).

101.    The notice enclosed a copy of the Code, the Guide, and a list of University faculty and administrators who agreed to serve as advisors to students involved in the student conduct procedures.  (Ex. 23).

102.    On Tuesday, October 21, 2014, Dean Castillo-Appollonio provided John Doe with copies of DPS's October 17, 2014 report and Jane Doe's October 18, 2014 complaint.  (Exhibit 24, 10/21/14 communication providing report and complaint (John Doe Dep. Ex. W)).

103.    Vice President Klawunn determined that the student conduct process should be completed in a prompt manner in John Doe's interests because, while he was allowed to attend classes, he remained otherwise removed from the campus.  (Ex. 12, Klawunn Tr. at 212:17 to 213:5; 220:24 to 221:9).

104.    Dean Castillo-Appollonio was the assigned case administrator in the student conduct process.  (Ex. 8, Castillo-Appollonio Tr. at 18:14 to 20:10).

**E.    October 21, 2014 - November 5, 2014**

105.    On Wednesday, October 22, 2014, John Doe informed Dean Castillo-Appollonio that he had elected to have his academic advisor, Marylou McMillan, serve as his advisor in the student conduct proceedings.  (Exhibit 25, 10/22/14 John Doe email to Castillo-Appollonio).

106.    During the week of October 20, 2014, John Doe and his father met with Dean Suarez, John Doe's support dean, and inquired about the student conduct process.  Dean Suarez discussed the Does' inquiries with Dean Castillo-Appollonio and also noted them in an email sent

on Saturday, October 25, 2014.  (Exhibit 26, 10/25/14 Suarez email to Castillo-Appollonio (John Doe Depo. Ex. BB)).

107.    John Doe did not submit his written statement by 9:00 a.m. on October 22, 2014.  On Monday, October 27, 2014, Dean Castillo-Appollonio met with John Doe and his advisor, Marylou McMillan.  Dean Castillo-Appollonio granted John Doe an extension to submit his written statement by 9:00 a.m. on October 30, 2014.  (Exhibit 27, 10/27/14 Castillo-Appollonio email to John Doe).

108.    During the evening of October 27, 2014, Dean Castillo-Appollonio sent an email to John Doe responding to the inquiries that he and his father raised with Dean Suarez.  Dean Castillo-Appollonio referred John Doe to applicable pages within the Code.  (Ex. 26, Castillo-Appollonio email to John Doe (John Doe Dep. Ex. BB)).

109.    On Wednesday, October 29, 2014 at 10:19 a.m., John Doe submitted to Dean Castillo-Appollonio: (1) his personal statement, (2) a list of five witnesses, and (3) eight photographs of Jane Doe that John Doe printed from another student's Facebook page, which purported to show her at a party on October 12, 2014 (the night after the incident).  (Exhibit 28, John Doe 10/29/14 submission).

110.    In his personal statement, John Doe wrote that his interactions with Jane Doe on October 11, 2014 were consensual.  (Ex. 28, Statement, Brown 1290-92).  John Doe wrote the he and Jane Doe were kissing in his room for about 10-15 minutes when Jane Doe told him "I don't think we should go any further than this tonight."  (Id., Statement, Brown 1290-91).  John Doe wrote that they continued to kiss and that he inserted his fingers inside of Jane Doe.  (Id.)  John Doe wrote that he asked Jane Doe if she liked his action and that he believed her response conveyed consent.  (Id.)

24

111.    A few minutes after submitting his statement, John Doe emailed Dean Castillo-Appollonio to inform her that, should a hearing take place concerning his encounter with Jane Doe, he wished his legal counsel to be present.   (Exhibit 29, John Doe 10/29/14 email to Castillo-Appollonio).

**F.    The November 5, 2014 Charge Letter**

112.    Based upon the information collected as of November 5, 2014 (including the written statements of Jane Doe and John Doe), Vice President Klawunn determined that that charges were appropriate and a Student Conduct Board hearing should be held.   (Ex. 12, Klawunn Tr. at 254:18-25).

113.    On Wednesday, November 5, 2014, Brown issued its charge letter to John Doe. (Exhibit 30, 11/5/14 Charge Letter (Castillo-Appollonio Dep. Ex. 58)).   The charge letter notified him that the Senior Associate Dean for Student Life had determined that a Student Conduct Board hearing was warranted in the case, which was scheduled to occur on Friday, November 14 at 9:00 a.m.   (Id.)

114.    The charge letter described the factual allegations supporting the charges against John Doe under Offenses IIa, IIIa, IIIb, and Va(ii).   (Ex. 30).

115.    The charge letter enclosed forty-one pages of witness statements and information that the Office of Student Life had received as of that date.   (Ex. 30).

116.    John Doe was advised of the witnesses who may appear at the Student Conduct Board hearing and his right to request that other witnesses appear.   (Ex. 30).   John Doe was informed of the Code's requirement that all written witness statements must be submitted by 9:00 a.m. on November 10, 2014 (at least four days before the hearing).   (Id.).

25

117.    John Doe was informed of his right under the Code to request in writing that any member of the Student Conduct Board be disqualified from hearing the case as a panelist.  (Ex. 30).  He was provided with the list of the Student Conduct Board members and a form to request the recusal of any member.  (Id.)

118.    Jane Doe was not charged with an alcohol violation.  (Ex. 8, Castillo-Appollonio Tr. at 481:18-20).  As a matter of practice, the Office of Student Life did not charge a complaining witness with an alcohol violation where he or she came forward to report allegations of more serious conduct (such as sexual misconduct).  (Id. at 482:5-14).

**G.    November 5, 2014 – November 21, 2014**

119.    Within two days of his receipt of the charge letter, on Friday, November 7, 2014, John Doe exercised his right under the Code to request the disqualification of a Student Conduct Board member from presiding at the hearing.  John Doe requested the disqualification of Dean Maria Suarez because she was advising him academically during the student conduct process.  (Exhibit 31, Disqualification Form (John Doe Dep. Ex. HH)).

120.    Also, on that date, John Doe requested a "reasonable continuance" of the November 14, 2014 Student Conduct Board hearing date.  (Exhibit 32, John Doe 11/7/14 email to Castillo-Appollonio (John Doe Dep. Ex. II)).  John Doe stated that he sought additional time to prepare for the hearing, that he intended to provide additional materials, and that his mother was scheduled to have surgery during the week of November 10, 2014.  (Id.)  John Doe sought a "short continuance," suggesting two-weeks.  John Doe confirmed his understanding that the "expedited hearing process is enacted for my own benefit because I am off-campus."  (Id.)

121.    The Office of Student Life granted a continuance of the Student Conduct Board hearing to Friday, November 21, 2014.  (Exhibit 33, Castillo-Appollonio 11/11/14 email to John Doe (John Doe Dep. Ex. JJ)).

122.    On November 12, 2014, John Doe requested another continuance because of his mother's shoulder surgery.  (Exhibit 34, John Doe 11/12/14 email to Castillo-Appollonio).

123.    Dean Castillo-Appollonio conferred with Vice President Klawunn regarding John Doe's second request for a continuance, and they agreed that another continuance should not be granted.   The University had the responsibility to balance the rights of both students (the complainant and respondent), as well as the schedules of students who would have to appear at the Student Conduct Board hearing, as the end of the fall 2014 semester approached.  (Ex. 12, Klawunn Tr. at 259: 21 to 260:4; Ex. 8, Castillo-Appollonio Tr. 387:18 to 388:9).

124.    Although the Office of Student Life had received the medical records from Women & Infants Hospital relating to Jane Doe's examination on October 15, 2014, the Office of Student Life had not received as of mid-November 2014 copies of the photographs of Jane Doe that were taken at the Hospital.  Dean Castillo-Appollonio and others at Brown contacted the Hospital to request the photographs, and the Hospital indicated that they were missing.  (Ex. 8, Castillo-Appollonio Tr. at 305:11 to 309:23).

125.    Marylou McMillan, John Doe's advisor, participated in meetings with John Doe, his father, and his attorney to prepare for the Student Conduct Board hearing.  (Exhibit 35, Transcript of March 16, 2017 Deposition of Marylou McMillan at 39:5 to 40:7).  During her deposition, Ms. McMillan testified that John Doe's father was insisting upon "very aggressive" narratives, particularly directed at Jane Doe.  (Id.)  She expressed concerns that it would not be in John Doe's best interests to take a hostile tone at the Student Conduct Board hearing.  (Id.)

126.   On Saturday, November 15, 2014, John Doe sent an email to Dean Castillo-Appollonio requesting that he be provided with all materials compiled by Brown, while acknowledging that, under the Code, he would be provided with additional materials "this week." (Exhibit 36, John Doe 11/15/14 email to Dean Castillo-Appollonio).

127.   Consistent with the Code, the deadline for submission of written witness statements was Monday, November 17, 2014 at 9:00 a.m. (four days before the November 21, 2014 Student Conduct Board hearing).  (Ex. 10, Code at 16).

128.   During the evening of Sunday, November 16, 2014, Jane Doe submitted a short addendum to her original statement (referring to her October 18, 2014 Campus Incident Report). (Exhibit 37, Jane Doe's Addendum)

129.   During the evening of Sunday, November 16, John Doe emailed Dean Castillo-Appollonio to inform her, that by the 9:00 a.m. deadline the next day, the Office of Student Life would receive seventeen (17) witness statements filed on his behalf.  Also, he resubmitted copies of the Facebook photographs of Jane Doe that he initially submitted on October 29, 2014.  John Doe noted that the resubmitted Facebook photographs were labeled and brightened.  (Exhibit 38, John Doe 11/16/14 email to Dean Castillo-Appollonio (John Doe Dep. Ex. MM)).

130.   After the 9:00 a.m. submission deadline on Monday, November 17, 2014, the Office of Student Life compiled that day the hearing materials to be submitted to the Student Conduct Board panelists for the November 21, 2017 hearing.  (Ex. 8, Castillo-Appollonio Tr. at 423:16 to 424:1).

131.   Upon review of the witness statements submitted on John Doe's behalf, Dean Castillo determined that certain character witness statements should not be included in the Student Conduct Board's hearing materials.  (Exhibit 39, Castillo-Appollonio 11/17/14 email to John Doe).

28

The removed character statements were not submitted by students or members of the University community.  (Id.)  As noted above, the Code states that individuals who are not members of the University community will generally be permitted to appear at a hearing only if they have direct knowledge or information regarding an incident.  (Ex. 10, Code at 10).  Also, in a statement by one of John Doe's witnesses that was included in the hearing materials, Dean Castillo-Appollonio redacted a portion that was unrelated to the October 11, 2014 incident at issue.  (Ex. 8, Castillo-Appollonio Tr. at 363:6 to 366:21).

132.    As noted in ¶ 115 above, with its issuance of its charge letter, the Office of Student Life had previously sent to John Doe and Jane Doe on November 5, 2014 the statements and information compiled as of that date.  At approximately 5:17 p.m. on November 17, 2014, the Office of Student Life provided the parties with the additional materials within the hearing record before the Student Conduct Board.  These documents included witness statements submitted between November 5, 2014 and the November 17, 2014 deadline, medical records pertaining to Jane Doe's visits to Brown Health Services and Women & Infants' Hospital on October 15, 2014, text messages provided by one of Jane Doe's witnesses pertaining to exchanges between her and John Doe after the incident, and the brightened and labeled Facebook photographs submitted by John Doe.  The materials also identified the panelists at the hearing:  Dean Ashley Ferranti of the Office of Student Life, Professor Gretchen Schultz (Professor and Interim Chair of French Studies), and Yao Liu (a Brown undergraduate student).  (Exhibit 40, Cover page with index to Student Conduct Board record).  The materials provided on November 17, 2014 are those listed on pages 42-128 in the cover page's index.

133.    The parties were provided with a timeline of the order of proceedings for the November 21, 2014 Student Conduct Board hearing.  (Exhibit 41, SCB hearing timeline).  The

timeline referenced opening and closing statements by John Doe and Jane Doe, consistent with the Code's provisions at pages 16-17 (Ex. 10).   Contrary to John Doe's contention, there is no reference to a "mid-point statement" in the timeline.

134.    John Doe requested a rescheduling of the Student Conduct Board hearing based upon his review of the additional hearing documents received on November 17, 2014.  (Exhibit 42, John Doe 11/27/14 email to Dean Castillo-Appollonio).

135.    In his continuance request, John Doe inquired about text messages referenced in some witness statements.  (Ex. 42).

136.    On Tuesday, November 18, 2014, Dean Castillo-Appollonio responded to John Doe regarding his continuance request, indicating that the hearing would proceed as scheduled on November 21, 2014 because the University had followed its normal process in receiving witness statements up to four days before hearing date.  (Exhibit 43, Castillo-Appollonio 11/18/14 email to John Doe).   Regarding John Doe's inquiry about student text messages, Dean Castillo-Appollonio indicated that the texts were not submitted by the student witnesses and that the University had shared with John Doe the currently available hearing documents.  (Id.).

137.    On November 19, 2014, Dean Castillo-Appollonio informed the parties of a change in the previously designated composition of the Student Conduct Board hearing panel.  (Exhibit 44, Castillo-Appollonio 11/19/14 email to John Doe (John Doe Dep. Ex. PP)).  Dean Richard Bova would preside as the dean on the panel.  (Id.)

H.    **The Student Conduct Board Hearing and Decision**

138.    It is undisputed in this litigation that the Student Conduct Board hearing in this litigation occurred on Friday, November 21, 2014.  The presiding Student Conduct Board panel was Professor Gretchen Schultz (panel chair), Dean Richard Bova, and an undergraduate student

30

named Yao Liu.  Brown has produced in discovery a full audio recording of the Student Conduct Board hearing that spanned approximately five hours.  Also, Brown had the recording transcribed in April 2015 and produced in discovery the 289-page hearing transcript.

139.    Consistent with the Code's provisions, John Doe and Jane Doe gave opening and closing statements.  (Exhibit 45, SCB Tr. at 7:1 to 17:19; 279:23 to 288:7).  In his opening statement, John Doe accepted responsibility for the alcohol charge (Offense Va).  (Id. at 7:3-5).  After Jane Doe and her witnesses had testified, John Doe sought to make at the hearing what he has described in this litigation as a "mid-point" statement, which is not referenced in the Code.  (Id. at 162:9 to 2).  Jane Doe's advisor raised an inquiry about the permissibility of John Doe's attempt to make an additional statement beyond his opening and a closing statements.  Professor Schultz, acting as the Chair and under her discretion under of the Code to decide upon matters of hearing procedure, stated that proceedings did not allow for a statement at that point "rebutting" Jane Doe's testimony.  (Id. at 163:7-19).

140.    As is confirmed by the audio recording and the transcript of the Student Conduct Board hearing, the following individuals appeared at the hearing and testified (which should be undisputed):  Jane Doe, Sergeant John Carvalho of Brown DPS, Detective Jeanne Peck of Brown DPS, Dr. Marsha Miller of Brown Health Services, six student witnesses for Jane Doe (Students K.R., D.G., L.S. C.L., R.R., and A.D.), John Doe, and five student witnesses for John Doe (TV, L.B., V.V., E.S., and A.C.).

141.    As was noted on the record during the Student Conduct Board hearing, Women & Infants Hospital did not respond to Brown's several pre-hearing requests that the nurses who examined Jane Doe on October 15, 2014 appear to testify.  (Ex. 45, SCB Tr. at 153:9-154:23).

John Doe's advisor was allowed to note on the record the questions that the respondent would have asked the nurses if they had appeared. (Id. at 160:15-21).

142. At one point during the questioning of John Doe, Jane Doe's advisor raised an inappropriate line of questioning, and Brown's representative from the Office of the General Counsel and the Chair called for a recess. (Ex. 45, SCB Tr. at 247:21 to 249:21). When the hearing resumed, the Chair stopped the line of questioning and noted its irrelevance to the proceeding. (Id. at 249:22 to 250:2).

143. At the conclusion of the hearing, John Doe and Jane Doe were informed that they would be notified of the Student Conduct Board's determination within five business days (by Tuesday, December 2, 2014 (because of the Thanksgiving holiday during the week of November 24, 2014). (Ex. 45, SCB Tr. 288:8 to 289:8).

144. On November 24, 2014, the Student Conduct Board filed its decision with the Office of Student Life, finding John Doe responsible for the charges and recommending his suspension from the University for 2.5 years. (Exhibit 46, Student Conduct Board's decision filed with Office of Student Life).

145. On December 2, 2014, the Office of Student Life provided John Doe with a decision letter informing him that the Student Conduct Board found him responsible for the charged offenses and that University had suspended him for 2.5 years. (Exhibit 47, 12/2/14 decision letter).

I.    **The Denial of John Doe's Appeal**

146. As noted above, the Code states that the Vice President for Campus Life and Student Services (Margaret Klawunn) or a designee reviews a student conduct appeal. Because she was acting as the Senior Associate Dean for Student Life during John Doe's disciplinary case, Vice President Klawunn could not review his appeal. (Ex. 12, Klawunn Tr. 294:21 to 295:4).

147.    As the designee to hear student conduct appeals under the Code, Vice President Klawunn determined that an appropriate officer would be a member of Brown's Office of the Provost, which previously heard student conduct appeals in Brown's student conduct process.  (Ex. 12, Klawunn Tr. at 289:6-17).  For the 2014-15 academic year, Vice President Klawunn designated Brown's Deputy Provost, Joseph Meisel, to review student conduct appeals.  (Id. at 290:19-25).

148.    On December 9, 2014, John Doe submitted his timely appeal to Deputy Provost Meisel contending several procedural errors.  (Exhibit 48, copy of John Doe's appeal letter).

149.    John Doe's appeal was the first student conduct appeal that Deputy Provost Meisel reviewed as the designated appeal officer during the 2014-15 academic year.  (Exhibit 49, Transcript of May 19, 2017 Meisel Deposition (first session) at 26:17-19).

150.    On December 10, 2014, Deputy Provost Meisel met with Vice President Klawunn and Dean Castillo-Appollonio to review his role as the appeal officer, the student conduct process under the Code, and the timeline in John Doe's case.  (Exhibit 50, Transcript of July 11, 2017 Meisel Deposition (second session) at 26:9-16; 88:19 to 89:8).

151.    Deputy Provost Meisel reviewed all of the written materials that were presented to the Student Conduct Board and listened to substantial portions of the recording of the Student Conduct Board hearing, including all of statements and testimony of John Doe and Jane Doe.  (Ex. 50, Meisel Tr. (second session) at 52:20 to 53:7).

152.    As he conducted his careful review of John Doe's appeal, Deputy Provost Meisel wrote detailed notes regarding the record evidence and the issues raised by John Doe. (Exhibit 51, Meisel's notes at Brown 3597-3603, Meisel Dep. Ex. 14B); (Ex. 50, Meisel Tr. (second session) at 59:11-18).

153.    By December 17, 2014, Deputy Provost Meisel had reached the point in his review where he was largely formulating his written response to the appeal.  (Ex. 50, Meisel Tr. (second session) at 27:8-15.   On that date, he met with Vice President Klawunn and Dean Castillo-Appollonio to confirm procedural matters under the Code. (Id.).

154.    On December 18, 2014, Deputy Provost Meisel circulated a draft of his appeal decision letter to Vice President Klawunn and Dean Castillo-Appollonio.  (Exhibit 52, 12/18/14 draft of appeal decision (Meisel Dep. Ex. 7)).   On the second page of his draft decision letter, Deputy Provost Meisel included a comment notation regarding John Doe's contention that he was not given sufficient time to review the hearing materials received on November 17, 2014.  (Id. at bates page Brown 1807).  Dean Castillo-Appollonio responded to the comment by referring to the Code's provision that statements may be submitted up to 9:00 a.m. four business days before the Student Conduct Board hearing.  (Id.).

155.    On December 22, 2014, Deputy Provost Meisel issued his six-page decision letter responding to each issue raised in John Doe's appeal and detailing his reasons for the denial of the appeal.  (Exhibit 53, 12/22/14 appeal decision letter).

BROWN UNIVERSITY

By its Attorney,

/s/ Steven M. Richard

Steven M. Richard (#4403)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI  02903
Tel:  (401) 454-1020
Fax:  (401) 454-1030
srichard@nixonpeabody.com

Dated:  December 7, 2017

34

<u>CERTIFICATE OF SERVICE</u>

     I certify that on the 7th day of December, 2017, I filed and served this Local Rule 56.1 Statement on the Court's CM/ECF system.

                       /s/ Steven M. Richard

4830-2520-0981.2