UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

---------------------------------------------------------------X
JOHN DOE,                                          :   Civ. No. 15-cv-00144-S-LDA
                                                   :
                **Plaintiff,**                :
                                                   :
      -against-                                  :
                                                   :
BROWN UNIVERSITY                                   :
  in Providence in the State of Rhode Island    :
  and Providence Plantations,                   :
                                                   :
                **Defendant.**               :
---------------------------------------------------------------X

**PLAINTIFF'S STATEMENT OF DISPUTED FACTS AND INFERENCES
WITH RESPECT TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56(a), Plaintiff John Doe presents the following statement of disputed facts (PSDF) with respect to Defendant Brown University's Motion for Summary Judgment, referring to Defendant Brown University's Statement of Undisputed Facts (CM/ECF 95, referred to below as "DSUF").  As part of this presentation, Plaintiff also will describe instances in which he disputes Defendant's characterizations of these "undisputed" facts and those instances in which Defendant's selective excerpting of evidence appears to support inferences based on those "undisputed facts" that Plaintiff disputes.[1]

---

[1] It is well-established that courts already "draw all inferences in favor of . . . the non-moving party" when reviewing motions for summary judgment, *see, e.g. Fadill v. Deutsche Bank National Trust Co.*, 772 F.3d 951, 955 (1st Cir. 2014); however, the DSUF contains an extraordinary amount of selective, out of context, quotations that, in Plaintiff's view, require clarification at this stage. With that said, Plaintiff reserves the right to claim favorable inferences from Defendant's summary judgment record beyond the specific examples set forth in this document.

1

I. <u>Objection</u>

Plaintiff objects to Defendant's out-of-context, partial quotations of documents which, as presented in the DSUF, give the appearance of supporting at best disputed or even plainly inaccurate inferences and/or conclusions. *See, e.g.*, PSDF ¶29 (disputing DSUF ¶103).

Plaintiff also objects to those instances in which Defendant presents quotations of University officials as "undisputed facts" when, although the quotation is accurately transcribed, the underlying statement is disputed. *See, e.g.*, PSDF ¶¶4, 28.

Plaintiff notes for the record that the general format of DSUF, in which several numbered paragraphs contain and combine multiple factual statements, does not comply with LR Cv 56(a)(2)'s requirement that "each 'fact' shall be set forth in a separate, numbered paragraph." The DSUF is inconsistent in this regard – on some occasions it stretches out the description of a single document to six or eight consecutive numbered paragraphs to describe each sentence it contains (*see* SUF ¶¶94-101, 112-18), when merely presenting the document would have been sufficient for the purposes of this Motion. Given Defendant's choice of format, Plaintiff will proceed in the same manner below "under protest" in order to facilitate the Court's review.

II. <u>Statement of Disputed Facts, Characterizations and Inferences</u>

1. Plaintiff disputes DSUF ¶5 as follows:

The University's decision to convene the Sexual Assault Task Force ("SATF") was an extraordinary project in response to a campus crisis, as documented by the following:

a. On April 26, 2014, President Paxson sent an email to the Brown community stating "This past week, a Brown University student conducted a press conference to discuss how charges of sexual assault she brought against another student were handled by the University. Her account raised questions about the adequacy of our processes for evaluating charges of sexual assault, and about the severity of sanctions for students who are found responsible for sexual misconduct under Brown's Code of Student Conduct." The email did not discuss any task force; instead it just said "policies and procedures designed to keep our campus safer

        must be open to continuous review. Such a review was already planned for the coming academic year. We are accelerating that review and it will include significant input from students." PSDF Exhibit 1.

   b.   On May 9, 2014, President Paxson announced the formation of the SATF in a "response to the student task force" that she sent to the entire Brown University community in which she stated, "As you know, the recent BUCC [Brown University Community Council] meeting discussion led to the decision to accelerate the planned review of the Code of Conduct as it related to sexual misconduct, and to nest this review in a broader assessment of our policies and programs around prevention, counseling and advocacy. The Brown University Task Force on Sexual Assault, which will include significant student representation and input, will begin its work in earnest in fall 2014." PSDF Exhibit 2.

   c.   The cover letter of the Sexual Assault Task Force Interim Report dated December 2014 states as follows: "In response to another round of national attention and scrutiny, this Task Force was formed and charged with the responsibility of shaping Brown into a national leader in addressing sexual violence on college campuses." PSDF Exhibit 9.

   2.   Plaintiff disputes DSUF ¶6 as follows:

From the beginning, the SATF served as a conduit for dialogue between President Paxson and Brown University student activists who were energized by Lena Sclove's protest of the disposition of her sexual assault case. President Paxson's May 9, 2014 email announcing the formation of the SATF was addressed to the "Student Task Force on Sexual Assault," which had sent President Paxson a list of demands in a petition with the heading of "Imagine Rape Zero." *See* PSDF Exhibits 3, 4 (Paxson Deposition, p. 37 *and* Exhibit 4 to Paxson's deposition). The dialogue between the SATF and the Imagine Rape Zero group continued through SATF's meetings, including its October 29, 2014 meeting, (*see* PSDF Exhibit 5 (SATF Report, Appendix C, p. 1)) and continued at least through the publication of the Interim Report in December, 2014. *See* PSDF Exhibit 6 (Appendix E to report).

   3.   Plaintiff disputes any inference from DSUF ¶8 that the selection process yielded an unbiased group of SATF members and support staff. More specifically, Defendant selected

Justice Gaines and Yvonne Yu to provide research to the SATF. PSDF Exhibit 9 (cover letter of SATF Report). They were activists who were advocates for Lena Sclove and the Imagine Rape Zero student group. PSDF Exhibit 8 (Carey Deposition exhibits 9, 10).

4.   Plaintiff disputes the accuracy of Vice President Carey's characterization of the SATF's mission and operation in DSUF ¶10. The SATF Interim Report continued a dialogue with student activists by focusing on the interests of victims of sexual assault, phrased in gender-based terms. For example, the SATF Interim Report's cover letter to President Paxson (PSDF Exhibit 9) begins with a discussion of the 1990 "Rape List" protest by exclusively female Brown University undergraduate students as a protest against what they believed to be the University's inadequate protection of women against male predators. (Vice President Carey was the principal author of both the letter and the Interim Report.) PSDF Exhibit 10 (Carey Deposition, p. 75.) *See also* PSDF Exhibit 11 (11/30/15 BDH Article describing origin of "rape list" controversy). Mr. Carey acknowledged that the use of the term "rape culture" was "broad and not particularly helpful" (PSDF Exhibit 10, p. 93) thus Plaintiff contends this term was a sop to the activist community.

5.   Plaintiff disputes DSUF ¶12 as follows:

The press conference referenced here took place on April 22, 2014, not April, 2013. PSDF Exhibit 12. The complainant's name was Lena Sclove, and her press conference ignited a firestorm of student protests. *Id.* President Paxson responded with her first of a series of campus-wide emails, specifically mentioning the press conference, four days later. *See* PSDF ¶1, *supra and* associated exhibits. At its October 29 meeting, the SATF received a presentation from the Imagine Rape Zero Group, two of whose members were hired by the SATF as research assistants. *See* PSDF ¶¶2, 3 *supra and* associated Exhibits.

      6.      Plaintiff disputes DSUF ¶15 as follows:

Although OCR did not identify the complainant when it contacted Brown University, the complainant's identity already was a matter of common knowledge for at least several weeks. Brown University learned of Lena Sclove's complaint when it was reported in a May 23, 2014 article by the Brown Daily Herald. PSDF Exhibit 13. (Mr. Carey regularly read the Brown Daily Herald as part of his responsibilities as University Vice President, *see* PSDF Exhibit 10, p. 57.) Ms. Sclove's complaint was prepared pro bono by a group called Legal Momentum, which describes itself as "the women's legal defense fund" with a mission to "provide an expert legal voice to seek justice for women." PSDF Exhibits 14 (OCR Complaint), 15 (Legal Momentum website).

      7.      Plaintiff questions the relevance of DSUF ¶¶20-21, in which Defendant packages its disagreement and/or dispute of an allegation made in the Complaint through the vehicle of a Statement of Undisputed Facts. With that said, Plaintiff disputes the significance of DSUF ¶¶20-21's exceptions to the pattern alleged in the Complaint as follows. Of the seven Student Conduct Board hearings for the 2014-15 academic year, all involved claims that male respondents had harmed female students, and five of them included a finding of responsibility. Of the remaining two, one of them was brought by the University rather than the female student herself, making its prosecution difficult, if not practically impossible. The same chart reveals that Professor Schultz and Dean Bova (two of the three Student Conduct Board members who heard Plaintiff's case) each heard three cases and found the male responsible in all of them. Also, of the 31 cases listed in this chart, 28 involved a female complainant, and all 31 involved a male respondent. *See* DSUF Exhibit 7. In this way, while the results were not, literally speaking, "invariably" against the respondent, the difference was not significant.

8. Plaintiff disputes DSUF ¶24 as follows: the PowerPoint presentation attached as Exhibit 9 to DSUF is not dated to establish that Brown's Office of General Counsel trained the Student Conduct Board members early in the 2014-15 academic year. Further, DSUF ¶24 contains a characterization of the training provided, which Plaintiff disputes.

9. DSUF ¶26 contains a characterization of the Code of Student Conduct (DSUF Exhibit 10) which Plaintiff disputes.  Pages 3-6 of the Code of Student Conduct purport to define offenses that the University, in its discretion, can use as a basis for imposing sanctions against students.  On the other hand, the University retains discretion to refuse to investigate offenses and/or impose these sanctions even when presented with evidence of the commission of an offense, and even when that offense also is a violation of State or local law.  *See* DSUF ¶118.

10. Plaintiff disputes DSUF ¶36. The procedures outlined at pages 11-12 of the Code refer to matters that may result "in a sanction of suspension or above," not just those that may result in "separation". Further, DSUF ¶36 omits the remainder of the Code provision, which provides as follows:

> 2. **Non-disciplinary Referrals**. If it is determined that a hearing is not necessary, the matter may be referred to mediation, counseling, alcohol/drug education, etc.
>
> 3. **Withdrawing Charges**. The Senior Associate Dean for Student Life has the authority to withdraw charges once they have been made.

*See* DSUF, Exhibit 10.

11. Plaintiff disputes DSUF ¶ 37. The Code does not provide that the Senior Associate Dean for Student Life must assign to a Student Conduct Board matters involving offenses such as sexual misconduct charges, as the language in DSUF ¶ 37 implies. Instead, the Code states at page 8 that the Senior Associate Dean for Student Life *may* "refer allegations of violations of the Code of Student Conduct to one of the following options for resolution," which

6

includes a Student Conduct Board. The decision to assign a matter to the Student Conduct Board is therefore discretionary. *See* DSUF, Exhibit 10.

12.     Plaintiff disputes DSUF ¶ 41 as it omits the balance of the cited provision which states as follows: "In determining whether to grant an extension, the Senior Associate Dean of Student Life shall consider the salient factors of the particular case, which may include items such as the complexity and/or severity of the matter to be heard, the number of individuals involved in the particular matter, or whether the academic calendar makes it impractical to commence a hearing within the prescribed sixty (60) calendar days."

13.     Plaintiff disputes DSUF ¶ 45. The Code does not provide at page 16 that the complaining witness will receive written notification of the charges, or the time and place of the hearing; this information is only provided to respondent. Both parties receive a copy of the case materials at least seven (7) days before the hearing.

14.     Plaintiff disputes DSUF ¶ 46. The Code states as follows: "if either party believes there is new information which may substantially influence the outcome of the hearing, he or she **will** request of the case administrator that the information be admitted to the hearing." (emphasis supplied).

15.     Plaintiff disputes DSUF ¶50 to the extent that it implies that the Code of Student Conduct was the exclusive source of procedural rules governing Student Conduct Board hearings at the time of Plaintiff's case.  In his case, those procedures were also governed by a schedule issued by the University to the parties.  DSUF Exhibit 41.  That document specifically includes, midway through the proceedings an entry for "Witness Statement Testimony by [John Doe] or Advisor, Marylou McMillan."

16. Plaintiff disputes DSUF ¶ 54 to the extent it is incomplete. The Code provision cited states as follows:

> Appeals will normally be considered only when: (1) there is relevant new evidence that was not reasonably available to be presented to the original hearing authority and that in the judgment of the Appeal Officer the introduction of the information may have changed the finding by the original hearing authority; or (2) when a substantial procedural error by the University or hearing body/officer is demonstrated and in the reasonable judgment of the Appeal Officer such error is sufficient enough that it may have affected the decision of the original hearing authority.

17. Plaintiff disputes Defendant's characterization of Senior Associate Dean for Student Life J. Allen Ward's status during the Fall of 2014 in DSUF ¶64. In the cited deposition testimony, Vice President Klawunn did not state that Dean Ward had actually left his position; instead, she stated that he was "in the process of leaving" his position. *See* DSUF Exhibit 12 (Klawunn Deposition, p. 100). She also did not state that Dean Ward had vacated his position during the Fall, 2014 semester. To this point, the Brown Daily Herald reported that the position of Senior Associate Dean of Student Life was not vacated until January, 2015, when Dean Ward took a position at Clayton State University. PSDF Exhibit 16 ("The position of dean of students, formerly titled the senior associate dean of student life, was vacated when J. Allen Ward assumed the role of assistant vice president for student affairs at Clayton State University in January").

18. Plaintiff disputes the implication in DSUF ¶65 that Vice President Klawunn had the authority under the Code of Student Conduct to assign to herself the responsibilities of the Senior Associate Dean for Student Life. The Code of Student Conduct (DSUF, Exhibit 10) contains at p. 8, n.2 a single provision for alternative University officials who can serve in the role of Senior Associate Dean for Student Life for disciplinary matters in the absence or unavailability of that particular official. It states the following:

8

> Throughout these procedures, all references to 'Senior Associate Dean for Student Life' will be understood to include the Senior Associate Dean's designee(s).

Vice President Klawunn did not testify that Dean Ward had designated her for this responsibility. It also is important to note that on the following page, the Code of Student Conduct identifies several officials (including but not limited to the Senior Associate Dean for Student Life) who have the authority to separate students from campus, thus demonstrating that the authors of the Code knew how to specify and identify other University officials who could perform certain tasks in the absence or unavailability of the Senior Associate Dean for Student Life, had those authors intended to do so.

19. Plaintiff disputes DSUF ¶68 as follows:

The Web of Caring was published in 1997. PSDF Exhibit 17. Vice President Klawunn began her employment at Brown University in 1996 as Director of the Sarah Doyle Women's Center. PSDF Exhibit 18. Therefore, it was published while she was employed at Brown University as the Director of the Sarah Doyle Women's Center.

20. Plaintiff disputes DSUF ¶69 as follows:

As its name implies, the Sarah Doyle Women's Center is and at all relevant times has been an advocacy organization for women. For example, the current staff consists of 14 women and one transgender person. *See* https://www.brown.edu/campus-life/support/sarah-doyle-center/guiding-philosophies/staff

21. Plaintiff disputes the implication in DSUF ¶¶71-72 that Dean Castillo's recalled observation of a bruise on Jane Doe and Jane Doe's identification of its causation occurred in a single conversation or meeting. Instead, according to Dean Castillo's testimony, she observed a bruise on Jane Doe at their meeting on Thursday, October 16, 2014 but she did not ask Jane Doe about the bruise at the time. At a subsequent meeting on Saturday, October 18, Dean Castillo

recalls asking Jane Doe if the bruise that Dean Castillo had observed the previous meeting was related to the incident, at which time Jane Doe said "yes." *See* DSUF Exhibit 8 (Castillo Deposition, pp. 144-45). Further, the testimony cited does not indicate that Jane Doe reported John Doe sexually assaulted her.

22. Plaintiff disputes DSUF ¶81 as the email sent on October 18, 2014 at 4:50 p.m. by Dean Castillo was sent not just to Ms. Klawunn but to Beverly Ledbetter, James Green and Michael Grabo, all from Brown's Office of General Counsel.

23. Plaintiff disputes DSUF ¶84 as follows:

Plaintiff disputes whether Vice President Klawunn was the Acting Senior Associate Dean for Student Life, *see* PSDF ¶17, *supra*. Plaintiff also disputes the validity of her stated basis for assuming she had this authority. At p. 190 of her deposition (DSUF Exhibit 12) lines 13-16, she testifies that "our policy says it could be a senior associate dean or a designee, and I was acting in that capacity."

Vice President Klawunn apparently refers to footnote 2 at the bottom of Page 8 of the Code of Student Conduct, which states that "[t]hroughout these procedures, all references to 'Senior Associate Dean for Student Life' will be understood to include the Senior Associate Dean's designee(s)." This contradicts Vice President Klawunn's previous testimony that she designated herself to serve as Senior Associate Dean for Student Life, as opposed to her having been designated to serve in that capacity by Senior Associate Dean J. Allen Ward, who according to Vice President Klawunn was either in his position or not, given that he was "in the process of leaving" Brown University as described in PSDF ¶17, *supra*.

24. Plaintiff disputes DSUF ¶85. Dean Castillo forwarded the Campus Incident Complaint to Beverly Ledbetter, James Green and Michael Grabo, all from Brown's Office of General Counsel, in addition to Ms. Klawunn.

25. Plaintiff objects to the use of hearsay testimony in DSUF ¶89 regarding John Doe's statement of what Jane Doe said him.

26. Plaintiff objects to the use of hearsay testimony in DSUF ¶90 regarding John Doe's statement of James Doe's stated plans.

27. Plaintiff disputes the accuracy of DSUF ¶91's description of DSUF Exhibit 22 to the extent that it does not describe the signature line of the letter. Instead of signing it as "Acting Senior Associate Dean of Student Life" or as "Designee of Senior Associate Dean of Student Life", Ms. Klawunn signed the letter as "Vice President of Campus Life and Student Services." *Id.*

28. As was the case with DSUF ¶¶20-21, Plaintiff questions the relevance of an "undisputed fact" whose sole purpose is to record a factual dispute between the parties, in this case the parties' differing recollections of what Vice President Klawunn did (or did not) say. With that said, Plaintiff disputes any inference that DSUF ¶93 identifies all the people present at the conversation at which James Doe recalls Vice President Klawunn making the "blame Obama" comment. More specifically, John Doe attended this meeting as well, and he recalls Vice President Klawunn telling him and his father to "blame Obama." PSDF Exhibit 19.

29. Plaintiff disputes DSUF ¶103 as follows:

Plaintiff disputes Vice President Klawunn's characterization of her thought process concerning her decision to expedite John Doe's investigation and hearing supposedly for John Doe's benefit. At the very latest by November 7, Defendant was aware that John Doe opposed

11

expediting his hearing, seeking a 2-week continuance and stating that "I understand that the expedited hearing process is for my own benefit because I am off-campus, *but I want to be in a position to provide the board with a complete picture and all relevant information at the hearing*" (emphasis added). *See* DSUF Exhibit 32, which is selectively quoted out of context at DSUF ¶120. Vice President Klawunn revealed her own thought process more clearly in a November 12, 2014 email to Dean Castillo with copies to the University General Counsel office in which she stated "I agree this is not sufficient to reschedule again. [John Doe] is trying to get in the whole semester." PSDF Exhibit 20. For these reasons, Plaintiff maintains that Vice President Klawunn's articulated reason of expediting the investigation and hearing purportedly for John Doe's benefit was so implausible that it supports the inference it is a pretext for discrimination.[2]

30.     Plaintiff disputes any inference from DSUF ¶ 104 that Dean Castillo was the assigned case administrator to John Doe's student conduct process.

31.     Plaintiff disputes the characterization in DSUF ¶108 that the October 27, 2014 email Dean Castillo sent to John Doe (DSUF Exhibit 26) "responded" to the inquiries he and his father made. More specifically, as DSUF Exhibit 26 indicates, John Doe and James Doe's inquiry had two parts, namely to "define the term investigation" and to "provide, in depth, step by step procedure your office followed from the time allegation was submitted to time [John Doe] was contacted." To both inquiries Dean Castillo directed Plaintiff to review pages 9-12 of Brown University's Code of Student Conduct (DSUF Exhibit 10). With regard to the first

---

[2] *See, e.g., Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010) (in employment discrimination context, "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.")

inquiry, the four referenced pages contain the term "investigation" exactly once, at p. 10, ¶6 without defining the term. With regard to the second inquiry, the entire document is completely unresponsive, as Plaintiff was asking Dean Castillo to explain what Brown University actually did in his case, not what the Code prescribes for Brown University to do in a generic case.

32. Plaintiff disputes DSUF ¶110's characterization of John Doe's personal statement (DSUF Exhibit 28), which document speaks for itself. For example, John Doe's statement described several specific instances confirming that Jane Doe was a willing and active co-participant in the intimacy they shared on the night in question. *Id.*

33. Plaintiff disputes DSUF ¶112 to the extent it implies that Ms. Klawunn determined that a Student Conduct Board hearing would be held no earlier than November 5, 2014. On October 24, 2014, Defendant began contacting potential members of a Student Conduct Board panel to hear John Doe's case. *See* PSDF Exhibit 20A (Brown 1262).

34. Plaintiff disputes the implication or inference in DSUF ¶115 that Defendant provided Plaintiff with all of the case materials in its possession as of November 5, 2014. More specifically, Dean Castillo's records indicate she obtained a copy of Jane Doe's medical records from Women and Infants Hospital on or before November 3, but Defendant did not include them in the November 5 charge letter packet. PSDF Exhibits 21, 22, 23. (Brown 126-28,1326, 536-600). Instead, she held onto them until November 17, 2014 at 5:17 p.m., fewer than four days before John Doe's hearing. *See* PSDF Exhibit 24 (Brown 602)*; see also* DSUF Exhibit 48, pp. 2-3 (John Doe's appeal stating the prejudice he suffered from lacking adequate time to review those records).

35. Plaintiff disputes the inferences DSUF ¶120 apparently presents from its selective quotation of DSUF Exhibit 32, which speaks for itself, and the selective quotation of which

mischaracterizes John Doe's assessment of Defendant's decision to expedite the investigation and hearing of his case. *See* PSDF ¶29, *supra*.

36. Plaintiff disputes DSUF ¶122's characterization of Plaintiff's reason for requesting a continuance of the Student Conduct Board Hearing. The document (DSUF Exhibit 34), which speaks for itself, refers to John Doe's request for a continuance "because the emotional support provided by my mother's presence is invaluable, and I would be extremely appreciative if the hearing were moved to a later date, to ensure it is possible." *Id.*

37. Plaintiff disputes the accuracy of DSUF ¶123's stated reason for the decision Dean Castillo and Vice President Klawunn made for denying John Doe's request for a continuance. Vice President Klawunn testified that "we were starting to get concerned that we were getting toward the end of the semester, and given the fact he was on the interim suspension, it had been our intention to do this as quickly as possible." As noted before (PSDF ¶¶29, 35, *supra*), Plaintiff did not wish for Brown to expedite his investigation or hearing; therefore, their decision to expedite was *not* for his own benefit. In light of their knowledge of what Plaintiff actually wanted, Defendant's officials stated reasons for their actions were a pretext for discrimination. Looking at the University's calendar for the Fall, 2014 semester, the scheduled (and actual) date of the Student Conduct Board hearing (November 21, 2014) was 20 days before the end of classes and a month before the end of the semester. Also, any appeals could have been reviewed up until January 21, 2015, when the Spring Semester began, including on a weekend or holiday. See PSDF Exhibit 25.

38. Plaintiff objects to DSUF ¶124 to the extent it does not identify the date on which Defendant received a copy of the Women & Infants Hospital records. That date was between October 30, 2014 and November 3, 2014. *See* PSDF ¶34 and associated exhibits.

39. Plaintiff disputes DSUF ¶125 to the extent that it implies that James Doe was the only person asking Ms. McMillan to question Jane Doe extensively. John Doe's attorney, Matthew Dawson, attended the meeting and prepared an outline containing a cross-examination of Jane Doe that Ms. McMillan rejected. PSDF Exhibits 26 (Dawson Deposition, p. 43), 27 (Brown 3510-12).

40. Plaintiff disputes DSUF ¶126's characterization of DSUF Exhibit 36, John Doe's November 15, 2014 email to Dean Castillo. In that email he specifically asked for "Copies of any of the text messages sent by [Jane Doe] which are referenced in the witness statements of [the other Brown students who submitted statements on Jane Doe's behalf]" without regard to whether Brown University already had collected them or whether Defendant planned to collect them absent this specific request. John Doe requested these texts as they represented documentary evidence that could corroborate (or disprove) the witness statements. The discovery record does not reveal any effort by Defendant to obtain the requested materials.

41. Plaintiff disputes DSUF ¶131 to the extent that it implies that Dean Castillo and Defendant excluded evidence from the record consistently on this basis. The witness statement that Dean Castillo redacted was from a Brown University student who had an intimate relationship with Plaintiff in the past, and in the redacted portion she testified as to how he always treated her in a gentle and respectful way. DSUF Exhibit 48, p. 5.

In the meantime, at the Student Conduct Board hearing, Dean Castillo and the Hearing Panel members made no effort to exclude statements and testimony by Jane Doe's witnesses that reflected negatively on John Doe's character. *See* PSDF ¶46, *infra*.

42. Plaintiff disputes DSUF ¶133. The timeline (DSUF Exhibit 41) specifically includes, midway through the proceedings at page BROWN 697, an entry for "Witness Statement Testimony by [John Doe] or Advisor, Marylou McMillan."

43. Plaintiff disputes DSUF ¶135's characterization of DSUF Exhibit 42, which speaks for itself. That document refers to a number of issues beyond the text messages supporting John Doe's request for a continuance, including his need for additional time to review the voluminous medical records from Women & Infants Hospital provided for the first time at approximately 5:00 p.m. on November 17, four days before the hearing. Plaintiff's advisor Ms. McMillan confirmed and validated the reasonableness of Plaintiff's request in her own email to Dean Castillo. PSDF Exhibit 28.

44. Plaintiff disputes Dean Castillo's assertion in DSUF ¶136 that the University's denial of a continuance was "in the normal course of its process." First, Plaintiff's hearing was conducted 35 days after the initial complaint, which was unusually fast. *See* Exhibits PSDF 29 (Brown 3290), 30 (chart compiling data from Brown's table). Second, Defendant did not follow "the normal course of its process" when it failed to provide Plaintiff with the Women & Infants Hospital records as part of the November 5 charge letter, instead holding onto them until November 17. *See* PSDF ¶34, *supra and* associated exhibits.

45. Plaintiff disputes the implication in DSUF ¶139 that the Code of Student Conduct's description of Student Conduct Board hearing procedures and procedural rights is complete and exclusive. *See* PSDF ¶42, *supra*.

46. Plaintiff disputes DSUF ¶142's inference that Dean Castillo and the Student Conduct Board hearing panel were evenhanded in protecting the record from irrelevant and prejudicial material. Jane Doe and her representative asked other inappropriate questions that

16

were not stopped by either the Hearing Panel or the Chair. For example, Jane Doe's lead witness K.R. provided negative character testimony concerning John Doe based on a second-hand or third-hand description of an unrelated event in the past she did not personally witness, called the "wing man" episode. *See* PSDF Exhibit 31. Instead of declaring this second-hand character testimony irrelevant, Dean Bova returned to the subject later during witness A.D.'s testimony, *see* PSDF Exhibit 31, SCB tr. pp. 145-46, as did the Chair of the Hearing Panel (pp. 146-8). In other words, Dean Castillo excluded favorable character evidence regarding John Doe from the record because she considered it irrelevant, but unfavorable character evidence was solicited by (and presumably relied upon by) the Student Conduct Board panel's members without objection or qualification by Dean Castillo.

47. Plaintiff disputes DSUF ¶151 to the extent it implies that Provost Meisel's review of the record was sufficient for him to be able to fully understand the issues raised by John Doe's appeal. For example, because he failed to listen to the entire hearing, Provost Meisel probably lacked a sufficient basis to review John Doe's appeal at DSUF Exhibit 48, part (c), pp. 4-5, in which he noted that Defendant redacted and/or excluded from the record his favorable character witness testimony. Had Dean Meisel listened to the testimony from all the witnesses, he would have heard the testimony cited in PSDF ¶46, *supra*, in which the Student Conduct Board hearing panel failed to exclude unfavorable character witness testimony from Jane Doe's friends against John Doe, to the point of soliciting that testimony. On this basis, Provost Meisel likely would have changed the portion of his appeal decision addressing this issue, in which he said that Defendant's one-sided exclusions was "a matter of standard University policy." *See* DSUF Exhibit 53, p, 4.

48.     Plaintiff disputes the characterization in DSUF ¶152 that Provost Meisel's review of Plaintiff's appeal was "careful." *See, e.g.,* PSDF ¶47, *supra*.

49.     Plaintiff disputes Provost Meisel's characterization, as quoted in DSUF ¶153 of his discussions with Vice President Klawunn and Dean Castillo to be limited to "procedural matters under the Code." Because the substance of John Doe's appeal involved procedural errors, Provost Meisel was discussing the substance of John Doe's appeal with two Brown University officials whose actions were subject to major portions of that appeal regarding the conduct of the investigation, the provision of materials to him, and the restrictions placed on the materials he submitted to the hearing panel record. Notwithstanding, Provost Meisel testified in his August 9, 2017 deposition (PSDF Exhibit 32), p. 40 that neither Vice President Klawunn nor Dean Castillo were the subjects of Plaintiff's appeal, reflecting a fundamental misunderstanding of the issues he raised.

50.     Plaintiff disputes DSUF ¶154 to the extent that it purports to identify the recipients of Provost Meisel's email containing his draft decision, the original of which is <u>not</u> presented as DSUF Exhibit 52. Instead, his original email is PSDF Exhibit 33 (Brown 1760), which indicates he sent his draft decision for review to Attorneys Green and Grabo in the University's General Counsel office and Dean Castillo (in that order), with a copy to Vice President Klawunn.

|  |  |
|---|---|
|  | Plaintiff John Doe, |
|  | By his attorneys, |
|  | NESENOFF & MILTENBERG, LLP<br>*Attorneys for Plaintiff John Doe* |
|  | By: /s/ Andrew T. Miltenberg<br>Andrew T. Miltenberg, Esq. (admitted *pro hac vice*)<br>Tara Davis, Esq. (admitted *pro hac vice*)<br>363 Seventh Avenue, Fifth Floor<br>New York, New York 10001<br>(212) 736-4500<br>tdavis@nmllplaw.com |
| February 9, 2018 | amiltenberg@nmllplaw.com |
|  | -and- |
|  | local counsel for Plaintiff John Doe, |
|  | By: /s/ Samuel D. Zurier<br>Samuel D. Zurier, Esq. (Bar No. 3576)<br>55 Dorrance Street, Suite 400<br>Providence, RI 02903<br>(401) 861-0200<br>sdz@zurierlaw.com |
| February 9, 2018 |  |

CERTIFICATE OF SERVICE

I hereby certify on this 9th day of February, 2018, I served a copy of this Statement of Disputed Facts and Inferences on Defendants' counsel via the Court's CM/ECF system.

/s/ Andrew T. Miltenberg
Andrew T. Miltenberg, Esq.