# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

```
------------------------------------------------------------X
JOHN DOE,                                :
                                         :     Civil Action No. 1:15-cv-144-S-LDA
                        Plaintiff,       :
                                         :
            -against-                    :
                                         :
BROWN UNIVERSITY,                        :
in Providence in the State of Rhode Island :
and Providence Plantations,              :
                                         :
                        Defendant.       :
------------------------------------------------------------X
```

**PLAINTIFF JOHN DOE'S MEMORANDUM IN SUPPORT OF OBJECTION TO BROWN UNIVERSITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

PLAINTIFF JOHN DOE
BY HIS ATTORNEYS,

NESENOFF & MILTENBERG, LLP
Andrew T. Miltenberg, Esq. (admitted *pro hac vice*)
Tara J. Davis, Esq. (admitted *pro hac vice*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com

-and-

Samuel D. Zurier, Esq. (Bar No. 3576)
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-0200
sdz@zurierlaw.com

**Table of Contents**

Page(s)

INTRODUCTION ..................................................................................................1

I.  Legal Standard ..........................................................................................2

    **A.**  Summary Judgment ........................................................................2

    **B.**  The Title IX "Erroneous Outcome" Standard...............................3

    **C.**  The Title VII Burden-Shifting Framework..................................4

    **D.**  Inferring Discrimination From The Institution's Response To Criticism ...7

II.  Argument (In Support of Objection to Motion for Summary Judgment)..............10

    **A.**  Plaintiff has sufficient evidence to cast articulable doubt on the accuracy of the outcome reached. ........................................11

    **B.**  Plaintiff has made a prima facie case of discrimination to satisfy the first prong of the *McDonnell Douglas* burden-shifting framework.....14

    **C.**  Plaintiff has evidence of "particular circumstances suggesting that gender bias was a motivating factor" in the University's disciplinary action against him and that Brown's actions were a pretext for discrimination. ............................................14

        **1.**  Statements and actions of University officials.............................14

            **a.**  Professor Schultz ...........................................15

            **b.**  Vice President Klawunn ...................................19

                **(1)**  *The Web of Caring*.......................................19

                **(2)**  The Adam Lack Case..................................20

                **(3)**  Statement to James Doe .............................21

            **c.**  Dean Castillo...................................................21

         **2.**  Patterns of decision making.........................................23

         **3.**  Evidence of pretext .....................................................24

i

**4.** Evidence of bias "in favor of the accusing female and against the defending male [student] in order to avoid further fanning the criticisms that [Defendant] turned a blind eye to such assaults." .......................................................30

    **a.** Lena Sclove's press conference and President Paxson's engagement with the protesters .........................32

    **b.** The 2014 Commencement ..................................................37

    **c.** Formation of the Sexual Assault Task Force and supporting staff ..................................................................38

    **d.** President Paxson's communications during the Fall, 2014 semester ...........................................................38

    **e.** The Sexual Assault Task Force Interim Report ................41

    **f.** Impacts of the University's campaign on Plaintiff's case .44

        **(1)** The Removal Order................................................45

        **(2)** The rush to hold John Doe's hearing before he could prepare his defense.................................................48

        **(3)** The length of the sanction departed from precedent and was not supported by the evidence..................49

**D.** Defendant is not entitled to summary judgment on the Seventh Cause of Action (Declaratory Judgment)................................................................52

**III.** Conclusion (to argument of Objection) ................................................52

**I.** Summary of Argument (Cross-Motion for Summary Judgment)........................54

**II.** Legal Standard ............................................................................................55

**A.** Summary Judgment ...........................................................................55

**B.** Rhode Island Contract Law ...............................................................55

**III.** Argument .....................................................................................................55

**A.** The Code of Student Conduct, and ancillary documents provide a basis for contractual rights for Plaintiff. ......................................56

**B.**      Defendant violated John Doe's contractual right to be assumed not responsible of any alleged violations prior to the conduct of a hearing. ...56

    **1.**      The Removal Order........................................................................56

    **2.**      The Decision to Hold a Hearing ..................................................58

**C.**      Plaintiff's removal from campus was invalid because Vice President Klawunn lacked the authority to order it. ..................................................60

**D.**      Defendant failed to respond to Plaintiff's requests during the prehearing phases of the student conduct procedures. ..................................................62

**E.**      Brown violated its Code of Conduct when it deprived John Doe of the opportunity to offer a relevant response. ..................................................64

**F.**      Defendant breached Plaintiff's contractual right to a reasonable length of time to prepare a response to the charges against him. .........................66

**G.**      Brown violated its Code of Student Conduct when it deprived John Doe of the opportunity to articulate relevant concerns and offer all relevant evidence. ................................................................................69

**H.**      Defendant violated Plaintiff's contractual right to two (2) days advance notice of changes in the Student Conduct Board. .....................................72

**I.**      Brown's numerous violations of its Code of Student Conduct during Plaintiff's disciplinary process caused direct and proximate harm to John Doe. ................................................................................73

    **1.**      Brown's failure to afford John Doe a presumption of innocence precipitated the finding of responsibility. .....................73

    **2.**      Brown's failure to respond to John Doe's requests for information precluded him from presenting a meaningful defense, resulting in the erroneous finding. ...................................74

    **3.**      John Doe was directly damaged by Brown's failure to afford him an opportunity to articulate all relevant concerns and offer all relevant evidence. ...................................................74

    **4.**      John Doe was directly damaged by Brown's failure to provide him with a reasonable length of time to prepare a response to the charges against him....................................................................75

     **5.**     Brown violated its Code when it deprived John Doe of the
ability to challenge the participation of a hearing panel member.76

**J.**     John Doe is entitled to summary judgment with regard to liability on
his contract claims, as well as a declaratory judgment that the Defendant's
finding of responsibility was invalid..........................................................76

**IV.**    Conclusion ....................................................................................................... 76-77

## Table of Authorities

**Cases**                                                                                   **Page(s)**

*Ahern v. Shinseki,*
    629 F.3d 49, 54 (1st Cir. 2010)...................................................................5

*Back v. Hastings on Hudson Union Free Sch.,*
    365 F.3d 107, 125-26 (2d Cir. 2004) ......................................................15

*Chadwick v. Wellpoint, Inc.,*
    561 F.3d 38, 46 (1st Cir 2009)..................................................................5

*Cruz v. Mattis,*
    861 F.3d 22, 25 (1st Cir. 2017)................................................................5

*Doe v. Brown University,*
    166 F.3d 177 (D.R.I. 2016).........................................................4,5,56,62

*Doe v. Brown University,*
    210 F.Supp. 3d 310 (D.R.I. 2016) .............................................55,66,73

*Doe v. Colgate University,*
    2017 U.S. Dist. LEXIS 180267 (N.D.N.Y. Oct. 31, 2017) ...................8

*Doe v. Columbia Univ.,*
    831 F.3d 46, 53 (2d Cir. 2016).............................................4,5,7,9,31

*Doe v. Columbia Univ.,*
    101 F. Supp. 3d 356, 371 (S.D.N.Y. 2015)...........................................7,9

*Doe v. Cummins,*
    662 F. App'x 437 (6th Cir. 2016) ..........................................................4

*Doe v. Miami Univ.,*
    2018 U.S. App. LEXIS 3075 (6th Cir. February 9, 2018).......................8

*Doe v. Trustees of Boston College,*
    2016 WL 579997 appeal pending, Case No. 16-2290
     (First Circuit Court of Appeals).........................................................10

*Doe v. University of Colorado, Boulder,*
    255 F. Supp. 3d 1064, 1074-75 (D.Col. 2017) ...................................23

*Gerffert Co., Inc. v. William J. Hirten Co., LLC,*
    815 F.Supp.2d 521,534 (D.R.I. 2011) ...................................................2

*Gomez-Gonzalez v. Rural Opportunities, Inc.,*
    626 F.3d 654, 662 (1st Cir. 2010)............................................................5,6,24,29

*Holcomb v. Iona Coll.,*
    521 F.3d 130, 143 (2d Cir. 2008)............................................................15

*Lipsett v. Univ. of Puerto Rico,*
    864 F.2d 881,895 (1st Cir. 1988), aff'd, 759 F. Supp. 40 (D.P.R. 1991) ..................3

*Lyons v. Salve Regina College,*
    565 F. 2d 200, 201 (1st Cir. 1977)......................................................... 56

*Maldonado-Denis v. Castillo-Rodriguez,*
    23 F.3d 576, 581 (1st Cir. 1994)............................................................3

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792, 93 S. Ct. 1817, 36 L. E. 2d. 668 (1973)........................................5,14

*Morgan v. Hilti, Inc.,*
    108 F.3d 1319, 1323 (10th Cir. 1997) ........................................................6

*Plummer v. Univ. of Houston,*
    860 F.3d 767, 777 (5th Cir. 2017) ...........................................................4

*Reeves v. Sanderson Plumbing Products, Inc.,*
    530 U.S. 133, 146, 120 S. Ct. 2097, 2108 (2000)..............................................6

*Rolph v. Hobart and William Smith Colleges,*
    271 F.Supp 3d 386 (W.D.N.Y. 2017) ........................................................8

*Sassaman v. Gamache,*
    566 F.3d 307, 314-55 (2d Cir. 2009) .......................................................15

*Soto-Feliciano v. Villa Cofresi Hotels, Inc.,*
    779 F.3d 19, 29 (1st Cir. 2015)............................................................6

*Wells v. Uvex Winter Optical, Inc.,*
    635 A. 2d 1188, 1191 (R.I.1994) ..........................................................73

*Weser v. Glen,*
    190 F. Supp.2d 384, 395 (E.D.N.Y. 2002) aff'd, 91 Fed.
    Appx. 521(2d Cir. 2002).................................................................23

*Yusuf v. Vassar Coll.,*
    35 F. 3d 709,714 (2d Cir. 1994).........................................................3,4,6,11,14,

*Zapata-Matos v. Reckitt & Colman, Inc.*,
    227 F. 3d 40, 42 (1st Cir. 2002)..............................................................................3

**INTRODUCTION**

Defendant Brown University discriminated against Plaintiff John Doe when it summarily removed him from campus, rushed through a sexual misconduct "investigation," found him "responsible" for sexual misconduct he did not commit following an unfair hearing and imposed an excessive 2.5-year sanction, all in violation of University student conduct policies. The summary judgment record contains extensive evidence of gender bias in the form of statements by decision makers, decision making patterns and articulated reasons for decisions they made that are unworthy of credence and a pretext for discrimination. The record thus provides an ample basis for a jury to infer "erroneous outcome" Title IX gender discrimination using the classic burden-shifting framework under federal law.

With that said, the facts of this case go beyond the actions of a few biased officials. Instead, these officials acted within a culture which the University promoted in response to protests in the Spring of 2014 led by a student (Lena Sclove) who asserted that Brown University violated Title IX, culminating in the development and introduction of a new Title IX program one year later. Plaintiff's case was heard during this intervening year of transition.

The evidentiary record also allows a reasonable fact finder to draw a line of inferences that begins with the gender-based demands of the student protesters, continues with the University's sponsorship of a public discussion of gender-based values and norms, follows with a disregard of Plaintiff's presumption of innocence and other due process rights, and concludes with an excessive sanction. Connecting the protests to Plaintiff's case are three Brown University officials: (i) Professor Gretchen Schultz, who served as Chair of Lena Sclove's Student Conduct Board panel, the Sexual Assault Task Force that formed in response to the protests, and the Chair of the Student Conduct Board panel that heard John Doe's case; (ii) Vice

1

President Margaret Klawunn, who was criticized for her role in the Lena Sclove case; and (iii) President Christina Paxson, who made unprecedented use of her platform to shape debate in this area.  At three critical stages of Plaintiff's case, these connections led to decisions that sacrificed Plaintiff's rights as a student, not to mention his education and career aspirations, on the altar of appeasement. [1]

In the second part of this Memorandum, Plaintiff presents an argument in support of his cross-motion for partial summary judgment with regard to liability for the Third Cause of Action (breach of contract) and part (ii) of the Seventh Cause of Action (declaratory judgment that the University's findings of misconduct are illegal, null and void).

## I.   Legal Standard

### A.   Summary Judgment

Summary judgment is properly granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  *Gerffert Co., Inc. v. William J. Hirten Co., LLC*, 815 F.Supp.2d 521, 534 (D.R.I. 2011) (quoting Fed.R.Civ.P. 56(c)).   A "genuine" issue:

> is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Put another way, a "genuine" issue exists if there is "sufficient evidence supporting the claimed factual dispute" to require a choice between "the parties' differing versions of the truth at trial." A "material" issue is one that

---

[1]    *See* Exhibit 68 (Report of Suzanne M. Miller, MD, "Assessment of Chances of Medical School Admission" dated August 2017) ("Prior to the suspension, [John Doe] was on track to be an extremely competitive applicant to gain acceptance not just to an allopathic medical school in the US, but to a top 10 medical school." p. 15. However, "his institutional action record continues, to a reasonable degree of certainty, to decrease his chance of acceptance to top 10 institutions to <1% and diminishes his chance of acceptance to any medical school to <20%." p. 20

"affect[s] the outcome of the suit," that is, an issue which, perforce, "need[s] to be resolved before the related legal issues can be decided."

*Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994). In ruling on a motion for summary judgment brought by a defendant, the Court will "draw all reasonable inferences from the facts in plaintiff's favor." *Zapata–Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 42 (1st Cir. 2002).

Reversing the district court's summary judgment in favor of an employer in a gender discrimination case, the First Circuit in *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988), *judgment aff'd*, 759 F.Supp. 40 (D.P.R. 1991) described the fact finder's role in determining discriminatory intent as follows:

> Moreover, the test remains particularly rigorous when the disputed issue turns on a question of motive or intent. See *Poller*, 368 U.S. at 473, 82 S.Ct. at 491 ("summary judgment procedures should be used sparingly ... where motive and intent play leading roles"); cf. *Pullman-Standard v. Swint*, 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789-90, 72 L.Ed.2d 66 (1982) (whether a defendant's behavior reflected an intent to discriminate is a pure question of fact). "Under such circumstances, jury judgments about credibility are typically thought to be of special importance." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir.1983). In a discriminatory discharge case, particularly, a plaintiff "will rarely, if ever be able to produce a 'smoking gun' that provides direct, subjective evidence of an employer's [animus]. Rather, a plaintiff must try to convince the fact-finder to draw an inference from a broad array of circumstantial and often conflicting evidence...." *Id*. at 929.

**B.    The Title IX "Erroneous Outcome" Standard**

Congress enacted Title IX of the Education Amendments of 1972 to supplement the Civil Rights Act of 1964's ban on racial discrimination in the workplace and in universities. "Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the case law interpreting Title VII." *Yusuf v. Vassar Coll.,*

35 F.3d 709, 714 (2d Cir. 1994). Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf*, 35 F.3d at 715.

In *Yusuf*, the Second Circuit held that a plaintiff's challenge to a university disciplinary proceeding on grounds of gender bias can proceed in two principal ways, namely (i) erroneous outcome; or (ii) selective enforcement. In its decision on Brown University's Motion to Dismiss, *Doe v. Brown University,* 166 F.3d 177 (D.R.I. 2016) (referred to below as "MTD Decision"), the Court defined the elements of a Title IX "erroneous outcome" case in this way:

> A plaintiff making an erroneous outcome claim must first "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id*. Once the plaintiff has established doubt concerning the accuracy of the proceeding, they must next "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id*. (citations omitted). The *Yusuf* court noted that "[s]uch allegations might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id*.

*Doe v. Brown University*, 166 F.Supp. 3d 177, 185 (D.R.I. 2016) citing *Yusuf, supra*.

The *Yusuf* standard has gained broad acceptance nationally. *See Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016); *Doe v. Columbia Univ*., 831 F.3d 46, 53 (2d Cir. 2016); *Plummer v. Univ. of Houston*, 860 F.3d 767, 777 (5th Cir. 2017), as revised (June 26, 2017).

## C.     The Title VII Burden-Shifting Framework

In *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), the Second Circuit applied by analogy the framework of shifting burdens of proof of discriminatory intent that courts apply in Title VII employment cases, stating the following:

> We also adopted Title VII's requirement of proof of discriminatory intent, and stated that "[a]llegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases." *Id.* at 714–15. *Yusuf* made clear that Title VII cases provide the proper framework for analyzing Title IX discrimination claims. We therefore hold that the temporary presumption afforded to

4

plaintiffs in employment discrimination cases under Title VII applies to sex discrimination plaintiffs under Title IX as well.

Thus, a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination.

*Columbia University*, *supra,* 831 F.3d at 54-55.  *See also* MTD Decision*,* 166 F.Supp. 3d at 184 (noting analogy to Title VII).  As "smoking gun" proof of discrimination is rare, a plaintiff ordinarily uses circumstantial evidence to meet the test set out in *McDonnell Douglas*. *See Chadwick v. WellPoint, Inc.,* 561 F.3d 38, 46 (1st Cir. 2009) ("[a] plaintiff is entitled to prove discrimination by circumstantial evidence alone.")

The First Circuit defines the Title VII employment discrimination framework espoused in *McDonnell Douglas Corp. v. Green* in this way:

In evaluating a claim of discriminatory hiring under Title VII, we apply the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), where, as here, there is no direct evidence of discrimination. Under that framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination.  *Id.* at 802. To establish a prima facie case, the plaintiff must show the following: (1) he is a member of a protected class; (2) he was qualified for the position to which he applied; (3) he applied to that position and was not hired; and (4) the position to which he applied was filled by a person possessing similar or inferior qualifications. *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010).  If a plaintiff establishes a prima facie case, then the burden of production shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for the challenged hiring decision.  *Id.*  If the employer articulates such a reason, then the burden of production reverts to the plaintiff, who must offer evidence tending to prove that the reason offered by the employer is a pretext for discrimination.  *Id.*

*Cruz v. Mattis*, 861 F.3d 22, 25 (1st Cir. 2017).

In describing the third element (pretext), the First Circuit (in *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010)) stated:

Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.

> *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (internal quotation marks and citations omitted).

*See also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 2108 (2000) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination"); *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 29 (1st Cir. 2015) (citing and applying *Gomez-Gonzalez* to vacate district court summary judgment in favor of employer and remand for trial).

Plaintiff will present a *prima facie* case that (1) he is male, (2) he was not responsible for the violations for which he was sanctioned, (3) he was found responsible and sanctioned, (4) the outcome of the proceeding was not accurate, and (5) he has evidence of gender bias.  If Plaintiff meets this initial burden, Defendant has the burden of articulating a nondiscriminatory reason for the adverse action (in this case, finding John Doe responsible).  For the purposes of this Objection, Plaintiff will assume that Brown's articulated reason will be that Plaintiff was subject to a proper disciplinary proceeding.  If Brown meets its burden, then Plaintiff has the burden to prove that Brown's reason was a "pretext for discrimination."

In proving that Brown's stated reason was a "pretext for discrimination," following *Yusuf*, Plaintiff first will present evidence of "patterns of decision making" and "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  Plaintiff will then present evidence to rebut Brown University's articulated reason for the adverse action against John Doe that will demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in [Brown's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [Brown] did not act for the asserted non-discriminatory reasons."

### D.     Inferring Discrimination from the Institution's Response to Criticism

In *Doe v. Columbia University*, 831 F.3d 46, 57-58 (2d Cir. 2016), the Second Circuit described how institutional responses to campus protests may provide evidence of gender discrimination, stating the following:

> As outlined above, the Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students.  It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue. Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault.

> Columbia argues that the pleaded facts do not support an inference of intentional sex discrimination. It argues that the criticism of the University was for not taking student complaints of sexual assault seriously, and that any motivation on the part of the panel to demonstrate that it takes such complaints seriously is not the same thing as a motivation to discriminate against an accused male student. The district court stated that any bias in favor of Jane Doe "could equally have been — *and more plausibly was* — prompted by lawful, independent goals, such as a desire (enhanced, perhaps, by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity." *Doe v. Columbia Univ.*, 101 F.Supp.3d 356, 371 (S.D.N.Y. 2015). This reasoning fails to recognize the court's obligation to draw reasonable inferences *in favor of* the sufficiency of the complaint. *Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible.

> The Complaint alleges that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students— especially varsity athletes. There is nothing implausible or unreasonable about the

Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults.

(emphasis in original, footnote omitted.)

Though this decision concerned a motion to dismiss, the Second Circuit's *Columbia University* opinion makes two important legal findings that are directly applicable here. First, the Court identified an institution's response to protests, both among students and the media, as potential motivation for bias. Second, the *Columbia* decision recognized that a reasonable jury could find that certain protests and University responses in favor of victims and against perpetrators could be viewed as favorable to female victims and against male respondents, thus triggering a finding of gender bias under Title IX.[2]

While courts have applied *Columbia University*'s holding to deny motions to dismiss, see e,g, *Rolph v. Hobart and William Smith Colleges*, 271 F.Supp. 3d 386 (W.D.N.Y. 2017), to Plaintiff's knowledge, no plaintiff has presented sufficient evidence at the summary judgment stage to sustain a cause of action under this theory.

In a case extensively cited and quoted by Defendant in its Memorandum in Support of Motion for Partial Summary Judgment, the Northern District of New York granted summary judgment against a plaintiff who advanced this theory.  *See Doe v. Colgate University*, 2017 U.S. Dist. LEXIS 180267 (N.D.N.Y. Oct. 31, 2017), *notice of appeal filed*, Case No. 17-cv-03594 (2d Cir. November 3, 2017).  Plaintiff cautions this Court against drawing too many conclusions from the *Colgate University* holding, given that *Colgate* is under review before the Second

---

[2]     *See Doe v. Miami Univ.*, 2018 U.S. App. LEXIS 3075 (6th Cir. February 9, 2018) (in denying University's motion to dismiss, the Sixth Circuit found when "[t]aken together, the statistical evidence that ostensibly shows a pattern of gender-based decision-making and the external pressure on Miami University supports at the motion-to-dismiss stage a reasonable inference of gender discrimination.")

Circuit.  In that way, Defendant's reliance on *Colgate* presents the same risk of obsolescence that invalidated the multiple references in Defendant's Memorandum in Support of Motion to Dismiss (CM/ECF 10-1) to the later-reversed trial court decision in *Doe v. Columbia University*, 101 F.Supp. 3d 356 (S.D.N.Y. 2015), *rev'd,* 831 F.3d 46 (2d Cir. 2016).  Just as this Court, in its MTD Decision, was cautious in its analysis and application of the *Doe v. Columbia* trial court decision, so should it be cautious in analyzing and applying *Doe v. Colgate University* here.  The undersigned lead counsel, who represent the appellant in *Doe v. Colgate University*, will pursue that appeal with the same vigor that produced a successful result in *Doe v. Columbia University*.

With that said, even if one assumes (for the sake of discussion only) that *Colgate University* was correctly decided, the summary judgment record described by that court in its decision is substantially different from the summary judgment record here.[3]  The *Colgate* court's record (as described in its decision) did not contain evidence that the student protests were gender-based.  The *Colgate* court found that the plaintiff presented "insufficient evidence to permit a reasonable jury to find that Colgate faced pressure that caused gender bias to infect his EGP [disciplinary] hearing."   The *Colgate* district court described the summary judgment evidence of discrimination as follows:

- the campus protests by a student group did not support a *Columbia University* type claim because "it sought to raise awareness of sexual assault at Colgate, making no distinction between male and female victims.

- A University official's testimony that campus tour guides were trained to inform parents of the University's strict sexual misconduct policies "contain no reference to gender."

- A publication written by the University President "acknowledged that both men and women can be victims of sexual assault, and makes no reference to men as aggressors or women as victims."

---

[3]     As part of his appeal, the plaintiff in *Doe v. Colgate University* expects to seek appellate review of the adequacy and accuracy of the District Court's description of the summary judgment record of undisputed facts.

Similarly, in *Doe v. Trustees of Boston College*, 2016 WL 5799297 (D. Mass.), *appeal pending,* Case No. 16-2290 (First Circuit), the district court granted summary judgment because, in its view, the plaintiff failed to provide evidence linking the protests to the University's administration of his disciplinary case, *see id.* at *25 ("Doe provides no evidentiary support to show how these outside pressures have influenced the disciplinary proceedings and review to which Doe was subjected").

The cautious approach other district courts have adopted in early cases reviewing *Columbia University*-type claims at the summary judgment stage is not surprising. Student protests have always been a part of university life generally, and in recent years campus protests over a university's sexual misconduct policies have become prevalent. Plaintiff submits, however, that the record here goes beyond a garden variety campus protest (or even a garden variety Brown University campus protest). Instead, Plaintiff will present an extensive record of specific evidence and reasonable inferences therefrom, rather than asking the fact finder to leap to speculative conclusions. As described below, the summary judgment record here includes evidence of (1) gender-based student protests, (2) a gender-based University response to the protesters, and (3) specific instances in which the protests and the response affected Plaintiff's disciplinary case.

## II.    ARGUMENT

In addition to submitting a separate Statement of Disputed Facts and Inferences that undercut the factual record on which Defendant's motion is based, Plaintiff also presents sufficient evidence to raise questions of fact as to (i) whether Brown reached an erroneous outcome when it found John Doe responsible for violations of Brown's policies, and (ii) whether that finding was motivated by gender bias.

**A.     Plaintiff has sufficient evidence to cast articulable doubt on the accuracy of the outcome reached**

Plaintiff's first evidentiary burden under *Yusuf* is to present evidence that is "sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Yusuf,* 35 F.3d 709, 714-15 (2d Cir. 1994).  The *Yusuf* court described that burden this way:

> [T]he pleading burden in this regard is not heavy. For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof.

*Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994).

In support of his *prima facie* "erroneous outcome" case, Plaintiff attaches as Exhibit 1 the Declaration he previously filed in support of his Motion for Preliminary Injunction with associated exhibits (CM/ECF 28-4).[4]  In Paragraph 2 of the Declaration, Plaintiff verifies as true all the allegations in the Complaint of which he has personal knowledge, while attaching (and authenticating) certain documents from his case.   On this basis, most of the allegations considered by the Court in its MTD Decision are now part of the Rule 56(c) record for the purpose of the motions before the Court.

The Complaint (as verified by John Doe to the extent of his personal knowledge) is replete with evidence that casts articulable doubt on the accuracy of the result of the outcomes reached in the succeeding stages of his case (removal from campus, lack of investigation, biased hearing, excessive sanction and flawed appellate process). Subsequent paragraphs of the Declaration supplement and emphasize those doubts.   For example, Paragraphs 7-9 of John Doe's testimony in his Declaration states as follows:

---

[4]     To ensure compliance with all formal requirements, Plaintiff also submits under seal an Affidavit (Exhibit 2) confirming his identity verifying his testimony in the Declaration.

7.       Specifically, in reaching its erroneous decision, Brown overlooked the evidence which clearly demonstrated Jane Doe consented to the sexual encounter, for instance:

- Prior to mutually agreeing to go back to my room, Jane Doe texted her friends that she might be about to "hook up" with me.[5]

- When we entered my room, we began kissing and touching, which Jane Doe participated in passionately, as demonstrated by her kissing and biting my neck, leaving a noticeable bruise.

- When someone knocked at my door, we both jumped up out of embarrassment.  Had Jane Doe felt uncomfortable, she could have left at this time or called for help. However, she never attempted to leave my room, nor did she state a desire to do so.

- To confirm Jane Doe's consent, I explicitly asked "do you like this?  Jane Doe provided consent when she stated "yes" and then guided my hand and told me to rub her in a certain way. At no time did she state that she did not want me to touch her.

8.       Further, in reaching its erroneous decision, Brown disregarded the countless inconsistencies between and within Jane Doe's two statements, including:

- In the Oct. 18 Complaint, Jane Doe states I wrapped my arms around her, told her she was "so beautiful" and led her to the bed; however, in the Oct. 17 interview, she claims I walked towards her, forced her to walk backward and pushed her on the bed. *See* October 17 Public Safety Report, Exhibit 1 hereto; October 18 Complaint, Exhibit 2 hereto.[6]

- Facebook photographs of Jane Doe taken less than 24 hours after the encounter show no visible marks on her lips or neck, contradicting her claims that I kept biting her lip, bit her neck really hard and "gnawed at the skin and pulled away so that it really hurt.

- Jane Doe's medical records do not report any bruising on her lips or neck, and in fact specifically note "no marks on neck seen." The exam further noted "normal external female genitalia," "no skin abrasions," and that an internal exam was "declined by patient."   *See* medical records of Jane Doe, Exhibit 3 hereto.

---

[5]       *See* Exhibit 3 (witness statements).

- Jane Doe's medical report noted a few yellow bruises, indicating that a considerable amount of time had passed since they were sustained, and they were not in the locations where she claimed to have been bruised. *See* Exhibit 3 hereto.

- In the Oct. 18 Complaint, she states that she lay on top of me when we kissed, but in her Oct. 17 interview, she states I climbed on top of her, continued to kiss her, and bit her lips and neck several times in an aggressive nature. *See* Exhibit 1 hereto; Exhibit 2 hereto.

9.    In addition to the lack of evidence against me, there were numerous procedural flaws that resulted in the erroneous outcome. For instance:

- Brown failed to retrieve documentary evidence (text messages) referred to by Jane Doe's witnesses where she advised her friends that she felt safe with me.

- Brown failed to interview the witnesses identified in support of my defense before initiating formal charges against me; in contrast, Brown contacted all of Jane Doe's witnesses and collected statements from them prior to providing me with formal notice of the charges.

- Brown failed to afford me 7 business days to review all materials that would be presented at the disciplinary hearing when it waited until less than 4 days before the hearing to provide me with a package of 80 pages of critical evidence and procedural information, including an additional 23 unsigned, unsworn statements, an addendum by Jane Doe and Jane Doe's medical records from October 15, 2014.  *See* Exhibit A to Complaint, (Code), and p. 11.

.    .    .

See Exhibit 4 (Report of Brett A. Sokolow dated September 1, 2017) and Exhibit 5 (Deposition of Brett A. Sokolow dated November 17, 2017) identifying procedural violations and errors that led to an erroneous finding of responsibility; *see also* Plaintiff's Cross-Motion for Summary Judgment, pp. 54-77, *infra,* which provides more evidence concerning Defendant's violation of Plaintiff's procedural rights under the Code of Student Conduct. In these ways, the

summary judgment record contains more than enough evidence to satisfy Plaintiff's initial burden of production for an "erroneous outcome" case under *Yusuf*.

### B.    Plaintiff has made a prima facie case of discrimination to satisfy the first prong of the *McDonnell Douglas* burden-shifting framework

Plaintiff's Declaration also satisfies his initial burden of production under the *McDonnell Douglas* framework (*see* pp. 5-6 *supra*) as it provides evidence supporting his contentions that (1) he is male, (2) he was not responsible for the violations for which he was sanctioned, (3) he was found responsible and sanctioned, (4) the outcome of the proceeding was not accurate, and (5) he has evidence of gender bias.

### C.    Plaintiff has evidence of "particular circumstances suggesting that gender bias was a motivating factor" in the University's disciplinary action against him and that Brown's actions were a pretext for discrimination

Assuming that Brown articulates the non-discriminatory reason that its disciplinary process was a valid exercise of its authority, Plaintiff's next burden is to provide evidence of "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding" which "might include, <u>inter alia</u>, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *See* p. 4, *supra* (MTD Decision, quoting *Yusuf*).

Plaintiff will now present four types of evidence that gender bias (as opposed to "anti-respondent" bias) was a motivating factor: (1) statements and actions of University officials, (2) patterns of decision making, (3) evidence of pretext and (4) evidence of an institutional response to criticism.

### 1.    Statements and Actions of University officials

John Doe's disciplinary case went through several stages (complaint, removal from campus, investigation, presentation of charges, pre-hearing discovery, hearing, sanction and

appeal), and different University officials were involved in one or more of these stages.  In other contexts, courts have found sufficient evidence of discrimination from intermediate stages.  For example, in the employment discrimination context, the Second Circuit held that gender-stereotypical remarks made during an investigation were sufficient evidence to require a trial. *See Sassaman v. Gamache,* 566 F.3d 307, 314-55 (2d Cir. 2009) ("[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.") *See also Holcomb v. Iona Coll.,* 521 F.3d 130, 143 (2d Cir. 2008); *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004) (An "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision .... even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the ... process.")

Within this framework, Plaintiff will present evidence regarding statements and actions of three University officials, namely Professor Gretchen Schultz, Vice President Margaret Klawunn, and Dean Yolanda Castillo, that demonstrate gender bias.

### a.     Professor Schultz

Professor Gretchen Schultz served as Chair of the Student Conduct Board panel that heard John Doe's case.  *See* Exhibit 6 (Schultz Deposition, p. 15).  Plaintiff contends that Professor Schultz contributed to the erroneous outcome in his case by finding him responsible for misconduct of which he was innocent and which was not supported by the testimony and documents before the Student Conduct Board panel.  Plaintiff also presents evidence that Professor Schultz violated his procedural rights during the Hearing itself, by denying him the opportunity to make a "midpoint" statement (*see* pp. 64-66, *infra*) and encouraging witnesses to

present negative character testimony against Plaintiff as part of a proceeding in which the case administrator (Dean Castillo) excluded favorable character witness testimony that Plaintiff attempted unsuccessfully to introduce. *See* pp. 71-72 *and* PSDF Exhibit 31 ("wing man" episode), *infr*a.

More specifically, Plaintiff contends that Professor Schultz denied him the presumption of innocence (or an absence of responsibility) because (1) he was male, (2) he was a member of a fraternity and (3) both he and Jane Doe consumed moderate amounts of alcohol during the night of their encounter.  Plaintiff contends that Professor Schultz either developed or reinforced her biases and prejudgments of Plaintiff's case through her work on the University's Sexual Assault Task Force (SATF).  The SATF's one-year work schedule overlapped with Plaintiff's November 21, 2014 Student Conduct Board hearing, as it was formed in the Spring of that year and issued reports in December, 2014 (Interim Report) and March, 2015 (Final Report). The Interim Report began with a clarion call for fundamental change, stating the following:

> The goal of our Interim Report, and our Final Report which will follow in March 2015, is therefore crystal clear: <u>the current norms and culture of the Brown University campus are not acceptable, and as a community we must seek in word and deed to fundamentally change that culture in order to ensure that the Brown campus is a safe and welcoming place to learn, teach, conduct research, work, and live for all members of the community</u>.

Exhibit 7 (emphasis in original).

In her deposition, Professor Schultz's commentary on this portion of the report revealed her baseline views concerning the interaction of men, fraternities (whose members are exclusively male), alcohol and sexual assault as follows:

> Q.    Okay.  Can you describe your view of the culture at Brown that you sought to change?
>
> A.    Well, I think, for example, of some fraternities that had a reputation for boasting about sexual conquest.  It by no means is referring to the entire community.  It talks about a small number of Brown Community members who commit acts of harassment and violence. So the effort was to address through development,

> training, to try to change that culture in the sense of entitlement to sexual conquest where it existed.

Q.   And so when it's -- when you see the part of the sentence on the next page which states "...enables and empowers the small number of Brown Community members who commit acts of sexual and gender-based harassment and violence."  Do you see that?

A.   Yes.

Q.   How did the culture at Brown lend itself to that conclusion?

A.   What I believe the sentence to be saying is that assumptions having to do with the automatic privilege of this sort of spirit of sexual conquest was something that needed to be addressed and questioned.

Q.   What do you mean "the spirit of sexual conquest"?

A.   **Well, what I'm talking about is how some boys grow into manhood learning around them that it's okay to -- pardon my language -- get pussy in any way possible.  That's what I mean.**

Q.   And did you view [John Doe] as someone like that?

A.   Did I view him like that?  I wasn't thinking of him when I was reviewing this sentence, but I would say that he was someone who wouldn't take "No" for an answer.

.   .   .

Q.   So he would fall into the category of Brown Community members who commit acts of sexual violence, correct?

A.   Yes.  You could say that.

Exhibit 8 (Schultz Deposition, pp. 307-09) (emphasis added).

Moreover, Professor Schultz links the predatory intentions of men and fraternities to the use of alcohol as a weapon, stating the following:

Q.   Okay.  If we keep going, where it says "underlying cultures and norms," what underlying cultures and norms did you feel needed to be addressed?

> A.     Well, for example, the sense in some fraternities that it was acceptable to try to get first year students, female students intoxicated and -- in order to more easily sleep with them.

Exhibit 8 (Schultz Deposition pp. 311-12).

Finally, Professor Schultz confirmed her agreement with the statement that "Our larger culture is saturated with misogynistic and often violent representations of sex and sexuality." Exhibit 8 (Schultz Deposition, p. 323:12-22).

Professor Schultz likewise demonstrated her bias against male respondents and the presumption of innocence when she stated the following:

> Q.     Do you believe that a sexual assault victim is more likely than not telling the truth?
>
> MR. RICHARD:  Objection.  You can answer.
>
> A.     Yes.
>
> Q.     You do believe that?
>
> A.     Yes.
>
> Q.     And why is that?
>
> A.     Because I don't see why anyone would want to make false accusations and put them through -- themselves through such a process for no reason.

Exhibit 9.  Moreover, she confirmed her belief that false allegations are rare (Exhibit 8, Schultz Deposition, p. 322: 5-21) leaving an accused male student to fight an uphill battle.

Through her candid, if crude testimony, Professor Schultz demonstrated that she began her consideration of John Doe's case with fixed, stereotypical views concerning men, fraternities (which are populated exclusively by men), alcohol and how they combine to lead to sexual predation specifically by men and specifically upon women, all of which provide a gender-based motivation for her to deny Plaintiff a fair hearing.

###### b.        Vice President Klawunn

As Vice President of Campus Life and Student Services, Margaret Klawunn had a prominent role in John Doe's case. In addition to having general supervisory authority over the entire Student Conduct Board process, Ms. Klawunn made and/or contributed to decisions to (1) remove John Doe completely from the Brown University campus as an "interim" remedy before an investigation took place, (2) charge him with four violations of the Code of Student Conduct, (3) impose a sanction of 2.5-years, and (4) she also participated in the decision to deny his request to postpone the hearing past November 21, 2014. *See* Exhibits 25 (Klawunn Deposition), 44 (Brown 355 – removal letter).[7]   The summary judgment record contains evidence that her decisions were substantially motivated by a background prejudice linking men, fraternities and alcohol to sexual assault.

###### 1.        The Web of Caring

Prior to serving in the position of Vice President of Campus Life and Student Services, Ms. Klawunn in 1996 co-wrote an article stating her views about the ways in which fraternities provided a setting for men to sexually exploit women. The article appeared as a chapter entitled "The Web of Caring" in a book concerning campus life (Exhibit 10).   In that article, Ms. Klawunn co-wrote:

> Even though men and women claim that both sexes get drunk in order to socialize more freely with each other, the difference becomes harmful when women are entering a social situation set up by men, as in a fraternity house, which is designed to make it easier for men to take advantage of women sexually. (p. 69)
>
> . . .
> In the fraternity setting, the socializing can (and often does) lead easily to acquaintance rape and sexual assault. (p. 70)

---

[7]        Later, Ms. Klawunn modified John Doe's total campus ban to permit him to attend classes (but otherwise stay off campus). *See* p. 45, *infra*.

.   .   .

With regard to alcohol consumption and sexual assault, the fact that fraternities become the buyers/sources/servers of alcohol, and that women enter fraternities in order to drink it, means that the two main conditions that tend to predispose women to sexual assault are institutionalized in some greek systems. . . .   Because alcohol impairs judgment and weakens defenses, it becomes an agent in assisting a predator to acquire a victim.  (p. 71)

Earlier in the same article, the authors go further, clarifying that men are sexual predators, even without taking alcohol into consideration, stating:

But alcohol cannot be said to have caused bigotry and prejudice or caused men to objectify women and appropriate them for exploitative purposes. These attitudes precede alcohol consumption, and a focus on alcohol will not seriously attend to the underlying problems. (p. 49)

Through this article, Vice President Klawunn expressed the view that alcohol served at fraternity houses enables a male "predator" to take advantage of a female "victim."  In the case at bar, both Jane Doe and John Doe admitted to consuming moderate amounts of alcohol (in violation of the University's policy against underage drinking), but Vice President Klawunn decided only to charge John Doe and not Jane Doe with a violation of Brown's policy. Exhibit 25 (Klawunn Deposition, pp. 283-284).

## 2.      The Adam Lack Case

Vice President Klawunn's first position at Brown University was to serve as Director of the Sarah Doyle Women's Center. While employed there, she commented on a controversy involving Adam Lack, a Brown student who was charged with sexual misconduct, tried and exonerated. Though not employed by Brown at the time of Adam Lack's case, Vice President Klawunn considered herself informed enough to make the following statement about other men defending Mr. Lack: "They are afraid that they have already been or will be the next Adam Lack. Many men see themselves as potentially in that situation or have already been in that situation.

This case has become a magnet for men who have skeletons in the closet." *See* Exhibit 11 (Brown Daily Herald article of April 29, 2010).

### 3.      Statement to James Doe

On October 19, 2014, John Doe's father James Doe met with his son and Vice President Klawunn to discuss the removal order. When James Doe questioned the necessity and basis for this extreme measure, Vice President Klawunn's "direct response was to blame Obama, 'He's forcing us to do this.'"   Exhibit 12 (James Doe Deposition, p. 20).   While Vice President Klawunn did not elaborate on this reference, a jury could infer her comments were related to the fact that four months earlier, the United States Department of Justice, Office for Civil Rights opened a Title IX investigation of Brown University's sexual misconduct policies and practices, as triggered by Lena Sclove.  Exhibit 13.  This investigation was reported in the Brown Daily Herald.  Exhibit 14.

### c.      Dean Castillo

Dean Castillo held the position of Case Administrator, through which she was required to assist both complainant and respondent in preparing for the hearing.  While the Code of Student Conduct designates certain participants (such as student advisor and student advocate) to have roles assisting either the complainant or the respondent exclusively,[8] one of the Case Administrator's roles nominally is to assist both sides in an evenhanded manner.

The record contains several instances in which Dean Castillo favored Jane Doe over John Doe with better information and access during their pre-hearing preparations.  While Dean Castillo failed to respond to John Doe's requests for information in violation of his rights under

---

[8]      Dean Castillo confirmed this role in her deposition testimony.  *See* Exhibit 20 (Castillo Deposition, pp. 18-19).

the Code of Student Conduct (see pp. 62-64, *infra*), she went above and beyond the Code of

Student Conduct's requirements in helping Jane Doe, including these examples:[9]

- On November 4, 2014, Dean Castillo offered to provide Jane Doe with a copy of John Doe's witness statement "in advance", while not making a reciprocal offer to John Doe. *See* Exhibit 69 (Brown 1342).

- On November 6, 2014, Dean Castillo's secretary Bianca Del Cid offered to provide Kisa Takesue, Jane Doe's student advisor, with "any new information as soon as we received it," whereas John Doe did not receive any additional witness statements until November 17, 2014, even though those statements were in some cases received by Defendant as early as November 13, 2014.  *See* Exhibit 70 (Brown 1380, 1385), Exhibit 60 (Brown 602).

- In a series of November 12, 2014 emails between and among Jane Doe, her private attorney, and her student advisor, Dean Castillo provided Jane Doe's team with progress reports on her efforts to (1) obtain statements from the nurses at Women and Infants Hospital, (2) coordinate the testimony of the campus police officers, (3) contact the physician at University Health Services who treated Jane Doe, and (4) correspond with a potential student witness who could support Jane Doe's case.  *See* Exhibit 71 (Brown 1497-1503).

- In an email exchange during November 19-20, 2014 Dean Castillo corresponded with Detective Peck concerning their efforts use the medical records to build a case against John Doe concerning evidence of bruising. Exhibits 72 (Brown 1607), 73 (Brown 1618-19)

Dean Castillo also participated in the decision to deny John Doe's requests for additional

time to prepare for the hearing, which also prejudiced his case. *See* pp. 24-30, *infra.*

Dean Castillo, whose career and personal history may have affected her objectivity

(Exhibit 20 (Castillo Deposition, p. 22)) revealed a predisposition towards female complainants

when she testified that "the person who is making the allegations has certainly suffered some

kind of trauma that's making them come forward with this." Exhibit 20 (Castillo Deposition, p.

262:14-16). She confirmed that in her personal view, the complainant is therefore a "victim" and

a "survivor of some type of trauma." Exhibit 20 (Castillo Deposition, p. 264:14-23).

---

[9]     Plaintiff provides additional examples of Dean Castillo's unequal treatment of John and Jane Doe as part of his cross-motion for summary judgment.

## 2.    Patterns of decision making

In pretrial discovery, Brown University produced a chart of information concerning all Student Conduct Board hearings conducted between 2011 and 2015 that included at least one charge of sexual misconduct (Offense III, IIIa and IIIb under the Code of Student Conduct.)  *See* Exhibit 15 (filed under seal). According to that chart, Student Conduct Boards heard 31 cases involving at least one charge of sexual misconduct.  In all of the cases, the Respondent was male. In 25 of them, the Complainant was female, while another five cases were brought by a male complainant.  The last case was brought by the University on behalf of a female who was allegedly harmed by a male student.  In short, there never has been a case before the Student Conduct Board in which a male student claimed to be harmed by sexual misconduct from a female student, and the overwhelming majority (26 out of 31) involve charges that a male harmed a female.

Courts have divided on the issue of whether evidence of this kind can support a claim of anti-male bias.  *See, e.g., Doe v. University of Colorado, Boulder*, 255 F.Supp. 3d 1064, 1074-75 (D.Col. 2017) (collecting cases). Plaintiff contends that the *Columbia University* decision (quoted above at pp. 7-8) and its antecedents and progeny provide the better reasoning; namely, that while the gender-based dividing line between accusers and accused does not provide evidence of gender bias in and of itself, a jury may consider that disparity when evaluating the statements University officials or advocates make in favor of the rights of accusers (also referred to as "victims" or "survivors") and against the accused (also referred to as "predators").  *See Weser v. Glen*, 190 F. Supp.2d 384, 395 (E.D.N.Y. 2002) ("[s]tatistics may be used as circumstantial evidence to support an individual disparate treatment claim"), *aff'd*, 91 Fed. Appx. 521 (2d Cir. 2002).

### 3.      Evidence of pretext

As noted above (*see* p. 5, *supra*) the First Circuit has held in the employment discrimination context that a fact finder can infer discriminatory intent without a "smoking gun" of direct evidence if the employer's articulated non-discriminatory explanation for its action features "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Gomez-Gonzalez.*, 626 F.3d at 662. Plaintiff submits that Defendant's egregiously false explanations of why it rushed Plaintiff's case into a hearing a mere 35 days after the complaint was filed meet this standard.

The summary judgment record contains evidence that Defendant investigated and heard John Doe's case on an unnecessarily expedited basis, harming his ability to prepare his defense. The Code of Student Conduct called for hearings to be commenced within 60 days of the receipt of a complaint or report of an incident.  Exhibit 16 (Code, p. 11). In practice, hearings were often held much later than this.  Brown compiled a list of pending hearings involving charges of sexual assault and/or sexual harassment for the Office for Civil Rights.  Exhibit 17.  Plaintiff constructed a chart for the Court converting the information about dates to days after filing of complaint.  Exhibit 18.  As the chart indicates, the sample of 10 cases open at the same time as Plaintiff's (which appears in the Chart as item 8) proceeded for an average of 81 days before the hearing, with a median value of 61 or 62 days.  In contrast, Plaintiff's case was heard in 35 days, with a hearing on November 21, 2014 for an incident that was reported on October 17.

Originally, Brown tried to hold the hearing even faster than that.[10]  On October 27, 2014,

Dean Castillo prepared a letter with charges that would result in a hearing on November 7.

Exhibit 19 (Brown 424-25). At that point, John Doe had not even prepared a statement. Exhibit

20 (Castillo Deposition, p. 347). When John Doe indicated he wished to prepare a statement,

Dean Castillo did not issue the letter. *Id.* On November 7, Dean Castillo issued a second letter,

this one calling for a hearing on November 14. Exhibit 21 (Brown 534-35). The same day,

Plaintiff sent Dean Castillo the following email:

> I would like to formally request a reasonable continuance of my hearing date for the
> following reasons:
>
>> Based on the materials I was provided this week, including statements from other
>> witnesses, I will need additional time to prepare for the hearing. I anticipate
>> providing you with additional materials and I will be unable to complete that by
>> the deadline you established of Monday, November 10
>>
>> I need additional time to consult with my advisor.
>>
>> Unfortunately, my mother is scheduled to have major surgery next week. Given
>> the significance of this hearing, I will need my parents to be present in Providence
>> on the hearing date for guidance and emotional support. That will not be possible
>> next week.
>
> I am asking for a short continuance at your discretion, although I am suggesting two
> weeks. Please let me know if you have any questions concerning the need for the
> continuance. I understand that the expedited hearing process is enacted for my own
> benefit because I am off-campus, but I want to be in a position to provide the
> board a complete picture and all relevant information about the case at the hearing.[11]

As of November 7, 2014, Dean Castillo had not been able to obtain statements from the hospital

staff at Women and Infants Hospital concerning Jane Doe. Consequently, with the approval of

Vice President Klawunn, Dean Castillo determined that the hearing should be postponed by one

---

[10]     *See* Exhibit 74 (Brown 1217); email from Dean Castillo to Vice President Klawunn and
copying counsel, dated October 19, 2014 stating "we are expediting."

[11]     In an unsuccessful response to this issue, Defendant in its Statement of Undisputed Facts,
CM/ECF 95, paragraph 120, Defendant quotes a portion of this email out of context.  *See*
footnote 12, *infra.*

week, until November 21. Exhibit 75 (Brown 2325) As a result, the delay was as much for the benefit of the University and/or Jane Doe (by allowing more time to attempt to fill an evidentiary hole in the case against John Doe).

When Dean Castillo approved the extension of one week but not two (i.e. until November 21), Plaintiff again requested, in a November 12, 2014 email, a continuance for a second week so that his mother could join him, stating the following:

> Dear Dean Castillo,
>
> I appreciate your granting a continuance of the hearing date, and your office's flexibility in this matter. Unfortunately, due to the severe nature of total shoulder replacement surgery, my mother will need some more time after surgery before being able to travel on an airplane. Thus, I am requesting a second continuance of the hearing date. We had suggested a continuance of 2 weeks only because that was roughly the minimum amount of recovery time needed for her to travel, without dragging this process too far into December.
>
> I understand that you are under no obligation to move the hearing date back farther, but it is certainly the best option for my family and I to have the hearing later than its current date of November 21. The emotional support provided by my mother's presence in Providence during hearing is invaluable, and I would be extremely appreciative if the hearing were moved to a later date, to ensure that it is possible. Again, feel free to contact me with any questions concerning this request.

Dean Castillo denied this request for the stated reason that the Thanksgiving holiday occurred the following week. Exhibit 76 (1504).

If Brown had granted this request, the hearing would have taken place on November 28, 42 days after the initial report and well below the University average. Had Brown waited an additional week to account for Thanksgiving (i.e. waiting until December 5), the hearing would have been 49 days after the date of the complaint.  A jury might find it difficult to understand why the timing of the semester provided a reason to deny John Doe's request; after all, the 60-day window extended to December 16, and another week past that would have been well within the common range of experience.

26

The issue returned in a different form the following week.  On Monday, November 17 at around 5:00 p.m., John Doe received a voluminous packet of materials for a hearing scheduled to take place the morning of Friday, November 21. Exhibit 22 (Brown 1593) He asked for additional time to review and understand the documents which included medical records, stating the following:

> I received the packet of information for the case in the e-mail you sent me at 5:17 pm today. Looking through the contents, there is a host of new materials submitted by the other side that I was previously unaware of. These include new witness statements, amended witness statements, text messages, hospital medical records, and Brown Health Services reports.  Also, there are other relevant materials referenced in witness statements that are not included in the packet . . .

> Because of the enormity of the amount of new information received, the three day window between now and the hearing date is not a reasonable length of time for me to prepare a response to the charges. Pursuant to rights D and E in the list of Student Rights and Responsibilities in the Code of Conduct, I am formally requesting a continuance of the hearing date. Ideally, I would prefer to clear my name as quickly as possible. However, by this Friday, I will not have had an opportunity to provide the panel with comprehensive responses to the charges. I hope you will understand my position, and respond to my request for a hearing date continuance.

Exhibit 22 (Brown 1593).  His faculty advisor, Marylou McMillan, seconded John Doe's motion, sharing her view that "this is a lot of material to get through and have prepared for a Friday hearing."  Exhibit 23.  (Brown 3537). Once again, Dean Castillo denied this request, this time stating "As this is the normal course of the process, we will not be issuing a continuance at this time."  Exhibit 24 (Brown 1597). As argued below, Brown University's last-minute document dump was anything but "the normal course of the process."  Plaintiff wanted additional time to review 55 pages of new material, including 27 pages of medical records that Brown University had held since November 3, and which Jane Doe also submitted to Brown University on November 13. Exhibit 20 (Castillo Deposition, p. 375:6-15). Depending on how one reads the Code, Plaintiff had a right to receive these records as early as November 7 (with the charge

letter), and at the latest by November 14 (7 days before the hearing).  Either way, Brown had

violated "the normal course of the process" by withholding these documents from Plaintiff past

the deadline, and had denied him due process under its procedures by forcing the hearing to take

place on what amounted to an expedited schedule that violated John Doe's contractual due

process right to "a reasonable length of time to prepare a response to the charges against him."

Vice President Klawunn's explanation for Defendant's denial of Plaintiff's requests for

more time is even harder to understand or accept.   At her deposition, she explained her

opposition to Plaintiff's request to extend the hearing date in this way:

> Q.   Do you know whether the request for an extension would have put the investigation past 60 days?
>
> A.   I don't believe it would have.
>
> Q.   Okay.  On average, how long did other investigations take during the 2014-2015 academic year?
>
> MR. RICHARD:  Let me just -- objection.  You can answer.
>
> THE WITNESS:  Yeah.  I can't answer on that.  I have indicated that the specifics of this case included the fact that we had a student on interim suspension and that our commitment to that student and his parents, who were extremely concerned about his academic progress, was to do the hearing in as timely way as possible so that he could resume his studies as a normal student if we got through the hearing and he was found not responsible.

Exhibit 25 (Klawunn Deposition, pp. 264-65).

This proposed explanation is at complete odds with the facts.  John Doe's disciplinary

hearing took place on November 21, 2014, a full two months before the January 21, 2015 start of

the Spring semester.  Exhibit 26.  For example, a three-week extension would have resulted in a

December 12, 2014 hearing, more than five weeks before the Spring semester began, allowing

John Doe ample time to "resume his studies as a normal student if .  .  . he was found not

responsible."  Also, a December 12, 2014 hearing would have been 56 days after Jane Doe's

complaint, well within the 60-day threshold established under the Code of Student Conduct or the longer interval between complaint and hearing that ordinarily occurred.  In short, Vice President Klawunn's explanation that she decided to deny John Doe's requests for extensions for his own academic benefit defies belief, and "a reasonable factfinder could rationally find [it] unworthy of credence and hence infer that [Brown] did not act for the asserted non-discriminatory reasons."  *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010).

While the irrefutable facts of the academic calendar provide a sufficient reason for a reasonable jury to find Vice President Klawunn's *post hoc* explanation unworthy of credence, there is even more compelling evidence of pretext, namely what Vice President Klawunn actually stated at the time.  After Plaintiff sent his November 12 email seeking an additional one-week extension (*see* pp. 25-26, *supra*), Dean Castillo forwarded his request to Vice President Klawunn.  They had this email exchange:

> Dean Castillo: FYI.  I do not think we should reschedule again for this reason.  Thoughts?
>
> VP Klawunn: I agree this is not sufficient to reschedule again.  [John Doe] is trying to get in the whole semester.

Exhibit 27 (Brown 1491) (emphasis added).

Based on what she said at the time, Vice President Klawunn did not refuse John Doe's requests for more time out of any concern for his Spring semester academic career if he were exonerated.  Instead, Vice President Klawunn refused John Doe's extension requests because she did not want him to complete successfully his fall semester courses.  Vice President Klawunn did not provide a candid answer as to why she took this position at the time, but a reasonable jury could infer that she already had predetermined John Doe's guilt before the hearing took place, and she did not want for him to gain the benefit of a full semester of a Brown education under

those circumstances, thereby shredding any right John Doe had to a presumption of innocence under the Code of Student Conduct that remained after she ordered John Doe removed from campus, before ever meeting him and before the investigation began.  In any event, no matter what exactly Vice President Klawunn meant when she said she opposed John Doe's "getting in the whole semester," that contemporaneous statement provides even more basis for a reasonable jury to view her counter-factual *post hoc* explanation as pretextual and unworthy of belief.

To conclude, the revisionist history that Vice President Klawunn and Dean Castillo presented to justify their actions, which has continued in skewed fashion in Defendant's Statement of Undisputed Facts[12], is not only demonstrably false based on their statements at the time, but also is so far off-base that a jury could find it to be a pretext for discrimination.

> **4.**     **Evidence of bias "in favor of the accusing female and against the defending male [student] in order to avoid further fanning the criticisms that [Defendant] turned a blind eye to such assaults."**

While the evidence presented so far provides a more than sufficient basis for a jury to find that the erroneous outcome in Plaintiff's case was substantially motivated by gender discrimination, the particular actions of these University officials in John Doe's case occur within a larger setting of a campus dealing with a sensitive issue raised by vigorous gender-based student protests.  This background information bolsters the evidentiary record of discrimination in two ways.  First, it provides color and context to understand and explain the statements and actions of Professor Schultz, who was involved in the Lena Sclove case and the Sexual Assault

---

[12]     Defendant's Statement of Undisputed Facts (CM/ECF 95), Paragraph 120, refers to John Doe's November 7 email, stating that it "confirmed his understanding" that "the expedited hearing process is enacted for my benefit because I am off-campus."  This partial quotation omits the conclusion of the sentence ("but I want to be in a position to provide the board a complete picture and all relevant information about the case at the hearing").  This use of a selective quotation to support a supposedly "undisputed fact" further demonstrates the extent of Defendant's effort to present a pretextual explanation for its decision to expedite John Doe's hearing.

Task Force as well as serving as Chair of Plaintiff's Student Conduct Board, and also Vice President Klawunn, who had connections to these background events.

Also, the factual record of the student protests and the University's response provide an independent basis for a jury to infer discrimination based on the Second Circuit's *Columbia University* decision, which held that a jury can infer discrimination from (1) "substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students," (2) a University administration that was "was cognizant of, and sensitive to, these criticisms," and (3) statements and actions by the University's leadership (especially President Paxson) that support the inference that Brown's officials "were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." *Columbia, supra*, 831 F.3d at 57-58.

As will be developed below, the protests regarding sexual misconduct at Brown University during 2014-15, and the University's response to those protests, goes well beyond a few incidents that caught people's attention in four important ways.  First, those protests provoked a campus-wide dialogue that played out over a period of twelve months, with the President of the University extensively engaged to the point of extending her personal moral and financial support to the protesters and their list of demands.  Second, both the protesters and the University framed much of their dialogue in gender-based terms, rather than speaking more generically about the rights of all victims and/or respondents, regardless of gender.  Third, the President of the University's actions and communications touched directly on Plaintiff's disciplinary case in "real time" as it developed.  Finally, the University officials handling

Plaintiff's disciplinary case afforded him harsh and unfair treatment in three ways that matched three of the specific demands of the protesters (which demands were previously endorsed by the University President).

> **a.     Lena Sclove's press conference and President Paxson's engagement with the protesters**

On April 22, 2014, a Brown student named Lena Sclove held a press conference to publicly discuss what she viewed as Brown's improper handling of her sexual assault complaint (abridged version viewable on YouTube at https://www.youtube.com/watch?v=jNNyZwJrM0I). Ms. Sclove claimed that she was a victim of a violent sexual assault by a fellow male student and although a Brown University Student Conduct Board panel found him "responsible," the resulting one-year suspension was inadequate, as it would end that fall, while she was still a student at Brown. She expressed her fear of his return to campus. *Id.*

In a complaint she later filed with the United States Department of Education, Office for Civil Rights and made public, Ms. Sclove claimed that while the Student Conduct Board panel initially recommended a two-year suspension of the male student, the Senior Associate Dean for Student Life reduced the sanction to one-year, which reduction was upheld on appeal to the Vice President for Student Life (Ms. Klawunn). Exhibit 13 (OCR Complaint), pp. 4-5, ¶¶19-21.

Student protests are a regular part of the daily life of many universities, and Brown University has its own storied history, dating back to the Vietnam War if not earlier. With that said, Ms. Sclove's April 22, 2014 press conference ignited an unusually vigorous protest even when measured against Brown University's rich tradition. In the days that followed, Ms. Sclove's press conference was reported in the student newspaper (Exhibit 28, Brown Daily Herald, April 23, 2014) and in the local and national press. Exhibit 29 (Slate Magazine); Exhibit 30 (Huffington Post); Exhibit 31 (Buzzfeed); Exhibit 32 (Providence Journal). She and her

fellow protesters framed the issue in terms of gender, filing a Title IX complaint with the OCR that was prepared by Legal Momentum, also known as the Women's Legal Defense Fund.  *See* Exhibit 13.

The protests drew the attention of Brown University's President, Christina Paxson.  The day after the press conference (April 23, 2014), President Paxson attended a meeting of the Brown University Community Council (which she chaired). Exhibit 43 (Carey Deposition, pp. 19:11-23). At this meeting, students expressed their concerns regarding how issues of sexual violence were being handled by the University and a particular concern about the Lena Sclove case which had gained local and national media attention. Exhibit 43 (Carey Deposition, pp. 20:14-20, 21:13-23).

On April 26, President Paxson sent a campus-wide email acknowledging the press conference, assuring the community that the respondent in Ms. Sclove's case had decided not to return to the University that fall, and announcing that the University was accelerating its review of student conduct policies.

The April 26 email did not satisfy the protesters. One group organized under the banner of "Imagine Rape Zero."  They based their name on an "Imagine Brown 250" campaign the University had organized to celebrate this anniversary at Commencement later that Spring. Exhibit 33 (Petition).  On April 30, this group issued a Petition, which called upon President Paxson, Vice President Klawunn, Provost Mark Schlissel, and Senior Associate Dean J. Allen Ward to publicly endorse a list of 16 "Demands."  The group gave the University officials a deadline of May 9 to respond.

President Paxson continued to be personally engaged.  On May 2, 2014, she sent a campus wide email announcing her decision to create a Sexual Assault Task Force. Exhibit 24

(Paxson Deposition, p. 24:4-18). She noted the Task Force was "charged with undertaking a comprehensive review of Brown's current practices, policies and procedures around issues of sexual assault and sexual misconduct." Specifically, President Paxson instructed the Task Force to focus on (i) sexual assault prevention; (ii) student support and advocacy; and (iii) policies and procedures for sexual misconduct. Exhibit 36 (May 2, 2014 email).

These two campus-wide emails began a twelve-month campaign by President Paxson to use her "bully pulpit" to influence discussion and action regarding the issues raised by Lena Sclove and her protester allies. In her deposition, President Paxson acknowledged the significance of these emails, stating "When I send out an email, usually I'm providing information or trying to convey information about values that I'm trying to propagate at the University," (Exhibit 34, Paxson Deposition, p. 18:15-18) and "The emails I send out tend to be on important matters." Exhibit 34 (Paxson Deposition, p. 17:24-25).

A review of those emails demonstrates how President Paxson projected her moral authority as President of Brown University to make this issue the University's highest priority in the area of campus life. Recognizing that sexual assault "was a major focus of people on campus" (Exhibit 34, Paxson Deposition, pp. 26:10-27:22) and "an area that [she] was paying attention to" (Exhibit 34, Paxson Deposition, p. 27:3-4), during the 12 months following Lena Sclove's press conference, President Paxson issued 24 emails or statements regarding campus life, of which 14 touched on the subject of sexual assault. The remaining items were on a variety of subjects, including five which marked the passing of five different members of the Brown University community.

President Paxson's extensive engagement with the Lena Sclove protesters and the Brown University at large on this issue went far beyond her involvement in any other campus life issue,

either before or since.  Exhibit 35 is the University's compilation of Presidential emails on the subject of student life from the beginning of President Paxson's term of office (September, 2012) to the present.[13] It is worth noting that this critical 12-month period (April 26, 2014 – May 7, 2015) marked President Paxson's busiest period for campus emails in general.  Her output per calendar year is as follows:

2013:       10 emails/communications

2014:       18 emails/communications

2015:       17 emails/communications

2016:       8 emails/communications

2017:       3 emails/communications

President Paxson's next email came one week later, on May 9, 2014, the deadline that Imagine Rape Zero had posted for her to respond to their list of demands, which list included the following:

1.    Require all students found culpable of sexual misconduct be, if not expelled, suspended from the University for at least two years, or until the victim in question graduates, whichever is longer.

5.    Expedite the current timeline for Student Code of Conduct hearings.

13.   Meet and prioritize the needs of the victim with respect to housing and academic accommodations beginning as soon as the incident is brought to the attention of University personnel, as required by federal law.

15.   Create programs and allocate resources to the Department of Public Safety and Health Education to confront and prevent sexual harassment in all its forms, recognizing that it is a foundational component of rape culture.

16.   Formulate programs and policies which address differential victim experiences based on intersecting identifies of race, gender identity and expression, socioeconomic status, sexual orientation, religious identity and ability.

---

[13]    As Exhibit 35 indicates, the compilation was printed from the University's website on December 21, 2017, and its most recent entry is from August 13, 2017.

In her deposition, President Paxson acknowledged that some of the students' demands were extreme and/or vague, testifying as follows:

> Q.    With regard to policies, would you agree that Brown's policies did not discriminate on the basis of the categories identified in Item No. 16?
>
> A.    Our policies should not discriminate ever.
>
> Q.    So to that extent, you disagree with the statement there?
>
> A.    The -- the statement here is so vague, formulate programs and policies which address -- I don't -- I'm not sure what the intent was of the students who were writing this.

Exhibit 34 (Paxson Deposition, pp. 39-40). In a point Plaintiff will return to later (*see* p. 39, *infra*), she also acknowledged at her deposition that she found the term "rape culture" in Demand No. 15 "a little bit inflammatory and I don't -- I don't really like it."

Notwithstanding her personal misgivings, President Paxson took a different public tone in her May 9, 2014 email (Exhibit 37), in which she endorsed the demands of the group and thanked the petitioners "for the carefully researched and comprehensive list of recommendations you have developed," adding "We are taking a number of immediate steps that align with your recommendations." Further, President Paxson outlined her expectations of the Task Force, stating "Many of your recommendations concern important issues such as the length of sanction, the definition of consent, the structure of the appeals process, sanctions for violating no-contact orders, systems for staff and faculty accountability, and the timeline for Code of Conduct Hearings. These are precisely the issues I expect the Task Force to consider, with substantial input from the Brown community." Moreover, she announced new initiatives, including the creation of two summer jobs to conduct research and support the work of the Sexual Assault

Task Force.  *Id.*[14]   In addition to sending this email to the Brown community, President Paxson sent copies specifically to a group of five administrators that included Vice President Klawunn. *Id.* She also asked the Imagine Rape Zero group to post her letter on their Facebook page. *Id.* President Paxson made a personal contribution of $2,500 to Imagine Rape Zero's fundraising efforts, which clearly listed her as a supporter of their cause. Exhibit 34 (Paxson Deposition, p. 50:8-20); Exhibit 38.

### b.  The 2014 Commencement

University commencement exercises are high-profile events, and the protesters made full use of this opportunity.   Their message was gender-based, as graduating students placed a "IX" on their graduation caps to bring attention to sexual assault policy reform. (*See* https://thinkprogress.org/red-tape-wont-cover-up-rape-the-silent-protests-that-are-sweeping-college-graduations-d6f6fd5eb9d/). Students involved with the Imagine Rape Zero group handed out flyers protesting the University's handling of Lena Sclove's case in particular, and its sexual assault policies more generally (*see* https://www.youtube.com/watch?v=8V5KRJM0rVU NYT Op-Docs 9-26-14 (New York Times video)), actions that certainly drew the attention and concern of Brown administrators. Further, President Paxson addressed the issue of "how to make members of our community safe from the threat of sexual assault" in her commencement address, and presented the issue of sexual assault to the University Corporation at its meeting.[15]

---

[14]    Those positions were filled by two students who were active in the Imagine Rape Zero group.  *See* Exhibit 7 (Task Force Interim Report) Appendix C, p. 1 (identifying student researchers), Exhibit 39 (Justice Gaines and Yvonne Yu Facebook posts).

[15]    Her address is viewable at https://www.youtube.com/watch?v=MQdF-5bK5kg&feature=youtu.be&t=565 at the 17:48 mark. *See also* . https://www.brown.edu/about/administration/president/statements/20140523-corporation-news (President's email to Brown Community reporting on May, 2014 Corporation meeting.)

c.      **Recruiting and Staffing the Sexual Assault Task Force**

By the fall of 2014, the membership of the Task Force had been fully established. Exhibit 43 (Carey Deposition, p. 41:9-10) President Paxson appointed Executive Vice President for Planning and Policy Russell Carey to serve as Co-Chair of the Sexual Assault Task Force (Exhibit 43, Carey Deposition, p. 32:16-19) along with Dr. Michelle Cyr, Associate Dean for Academic Affairs in the Alpert Medical School. Exhibit 43 (Carey Deposition, p. 41:15-21). Professor Gretchen Schultz, who had served as Chair of the Student Conduct Board that heard Ms. Sclove's case (Exhibit 6, Schultz Deposition, p. 59:21-22) and which recommended a two-year sanction that the Associate Dean of Student Life reduced to one year, thus generating the protests,[16] was also asked to serve as a member of the Task Force, a position she accepted. Exhibit 8 (Schultz Deposition, pp. 296:20-297:10). While acting as a member of the Task Force, Professor Schultz also served as Chair for the board that heard John Doe's case, in the fall of 2014. Exhibit 8 (Schultz Deposition, pp. 305:19-306:2).

In addition to the appointed faculty members, the Task Force included the appointment of four undergraduate students, all of whom were active in either the Imagine Rape Zero group or other sexual assault related protesting. Exhibit 39 (Carey Deposition Exhibits 9 and 10).

d.      **President Paxson's communications during the Fall, 2014 semester**

President Paxson continued her campaign of encouraging Brown to take a tougher stance on sexual assault through the fall 2014 semester. By email dated November 17, 2014, President Paxson extended her strong support for the activists mobilized by Ms. Sclove's press conference

---

[16]       In her deposition, Professor Schultz testified that, in her opinion, the sanction should have been the original two years that she recommended (Exhibit 8, May 16, 2017 deposition, pp. 316-17), thus taking Lena Sclove's side in her protest against the University when it rejected the Student Conduct Board's recommendation and imposed a one-year sanction.

when she discussed the steps taken to date to "change the culture and norms on our campus" and discussed how recent sexual misconduct complaints brought to the attention of the administration were being handled aggressively, including the one against John Doe. Exhibit 41.

President Paxson's November 17, 2014 email demonstrated her support for the protesters in a second way when she stepped into a controversy involving a debate forum in which one of the speakers expressed controversial views on the subject of campus sexual harassment.

For many years, the University's Political Science department had sponsored a student organization called the Political Theory Project, which ran the Janus Forum Lecture Series. Exhibit 40.  This series featured debates on topics of current interest.  On November 18, 2014, the Janus Forum scheduled a debate between Wendy McElroy and Jessica Valenti on the subject of "How should colleges handle sexual assault?"  Exhibit 40. President Paxson recalled that Ms. McElroy did not believe a rape culture existed and took "a very firm stance on the idea that rape is much rarer…than much of the survey evidence shows" (Exhibit 34, Paxson Deposition, p.73:19-25) while Ms. Valenti took an opposing view. Exhibit 40 (explaining speakers' opposing perspectives).

In this way, the debate was designed to provide students with an opportunity to hear both sides of a controversial argument.  *Id.*  A group of female students who disagreed with Ms. McElroy's views organized a boycott and protest.  Exhibit 34 (Paxson Deposition, p. 75). They also arranged for another speaker, Professor Lindsay Orchowski, to speak at the same time as the Janus Forum on a different topic, namely "The Research on Rape Culture." Exhibit 34 (Paxson Deposition, p. 75:2-14). As President Paxson acknowledged in her deposition, the term "rape culture" is "a little bit inflammatory and I don't -- I don't really like it. . . . I think that it is

somewhat inflammatory because it tends to equate all sexual assault with rape and sexual assault is a broader term." Exhibit 34 (Paxson Deposition, pp. 82:20-23; 83:9-11).

Despite her private qualms, President Paxson chose sides in this counter-programming debate, stating the following in her November 17 letter:

> Some people--including writer Wendy McElroy, who will speak with Jessica Valenti at a Janus Forum event next week--have argued that sexual assault is the work of small numbers of predatory individuals whose behaviors are impervious to the culture and values of their communities. I disagree. Although evidence suggests that a relatively small number of individuals perpetrate sexual assault, extensive research shows that culture and values do matter…In order to provide the community with more research and facts about these important issues, students and administrators have worked together to sponsor a lecture by Brown University Assistant Professor of Psychiatry and Human Behavior Lindsay Orchowski, entitled *The Research on Rape Culture*. This presentation will take place at 4:30 pm on Tuesday, November 18th in Wilson 102 as an alternative to the Janus Forum...

Exhibit 41.

While President Paxson did not join the students in urging a boycott, she stated her disagreements with one speaker (Ms. McElroy) without noting that Ms. McElroy would be opposed in a debate by Ms. Valenti, who would offer a counterpoint to the views of Ms. McElroy with which President Paxson disagreed. Also, while encouraging students to attend Professor Orchowski's talk on "rape culture," President Paxson neglected to state her disagreement with the use of the term. When asked at a deposition why her campus email stated her disagreement with Ms. McElroy's view but not her disagreement with Professor Orchowski's choice of words, President Paxson stated "At a university, academic freedom means that people should be able to go to talks the titles of which they disagree with" Exhibit 34. (Paxson Deposition, p. 83:4-6).  As President of Brown University, Ms. Paxson's public statements about "community norms and values" carried significant weight.

40

A reasonable jury could find that President Paxson used her campus-wide emails to express support for the concerns of Imagine Rape Zero and like-minded activists in ways that went beyond her traditional role as President, all part of her broader effort to change the "culture and values" regarding sexual assault at Brown University.  In this way she helped to "send a message" to the Brown community supporting a gender-based protest.

### e.        The Sexual Assault Task Force Interim Report

During the Fall 2014 semester, the Sexual Assault Task Force worked to prepare an Interim Report that embodied the values and objectives espoused by President Paxson on behalf of Brown University. In doing so, the Task Force considered selective information skewed in favor of female complainants and issued a report tainted with an evident bias against male students accused of misconduct.

Setting the tone for the findings presented, the Task Force's cover letter to President Paxson recounts the University's experience with the gender-based "Rape List"-an incident that gained national attention in the fall of 1990 when female students wrote on the bathroom walls to warn others about male students they believed to be sexual predators. Exhibit 7 (Interim Report, p. 1); Exhibit 43 (Carey Deposition, p. 75-76).[17] At the time these events occurred, the University administration was concerned about the due process rights of accused male students; however, that part of the incident's history was not described in the Interim Report's introductory letter.  Exhibit 7.

---

[17]        Footnote 1 of the December 16, 2014 cover letter refers to a November 16, 1990 New York Times article (Exhibit 42) which identifies the issue as gender-based, brought by a group of female students who protested in a way that some male students considered unfair.    *See also*  https://www.nytimes.com/video/opinion/100000003136974/browns-rape-list-revisited.html discussing Brown's handling of Lena Sclove matter and connection to Brown's "Rape List".

Viewing the Lena Sclove incident from the historical context of the Rape List, the Task Force noted the norms and culture at the University that it sought to change. For instance, it stated: "Social norms contribute to sexual harassment and sexual violence in a number of ways. Our larger culture is saturated with misogynistic and often violent representations of sex and sexuality" (Exhibit 7, Interim Report, p. 11) and "National studies and survey research at Brown has found that athletic team and male fraternal organization members drink alcohol in riskier ways than the general population. Risky alcohol use and conformity to masculinity norms are associated with sexual aggression…In addition, Greek affiliation and athletic participation or males is associated with sexual aggression and rape myth acceptance." Exhibit 7 (Interim Report, p. 18).

The language and recommendations of the Interim Report demonstrated its objective to protect female students and take a tougher stance on sexual assault complaints. Nearly all of the research considered and cited to by the Task Force was provided by Dr. Lindsay Orchowski (Exhibit 43, Carey Deposition, p. 70:1-9), which allowed her to inject her own views and biases into the Task Force's discussions, including her belief that many sexual assault perpetrators are repeat offenders, and though perpetrators comprise a "heterogeneous group," they are often angry, "hypermasculine" and see acquiring sexual partners "as a game." (http://www.browndailyherald.com/2014/11/19/research-indicates-persistent-rape-culture-orchowski-says/) While acting as a member of the Task Force, Dr. Orchowski was also directing a project that developed "a prevention program for college men and addresses the role of alcohol in sexual violence." Exhibit 7 (Interim Report, p. 6).

Dr. Orchowski selectively presented the information she deemed relevant to the members of the Task Force when she failed to address any controversies in the field of sexual assault

research or present a view that differed from her own. Exhibit 43 (Carey Deposition, pp. 73:18-74:3). Instead, she cited to such articles as "Fraternities and collegiate rape culture: Why are some fraternities more dangerous places for women?"; "Young Men's Likelihood Ratings to Be Sexually Aggressive as a Function of Norms and Perceived Sexual Interest"; "Examining masculinity norms, problem drinking, and athletic involvement as predictors of sexual aggression in college men;" and "Athletic participation, fraternity membership, and sexual aggression among college men." Exhibit 7 (Interim Report, pp. 26-28)

Also, while some of the Interim Report's language appears on its surface to be evenhanded in its discussion of the rights of complainants and respondents, a reasonable jury could find an emphasis on the concerns of (female) "survivors." For example, there is the following recommendation at p. 21 of the Report:

> *A discretionary fund of approximately $50,000 annually should be established to respond to the needs of complainants and respondents.* This fund should be administered by the Vice President of Campus Life and can be used for such critical needs as access to medically necessary care which may not be covered by insurance or which students may be fearful of placing on insurance claims which may become known to their parents or guardians. Many survivors of sexual assault do not, for example, pursue prophylactic treatment for HIV and other potential treatments due to concerns about cost and insurance. The costs of such treatment are modest (about $2700) relative to the medical benefits. This discretionary fund will enable Health Services, without violating doctor-patient confidentiality, to ensure students receive the care they need. Commensurate with this recommendation is a need to further publicize to students the medical and testing choices available if they are sexually assaulted.

(Emphasis in original.)

While the caption of the recommendation is for a fund "to respond to the needs of complainants and respondents," the proposed uses are only for the benefit of assault victims. A reasonable jury could find this to be an example of how the Task Force, which was triggered by a complaint from a female complainant about the University's treatment of a male respondent, was primarily if not exclusively focused on this particular gender configuration.

On October 29, 2014, the Imagine Rape Zero group met with the Task Force and presented a modified list of the demands previously submitted to President Paxson. Exhibit 7 (Interim Report, Appendix E). While Russell Carey, Co-Chair of the Task Force, acknowledged that one of them (Item 16) was contrary to Brown's policies of non-discrimination (Exhibit 43, Carey Deposition, p. 53:12-16), the demands were nonetheless included as an appendix, and thus incorporated into the Interim Report.

The foregoing, when coupled with the testimony of Professor Schultz (s*ee* pp. 16-18, *supra*) provides a basis for a jury to conclude that the Interim Report advanced the mission of protecting female students from assault by male students.

### f.       Impacts of the University's campaign on Plaintiff's case

The factual record to this point has presented gender-based protest and the extensive engagement of the University and its President through a gender-based perspective.  Now, Plaintiff will present evidence that "connects the dots" between and among (1) the protesters and their demands, (2) the University's engagement campaign and (3) the specific circumstances in which Defendant treated Plaintiff unfairly.

Plaintiff submits there are at least three such direct connections which run from Imagine Rape Zero's petition of demands, through the President's messages and the Sexual Assault Task Force, to the unfair administration of Plaintiff's case, namely: (i) the order of immediate removal from campus; (ii) the rush to hold his student conduct board hearing before he could prepare a defense; and (iii) the length of the sanction imposed after he was found responsible.[18] In all three

---

[18]     A jury also could find many indirect impacts of Defendant's response upon Plaintiff's case.  For example, President Paxson's November 17, 2014 email (Exhibit 41) encouraging students to attend a talk on "rape culture" and informing the community of two campus removals that had taken place was issued four days before John Doe's Student Conduct Board hearing.

of these instances, John Doe received harsh treatment beyond the University's stated policies and precedents in ways that were urged by the Imagine Rape Zero petition that President Paxson endorsed in the Spring of 2014, portions of which were ultimately adopted by the Sexual Assault Task Force, in the issuance of their Interim Report.  We consider each in turn.

### (1)  The Removal Order

Demand No. 13 of the Imagine Rape Zero petition highlighted the issue of interim removals, stating the following:

> 13.    Meet and prioritize the needs of the victim with respect to housing and academic accommodations beginning as soon as the incident is brought to the attention of University personnel, as required by federal law.

Exhibit 33.

Brown University, with the encouragement of President Paxson, initially sought to achieve complete compliance with this demand in Plaintiff's case. On October 19, 2014, Dean Castillo presented John Doe with a letter, signed by Vice President Klawunn, informing him that "effective immediately, Sunday, October 19, 2014, you are removed and barred from the Brown University campus on an interim basis."  Exhibit 44 (Brown 355) The letter informed him that the removal was for "an indefinite period of time" and that if he set foot on the campus he "will be considered trespassing and subject to additional action."  *Id.*  John Doe objected, stating that he wanted at least to be able to complete his course work.  On reconsideration, Vice President Klawunn realized her initial order was too drastic, and decided to allow John Doe to continue attending class, provided that he found lodging off campus and limited his appearances on campus to attending class, stating:

> I don't specifically -- the piece that I remember more specifically is that given how committed he was to his schoolwork and the importance of his schoolwork, that we made an adjustment to allow him to stay in town and participate in his classes.

45

Exhibit 25 (Klawunn Deposition, p. 230)

In this way, Vice President Klawunn took a more moderate approach in handling Plaintiff's case than did President Paxson. Before seeking the original, most severe interim remedy imaginable, Vice President Klawunn corresponded with President Paxson, wherein she proposed the following course of action:

> Our plan would be to issue a no contact order tonight, for deans to meet with him tomorrow morning, we would notify his parents, and fly him home tomorrow. Okay with you? Call me if you would like.

Exhibit 45 (Brown 2186). At that time, Vice President Klawunn had not spoken to either the Complainant or John Doe concerning the alleged events, had not reviewed any evidence and had not even received a written complaint. Exhibit 25 (Klawunn Deposition, pp. 167:1-12; 231:21-232:9). Indeed, Dean Castillo corresponded with Vice President Klawunn at 9:02 p.m. on October 17, 2014 about serving the removal letter the following day, prior to receiving Jane Doe's formal complaint at 9:03 p.m. Exhibit 78 (Brown 1018-1019). The removal letter referred to injuries allegedly sustained by the Complainant, though medical records had not yet been collected or reviewed. (Brown 1208).[19] Even more egregious, Vice President Klawunn did not have the authority to issue such a removal order (*See* discussion *infra* regarding breach of contract). Exhibit 25 (Klawunn Deposition, p. 230:17-23) Notwithstanding, later that night, Vice President Klawunn informed Dean Castillo that President Paxson approved their removal plan. Exhibit 46 (Brown 2215).

---

[19]     Though the decision to remove John Doe was motivated in part by the Complainant's allegation that she sustained injuries during her encounter with John Doe, Dean Castillo admitted that if she had been made aware that the photos of the alleged bruises taken by the hospital were missing, "I wouldn't have moved him off campus." Exhibit 47 (Brown 2581).

In her deposition, President Paxson took a more balanced position on the issue of interim removal, stating the following:

Q.   Do you believe that the most severe form of removal should be applied in all cases?

A.   Absolutely not.

Q.   And how instead do you believe the University should proceed in making these decisions?

A.   I think that the important thing to remember is that you are balancing the need to maintain a safe environment with the desirability of letting people stay in school.

Q.   And is it fair to say that the second – the second half of the balance is the rights and interests of the respondent?

A.   Yes.

Q.   Do you know -- and is it your view that the most -- that the University should impose the least restrictive type of removal consistent with preserving the safety of the campus?

A.   Yeah.  I think that's a fair statement.

Exhibit 34 (Paxson Deposition, pp. 95-96)

Once again, however, President Paxson's official actions and public statements at the time do not match these views, as she authorized the most drastic remedy possible when given the opportunity. She then made a point of using one of her campus emails (the same one in which she expressed her views concerning Wendy McElroy and Professor Orchowski) to bring up John Doe's removal as an indication of how Brown was getting tough on sexual assault, stating "More generally, we have seen an increase in reporting of sexual assault reporting this academic year.  In several [2] cases, the evidence was strong enough to warrant immediate removal of the alleged perpetrators from campus." Exhibit 41.

At her deposition, President Paxson explained her decision to inform the campus community of Plaintiff's removal, stating the following:

Q.      Now, in this letter you make a point of informing the community that there were two immediate removals that semester?

A.      Yes.

Q.      Do you recall telling them that?

A.      Uh-huh.

Q.      Why did you want the community to know that?

A.      I think it was important to let the community know that, when it was indicated, we were taking appropriate action to protect them.

Q.      Was it your intention to inform the community that the decisive action was being taken in the area of sexual assault?  Is that why you included that message, that part of your message?

A.       I think it was important to show them that we were taking concerns of sexual assault seriously and fairly.

Exhibit 34 (Paxson Deposition, p. 99:7-24)

Plaintiff does not claim to know President Paxson's intent throughout her messaging campaign and her actions in his case; however, a reasonable jury could find that the members of the Brown community were receiving a clear directive from their President that it was time to change Brown's "culture and values" and get tough on male students accused of sexual assault.

### (2)     The rush to hold John Doe's hearing before he could prepare his defense

Demand Number 5 of the Imagine Rape Zero activists was to "[e]xpedite the current timeline for Student Code of Conduct hearings." In John Doe's case, the University took this demand to heart, pushing his hearing ahead far faster than its policies required, far faster than cases normally took, and against his repeated requests for additional time to deal with complicated material that was submitted at the last moment, delays that themselves violated the Code of Student Conduct.

In an earlier section (pp. 24-30, *supra*) Plaintiff described how Defendant reduced the interval between the filing of Jane Doe's complaint from the 60 days prescribed by the Code of

Conduct and/or the historical median time of 61-62 days and average time of 81 days to a miniscule 35 days, notwithstanding Defendant's "document dump" of the hospital records at 5:17 p.m. on the Monday evening before the Friday morning hearing date.  Plaintiff also described Vice President Klawunn's stated, vengeful reason at the time, that she opposed Plaintiff "getting in the whole semester" and the other counterfactual reasons she and Dean Castillo constructed after the fact.  Plaintiff submits a jury could find that the true reason Vice President Klawunn was motivated to throw Plaintiff's concerns under the bus was Demand No. 5 of the Imagine Rape Zero petition, a copy of which had been sent to her in April of that year, and which remained part of the public debate in the months that followed.

### (3) The length of the sanction departed from precedent and was not supported by the evidence

Finally, Brown University departed from precedent in order to accommodate Demand Number 1 from the Imagine Rape Zero petition, which read as follows:

1. Require all students found culpable of sexual misconduct be, if not expelled, suspended from the University for at least two years, or until the victim in question graduates, whichever is longer.

This, of course, was at the heart of Lena Sclove's protest in the Spring of 2014.  The Task Force recognized this concern in its Interim Report, noting: "[t]here is a widely shared perception that penalties are too lenient" (Exhibit 7, Interim Report, p. 4), a consideration that was taken into account in imposing a sanction on John Doe. In her role as Chair of the Student Conduct Board, Professor Schultz, who criticized the sanction imposed in Ms. Sclove's case as being too lenient (Exhibit 8, Schultz Deposition, p. 317:2-4), proposed a 2.5-year sanction, which was adopted by Vice President Klawunn.  Exhibits 48 (SCB decision), 49 (Brown decision letter).

The sanction that Professor Schultz recommended for Plaintiff's case, and that Vice President Klawunn imposed, departed from the pattern of prior decisions. In pretrial discovery, Brown University produced a chart (Exhibit 15, answer to Interrogatory No. 10) that listed the disposition of Student Conduct Board cases during 2011-15 that included a charge of sexual misconduct (Sections III, IIIa and/or IIIb).  In this data set there are 18 cases involving violations of Code Sections III, IIIa or IIIb that were decided prior to the Fall semester of 2014, the first one following the Lena Sclove protests that Spring.  Reviewing the sanctions for those 18 cases, 15 of them were for suspensions of 1 year or shorter (or less drastic forms of punishment).  One was for 2 years (still less than Plaintiff's) and two were for expulsions (admittedly harsher than Plaintiff's sanction). Of particular note is Case No. 10, based on a Fall, 2013 Student Conduct Board hearing in which the respondent was found responsible on four Code charges including IIIa and IIIb, and subjected to suspension until the fall of 2014. This case was Lena Sclove's case, as it was the only one decided that semester with that sanction, which in her complaint to OCR, Ms. Sclove described as too lenient.  *See* Exhibit 13 (Lena Sclove OCR complaint).[20]  Ms. Sclove appealed the sanction but Vice President Klawunn denied the appeal, explaining her decision in a letter to Ms. Sclove as follows:

> The Senior Associate Dean sets the sanction by reviewing cases with similar findings and benchmarking the sanction against other cases while also factoring in the specific circumstances that might suggest a different determination even if the violations are the same.  In some instances the respondent might have previous violations that would need to be considered in setting the sanction.  In this particular case, the precedent of similar cases needed consideration.  Dean Ward set the sanction at a one-year suspension after

---

[20]  In her OCR Complaint, Ms. Sclove claims that the Student Conduct Board that heard her case recommended a 2-year suspension, which Dean Ward reduced to one year and which Vice President upheld on appeal.  Exhibit 13, pp. 4-5, Exhibit 50.  Professor Schultz was the Chair of the Student Conduct Board that made the sanction recommendation that Dean Ward and Vice President Klawunn considered to be too harsh.  Exhibit 15 (under seal), Item #10.

his review of the sanction imposed in other sexual misconduct cases that included suspension from the University.

Exhibit 50.  These letters are normally kept confidential, but Ms. Sclove gave this letter to the Brown Daily Herald to publish as part of its coverage of her protest.  *See* http://www.browndailyherald.com/2014/04/23/u-mishandled-sexual-assault-case-victim-says/ .

For Professor Schultz, the recommendation of a 2.5-year sanction was easy to make, given that she had thought the sanction in Lena Sclove's case was too lenient.  A reasonable jury could find that Professor Schultz could have decided to ignore precedent because she felt vindicated in her views by the Lena Sclove protests and the University's response thereto. As "acting" Senior Associate Dean, Vice President Klawunn assigned to herself the responsibility of reviewing the Student Conduct Board's recommendation and then deciding the proper sanction for Plaintiff's case.[21]  Vice President Klawunn was well aware of precedent; after all, her appeal decision concerning Lena Sclove's case (upholding the one-year suspension) was at the heart of the protests in the Spring of 2014.  The protesters also were well aware of her role at the time; in fact, the Brown Daily Herald published a copy of Vice President Klawunn's appeal decision as part of its April 23, 2014 article covering the protests.[22]  For this reason, the Imagine Rape Zero activists sent Vice President Klawunn her own personal copy of their petition.  *See* p. 33, *supra*.

In the Fall of 2014, when Vice President Klawunn reviewed the precedents for John Doe's sanction, she had essentially the same database she reviewed the previous spring when deciding the appeal in Lena Sclove's case, adding only the 1-year suspension from Lena

---

[21]    Plaintiff's Cross-Motion for Partial Summary Judgment makes the argument that Vice President Klawunn did not have the authority to assume the responsibilities of Senior Associate Dean.

[22]    The full article (including the image of Vice President Klawunn's decision) is viewable at http://www.browndailyherald.com/2014/04/23/u-mishandled-sexual-assault-case-victim-says/ .

Sclove's case itself and two other cases from that semester, one of which had a deferred suspension and the other of which had a 1.5 year suspension (Exhibit 15, Cases 8, 9). In short, there was not a reasonable basis in precedent for the 2.5-year suspension Brown imposed on John Doe. A reasonable jury could find that Vice President Klawunn departed from precedent when imposing this lengthy suspension on John Doe, and her decision was influenced by the pressure she felt from campus outcry from her correct application of precedent in Lena Sclove's case the previous spring.

In this way, both Professor Schultz and Vice President Klawunn had direct ties to the Lena Sclove case and to Plaintiff's. The protesters made Vice President Klawunn a direct target, and a reasonable jury could find that the resulting pressure influenced her actions in Plaintiff's case.

### D. The Court Should Deny Defendant's Motion for Summary Judgment on the Seventh Cause of Action (Declaratory Judgment)

In any event, Plaintiff's Seventh Cause of Action (Declaratory Judgment) applies to other causes of action (e.g. breach of contract); therefore, the Court should deny Defendant's Motion for Partial Summary Judgment with regard to this claim for relief.

## III. Conclusion

When John Doe enrolled at Brown University in the Fall of 2013, he and his classmates sailed into the calm before a perfect storm. The storm began in the Spring semester with Lena Sclove's press conference, which precipitated student protests, local and national media attention, and an activation of the feminist community both on campus and across the country. In her efforts to respond to, and ultimately embrace the protest, President Paxson involved herself in this student life matter to a far greater extent than any other such matter during her entire Brown University career, both before and after. She invested the moral authority of her

position in a concerted campaign to change the culture, norms and values of the University community in the area of sexual assault.  She endorsed and supported the demands of student activists, lending her good name to their cause.  In her official capacity, she approved a request to send Plaintiff home in an airplane even before he could answer the charges against him, a violation of Plaintiff's rights that even her Vice President ultimately rejected.

Later that term, President Paxson informed the University community of two immediate removals of students from the campus as proof of Brown's commitment to be tough on sexual assault. Through these actions, President Paxson sent a clear message to the University administration and the community at large that Brown University was getting tough on sexual assault, creating the conditions where the University officials repeatedly violated their own policies in handling Plaintiff's case, doing so in ways that were demanded by activist petitioners. Professor Schultz, who decided Plaintiff's case, served on the Sexual Assault Task Force President Paxson commissioned, where she was exposed to the activists' demands, while reinforcing her own focused views on male "privilege" and the "spirit of sexual conquest."  In this way, President Paxson's initiative helped provide Professor Schultz with a frame in which to place Plaintiff's case before she reviewed any of the evidence.

Plaintiff respectfully submits that he has a right for a jury to decide whether these extraordinary events amount to gender bias under Title IX.

**CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF
CONTRACT (LIABILITY) AND DECLARATORY JUDGMENT (HOLDING
DEFENDANT'S FINDINGS OF MISCONDUCT TO BE ILLEGAL, NULL AND VOID)**

## I.   Summary of Argument

Plaintiff cross-moves for partial summary judgment for a finding of liability on the

Complaint's Third Cause of Action (breach of contract) and part (ii) of its Seventh Cause of

Action (declaratory judgment that Defendant's findings of misconduct are illegal, null and void).

Plaintiff will argue that the Court should grant this relief at this time because the record of

undisputed facts demonstrates that Brown violated the following provisions of the 2014-2015

Code of Student Conduct: (i) "[s]tudents and student organizations charged with offenses" have

the "right[]…[t]o be assumed not responsible of any alleged violations unless she/he is so found

through the appropriate student conduct hearing." Exhibit 16 (Code, p. 7); (ii) the authority to

order student separation from the University is limited "to five (5) officials-President, Dean of

College, Dean of Graduate School, Dean of Medicine and Biological Sciences, and Senior

Associate Dean for Student Life." Exhibit 16 (Code, p. 9); (iii) the Case Administrator must

"respond to requests from respondents and complaining witnesses during the prehearing phases

of the student conduct procedures." Exhibit 16 (Code, pp. 10, 16); (iv) both parties will be

afforded "an opportunity to offer a relevant response." Exhibit 16 (Code, p. 7); (v) both parties

will be provided a "reasonable length of time to prepare a response to any charges." Exhibit 16

(Code, p. 7); (vi) both parties will be provided "every opportunity to articulate relevant concerns

and issues, express salient opinions, and offer evidence before the hearing body or officer…"

Exhibit 16 (Code, p. 7); and (vii) both parties have the right to "challenge participation of a

hearing panel member 2 days before the hearing." Exhibit 16 (Code, pp. 7, 9). As each of the

foregoing contractual breaches directly contributed to the erroneous finding of responsibility

against Plaintiff, he has suffered damages as a result of Brown's violations.  As part of this Motion for Partial Summary Judgment, Plaintiff seeks a declaratory judgment to clear his academic record.  Should the Court determine liability on summary judgment, Plaintiff will seek a trial to determine additional appropriate relief.

## II.   Legal Standard

### A.   Summary Judgment

*See* Memorandum in Support of Objection to Motion for Partial Summary Judgment, pp. 2-3, *supra*.

### B.   Rhode Island Contract Law

In *Doe v. Brown Univ.,* 210 F. Supp. 3d 310 (D.R.I. 2016) (referred to below as the "John Doe 2 case") this Court held that the Brown Code of Student Conduct defined a contractual relationship between students and the University, based on the parties' "reasonable expectations," and provided that any "[a]mbiguities in a contract must be construed against the drafter of the document."  *John Doe 2*, 210 F. Supp. 3d at 330.  In a contract case brought by a student against a university, the court may look to a combination of university documents to define the terms of the contract.  *See, e.g., Lyons v. Salve Regina College*, 565 F.2d 200, 201 (1st Cir. 1977) (reviewing contract consisting of College Manual and Academic Information Booklet).

## III.   Argument

As detailed below, the factual record demonstrates there is no dispute that Brown violated several provisions of its Code of Student Conduct in carrying out its disciplinary process with respect to John Doe. As a direct result of Brown's violations, John Doe suffered material

damages, including being subjected to a disproportionate sanction as a result of the erroneous finding of responsibility.

**A.      The Code of Student Conduct, and ancillary documents, provide a basis for contractual rights for Plaintiff**

As the Court held in its MTD Decision, 166 F.Supp. 3d at 191-92, the 2014-15 Code of Student Conduct, and the reasonable expectations that result from that document, can provide a basis for John Doe to assert contractual rights.  In the case at bar, Defendant also provided two other contract documents, namely the Guide to the Investigative Process and the Timeline for the Student Conduct Board hearing.  In the MTD Decision, the Court reviewed the contractual violations alleged in the Complaint, identifying seven for which there was a sufficient legal basis to move forward assuming the factual validity of the allegations.  As argued below, the record of undisputed facts supports the granting of summary judgment in favor of these claims.

**B.      Defendant violated John Doe's contractual right to be assumed not responsible of any alleged violations prior to the conduct of a hearing**

The record of undisputed facts supports a finding that Defendant violated Plaintiff's due process right to be presumed not responsible for violations at two stages, first at the removal stage and then prior to the hearing.  We consider each in turn.

**1.      The Removal Order**

The Code limits a student's separation from campus to "matters in which individuals pose a danger to themselves or the immediate well-being of the University community." Vice President Klawunn testified that Dean Castillo did not specify that John Doe was either a threat to himself, or to the campus community, when she presented Vice President Klawunn with a draft removal letter for her signature. Exhibit 25 (Klawunn Deposition, pp. 188:16-189:8). Because Vice President Klawunn did not perform any independent investigation, speak to

witnesses, or review the evidence prior to signing off on the removal notice, (Exhibit 25, Klawunn Deposition, p. 181:5-10), there was no basis for concluding that John Doe was either a threat to himself or to the Brown community.[23]

Based on the foregoing, in reviewing the plain meaning of the applicable Code provision, there is no dispute that Brown violated John Doe's reasonable expectation that any separation from the University could only be issued by certain administrators, and only in limited circumstances.

Brown evidenced a presumption of guilt against John Doe when it decided to issue the removal order shortly after being notified that Jane Doe intended to file a complaint. By email dated Friday, October 17, 2014 at 6:45 p.m., Dean Castillo advised Vice President Klawunn that Jane Doe was aware that John Doe may be removed from the University based on the report she filed with Brown's DPS. Exhibit 62 (Brown 1142). At the time of this email exchange, neither Dean Castillo nor Vice President Klawunn had received a copy of the DPS report, or a formal complaint from Jane Doe filed with Brown's Office for Student Life. Exhibit 63 (Brown 1144, 1149, 1178, 1179). Vice President Klawunn testified that she also had not spoken to either the Complainant or John Doe concerning the alleged events and had not reviewed any evidence. Exhibit 25 (Klawunn Deposition, pp. 167:1-12; 231:21-232:9). Nevertheless, demonstrating a presumption of guilt against John Doe, Brown administrators took the most drastic action possible when they removed and barred John Doe from the University campus prior to conducting any investigation, and well before the Student Conduct Board hearing took place.

---

[23]   Brown's Department of Public Safety performed a background check on John Doe (but did not perform one on Jane Doe); though this report came back clean, this sole piece of objective evidence was not taken into consideration when issuing the removal order. (*See* Exhibit 79 (Brown 1141); Exhibit 80 (Peck Deposition, p. 118:13-15); Exhibit 20 (Castillo Deposition, pp. 128-129).

Similarly, prior to delivering the official removal letter or questioning John Doe about his version of the events, Dean Castillo ordered him to remain in his residence hall, on the evening of October 18, 2014. Exhibit 64 (Brown 1192). Dean Castillo acknowledged in her deposition that the Code did not grant her the authority to take such action. Exhibit 20 (Castillo Deposition, pp. 172:21-173:5). Despite the fact that John Doe's background check did not raise any red flags, and that no investigation had been performed to date, Dean Castillo accepted Jane Doe's allegations as fact when she required John Doe to remain in his room, demonstrating a presumption that John Doe would be found guilty of the charges.

### 2.    The Decision to Hold a Hearing

In the same vein, Vice President Klawunn and Dean Castillo evidenced a presumption that John Doe was responsible for the alleged violations, and would be so found by the Student Conduct Board, when they denied his request for a continuance of the hearing date. On November 12, 2014 John Doe requested a continuance of the hearing scheduled for November 21 as his mother was recuperating from a total shoulder replacement and would not be able to attend. Exhibit 27 (Brown 1491). John Doe made it clear that "(t)he emotional support provided by my mother's presence in Providence during the hearing is invaluable, and I would be extremely appreciative if the hearing were moved to a later date, to ensure that it is possible." Vice President Klawunn's response to this request, sent 7 minutes after having received it from Dean Castillo stated: "I agree this is not sufficient to reschedule again. [John Doe] is trying to get in the whole semester." Of course, the only reason why John Doe would *not* "get in the whole semester" was if he were to be found responsible at the hearing. It is irrefutably clear that Vice President Klawunn assumed John Doe was responsible and would be separated from Brown

before the end of the semester. An adjournment, in Vice President Klawunn's eyes, would only delay the hearing, and therefore, his inevitable separation from the University.

Furthermore, during James Doe's meeting with Dean Suarez on October 20, Dean Suarez advised him that although Brown's policies dictate that an investigation will be performed to determine whether a hearing is necessary, "this one's going to a hearing." Exhibit 12 (James Doe Deposition, p. 29:12-16). Confirming Dean Suarez's sentiment, four days later, Dean Castillo's office began contacting potential Student Conduct Board panel members to ascertain their availability for a hearing on November 7, which was characterized as "time sensitive." Exhibit 65 (Brown 1262). The decision to hold a hearing prior to speaking with John Doe, or any of his witnesses, was confirmed by Dean Castillo at her deposition:

> Q:     So as of October 27th, the date of this letter, you did not have [John Doe's] statement?
>
> A:     Correct.
>
> Q:     And we established before that you didn't taken an oral statement from [John Doe], correct?
>
> A:     Correct. I had – correct.
>
> Q:     And you hadn't interviewed any of [John Doe's] witnesses, correct?
>
> A:     Correct.
>
> Q:     But yet as of October 27th, you had already determined that a hearing was warranted, correct?
>
> A:     Based on the information that we had, yes. That's correct.

Exhibit 20 (Castillo Deposition, p. 351:2-15).

Based on the foregoing, it is clear that the substance of the complaint was not nearly as important as the mere fact that a complaint was lodged against John Doe. Here, Brown equated

the filing of the complaint to John Doe's guilt. This turns the presumption of non-responsibility on its head and is directly violative of the Code's provision.

### C.    Plaintiff's removal from campus was invalid because Vice President Klawunn lacked the authority to order it

Brown breached its contract with John Doe when Vice President Klawunn ordered his immediate removal from campus on October 19, 2014. Exhibit 44 (Removal Letter). The 2014-2015 Code of Student Conduct explicitly and unequivocally limits the authority to order a student's separation from the University to five specific individuals:

> For matters in which individuals pose a danger to themselves or the immediate well-being of the University community, the President, the Dean of the College, the Dean of the Graduate School, the Dean of Medicine and Biological Sciences, and the Senior Associate Dean for Student Life have the authority to separate a student(s) from the University and to impose any additional conditions deemed necessary."

Exhibit 16 (Code, p. 9).

In her deposition, Vice President Klawunn confirmed that she made the decision to order John Doe's removal from campus, testifying as follows:

> Q:    Was it Ms. Castillo's decision to remove [John Doe] from campus or was it yours?
>
> A:     It was mine.

Exhibit 25 (Klawunn Deposition, p. 181:2-4).

Yet, at the time Vice President Klawunn issued the removal order, she did not hold any one of the five positions identified in the Code. As acknowledged by this Court in its decision on Brown's Motion to Dismiss, "nowhere in the record before the Court has Klawunn been identified as the "Senior Associate Dean for Student Life," or any of the other positions that the Code classifies as having the authority to separate a student from campus due to safety concerns." (Decision on MTD, ECF 37, p. 37). Factual discovery did not reveal otherwise.

Vice President Klawunn testified that her title during the fall of 2014 was Vice President for Campus Life. Exhibit 25 (Klawunn Deposition, p. 19:1-3). She stated she had authority to issue the removal of John Doe by virtue of the fact that she was carrying out the responsibilities of Senior Associate Dean J. Allen Ward who was "in the process of leaving" his position. Exhibit 25 (Klawunn Deposition, p. 190:11-16). She did not state that Dean Ward had actually vacated his position during the Fall, 2014 semester. To this point, the Brown Daily Herald reported that the position of Senior Associate Dean of Student Life was not vacated until January, 2015, when Dean Ward took a position at Clayton State University. *See* Plaintiff's Statement of Disputed Facts ("PSDF") Exhibit 16 ("The position of dean of students, formerly titled the senior associate dean of student life, was vacated when J. Allen Ward assumed the role of assistant vice president for student affairs at Clayton State University in January"). Brown did not provide any evidence documenting Vice President Klawunn's assumption of Dean Ward's role or responsibilities in the fall of 2014.

Further, Vice President Klawunn did not have the authority under the Code of Student Conduct to assign to herself the responsibilities of the Senior Associate Dean for Student Life. The Code of Student Conduct contains at p. 8, n.2 a single provision for alternative University officials who can serve in the role of Senior Associate Dean for Student Life for disciplinary matters in the absence or unavailability of that particular official. It states the following:

> Throughout these procedures, all references to 'Senior Associate Dean for Student Life' will be understood to include the Senior Associate Dean's designee(s)."

Vice President Klawunn did not testify that Dean Ward had designated her for this responsibility.  It also is important to note that, because the Code of Student Conduct identifies the five specific officials who have the authority to separate students from campus, the authors of the Code undoubtedly knew how to specify the University officials who could perform certain

61

tasks in the absence or unavailability of the Senior Associate Dean for Student Life. Because Defendant "chose to write its policy to state that" five specific officials had the authority to remove without providing for substitutions, now Defendant "must live with" the Code that it wrote. *See* MTD Decision, 166 F.Supp. 3d at 194 (discussion of Code's duty for Defendant "to respond to" student requests).

### D. Defendant failed to respond to Plaintiff's requests during the prehearing phases of the student conduct procedures

Brown violated its Code of Conduct when it failed to respond to John Doe's requests for information during the investigation process. Brown's Code provides as follows:

> [T]he case administrator will respond to requests from respondents and complaining witnesses during the prehearing phases of the student conduct procedures.

Exhibit 16 (Code, p. 10).

As observed by this Court, this obligation is not discretionary; instead "Brown chose to write its policy to state that the case administrator 'will respond' to the respondent's requests; now it must live with that promise." MTD Decision, 166 F.Supp. 3d at 194.

Dean Castillo violated this provision when she failed to respond to critical inquiries posed by John Doe prior to the Student Conduct Board Hearing. Specifically, John Doe requested that Brown describe the specific information and evidence relied upon in reaching the decision to issue his immediate removal from campus. Dean Castillo failed to adequately respond to this request when she repeatedly stated that there was "evidence of bruising" and the allegations were "serious," yet failed to provide any documentation to verify such claims. Exhibit 66 (John Doe Deposition, pp. 133-134).

A second incident occurred a week later. On or around October 25, 2014, John Doe and his father James Doe met with Dean Suarez concerning the investigation. Exhibit 51 (JD 295).

Following that meeting, Dean Suarez forwarded to Dean Castillo the following information request from John and James Doe:

1.    Define the term investigation.
2.    Provide in depth, step by step procedures your office followed from the time the allegation was submitted to the time [John Doe] was contacted.

*Id.*

Dean Castillo emailed John Doe the following response:

Our process, including information regarding steps we take when an allegation is received and our investigation process, can be found in the Code of Conduct provided to you with your investigation letter.  Please refer in particular to pages 9 through 12.

*Id.*

The summary judgment record contains a copy of the Code of Student Conduct.  *See* Exhibit 16.  The term "investigation" is not defined in the pages Dean Castillo cited.  Instead, the word appears twice, first at p. 10 and then at p. 12. (The Code does not define the term elsewhere in its pages.)  Furthermore, the Code is entirely silent on the second question John and James Doe presented, which seeks specific factual information about how his case was handled.

Dean Castillo similarly kept John Doe in the dark when she failed to respond to his requests for information relevant to the upcoming Student Conduct Board Hearing.  By email dated November 11, 2014, John Doe wrote as follows to Dean Castillo:

If a witness is submitting a character statement but will not be present at the hearing, do I put down their name on the pre-hearing declaration sheet? Or is there a separate link for that.

Exhibit 82 (Brown 1481). Dean Castillo never responded to this inquiry. *See* Exhibit 2 (John Doe Affidavit). Similarly, John Doe wrote as follows to Dean Castillo on November 15, 2014:

Pursuant to the University's Student Conduct Procedures I am formally requesting to be provided copies of any and all materials gathered by any agent of Brown University during the course of the investigation into the complaint made against me…I am, however, respectfully requesting the following materials be included if they are available:

1. Copies of any of the text messages sent by [Jane Doe] which are referenced in the witness statements of [K.R.], [L.S.], [D.G.] and [C.L.];

2. Copies of any additional witness statements received since you provided me an initial package on November 5, including any statements taken from the witnesses I provided.

Exhibit 57 (Brown 1526). Once again, Dean Castillo never responded to this request, which sought information critical to the allegations against John Doe. Exhibit 2 (John Doe Affidavit). [24]

Not only did Dean Castillo violate the clear language of Brown's Code by failing to respond to John Doe's inquiries, but such actions also hindered John Doe from fully participating in the disciplinary process and preparing a meaningful defense. While Brown consistently and comprehensively responded to every one of Jane Doe's requests, Brown cannot dispute that it failed to respond to the foregoing requests made by John Doe during the prehearing phases of the conduct process, in violation of its Code.

### E. Brown violated its Code of Conduct when it deprived John Doe of the opportunity to offer a relevant response.

The Code of Student Conduct provides that a student charged with an offense will "be informed of the evidence upon which a charge is based and accorded an opportunity to offer a relevant response." Exhibit 16 (Code, p. 10). There is no dispute that Brown violated this provision when it deprived John Doe of the opportunity to make a midpoint statement during the Student Conduct Board Hearing. Further, the Code's lack of a clear definition of "consent" related to allegations of sexual misconduct prevented John Doe from offering a relevant response to the charges against him.

---

[24]    In the meantime, Dean Castillo was frequently solicitous of Jane Doe's needs and provided her with active assistance in preparing her case against John Doe. *See* pp. 21-22, *supra*.

Prior to the hearing on November 21, John Doe was provided an "Opening and Questioning Timeline" for the Student Conduct Board hearing that promised John Doe an opportunity to address the charges against him at, at least, three distinct times: (i) an opening statement at the beginning of the hearing; (ii) a midpoint statement to ask questions or make comments concerning the 13 witness statements made up to that point; and (iii) a closing statement at the end of the hearing. Exhibit 67 (Brown 694-698). Nonetheless, Brown deprived him of his right to "offer a relevant response" when Professor Schultz prevented him from making this midpoint statement.

At the appropriate time, as per the "Opening and Questioning Timeline," Professor Schultz stated" "Okay, so we're going to pass on now to [John Doe's] statement and his witnesses. [John Doe], do you have anything you'd like to add right now to your witness statement?" Exhibit 54 (SCB Tr. 161/Brown 2008) When John Doe began to comment on some of the evidence and allegations addressed thus far, he was interrupted by Jane Doe's advisor, who questioned whether John Doe was permitted to do so at that time. Exhibit 54 (SCB Tr. 163/Brown 2010). As testified to by his attorney Matt Dawson, "When [John Doe] was making his statement, which is on the calendar – on the schedule, I noticed that the alleged victim's advisor started getting very upset and waving at the chair, and I don't think the chair understood what her problem was, and then there was a major stoppage, and then I believe it was Dean Castillo who said he's not allowed to talk at this time, and that opening statement, which was allotted, was stopped." Exhibit 55 (Dawson Deposition, p. 28:2-10).

The hearing minutes reveal that this "stoppage" was indeed prompted by an outburst from Jane Doe's advisor. Exhibit 54 (SCB Tr. 163/Brown 2010). Characterizing John Doe's

comments thus far as a "rebuttal," Professor Schultz agreed that John Doe was not permitted to make such a statement and stopped him from speaking further. (SCB Tr. 163, Brown 2010).[25]

Moreover, Brown deprived John Doe of the opportunity to offer a relevant response based on the Code's lack of a definition of "consent." This Court acknowledged in the John Doe 2 trial that "the 2014-15 Code did not give a specific definition of consent…When adjudicating student disciplinary cases involving sexual misconduct charges under the 2014-15 Code, the Student Conduct Boards would look to available sources to define "consent" for purposes of their deliberations, including the dictionary and Brown's sexual education website." *John Doe v. Brown University*, 210 F.Supp. 3d 310, 316 (D.R.I. 2016). Without being informed of a clear definition of consent, John Doe was unable to offer a relevant response to the claim that he failed to obtain consent.

Based on the foregoing, Brown irrefutably violated its Code when it prevented John Doe from offering a relevant response to the allegations against him.

### F.    Defendant breached Plaintiff's contractual right to a reasonable length of time to prepare a response to the charges against him

Brown further violated its Code when it declined to provide John Doe with a reasonable amount of time to prepare a response to the charges against him. Specifically, the Code of Student Conduct guarantees that a student charged with offenses under the Code will "have a reasonable length of time to prepare a response to any charges." Exhibit 16 (Code, p. 7)

---

[25]    The "timeline" is also a contract document that was drafted by Brown University. As a result, to the extent that the meaning of the term "statement" is ambiguous, the Court should interpret the ambiguity in Plaintiff's favor. *See* p. 56, *supra* citing *Doe v. Brown Univ.,* 210 F. Supp. 3d 310, 330 (D.R.I. 2016).

Notwithstanding, Defendant railroaded John Doe when it provided extensive and complex

materials related to the charges against him less than four days before the hearing. [26]

The Code makes clear that the minimum amount of time a respondent will receive a copy

of the case materials will be "at least 7 days" before the hearing. Specifically: **"(a)t least seven**

**[7] days** before the hearing, the case administrator will provide the respondent[s] with written

notification of the charges, the time and place of the hearing, **and a copy of the case**

**materials**..." Exhibit 16 (Code, p. 17) (emphasis supplied).

Notwithstanding, on November 17 at 5:17 p.m., less than four days before the hearing,

John Doe was provided a packet of materials containing witness statements, addendums to these

statements, medical records from Women and Infants Hospital of Rhode Island, and medical

records from Brown Health Services. Exhibit 60 (Brown 602). The Women and Infants Hospital

records alone included 27 pages of very technical medical terms and abbreviations. Exhibit 81

(Brown 128-154). Dean Castillo confirmed at her deposition that Brown had received these

medical records by November 3, at the latest. Exhibit 20 (Castillo Deposition, p. 375:6-12).

John Doe objected to this belated and prejudicial document dump by email on November

17 at 8:21 p.m., stating:

> (b)ecause of the enormity of the amount of new information received, the three day
> window between now and the hearing date is not a reasonable length of time for me to
> prepare a response to the charges. Pursuant to rights D and E in the list of Student Rights
> and Responsibilities in the Code of Conduct, I am formally requesting a continuance of
> the hearing date. Ideally, I would prefer to clear my name as quickly as possible.
> However, by this Friday, I will not have had an opportunity to provide the panel with
> comprehensive responses to the charges. I hope you will understand my position, and
> respond to my request for a hearing date continuance.

---

[26]     In contrast, Brown provided all case materials to Jane Doe as soon as they became
available. Exhibit 70 (Brown 1380, 1385).

Exhibit 24 (Brown 1597-98). There is no question that the disclosure of these case materials less than four days prior to the hearing did not afford John Doe "a reasonable length of time" to prepare a response. Indeed, three of the Brown administrators involved in the process expressed their agreement with John Doe's sentiment:

First, John Doe's advisor MaryLou McMillan acknowledged that "this is a lot of material to get through and have prepared for a Friday hearing." Exhibit 52. (Brown 3537).

Second, when John Doe raised this procedural violation on appeal, Vice Provost Meisel, in a red-line edit of the appeal stated the obvious about Brown's belated disclosure of the case materials, noting Brown's action "does not jibe with the statement in the Code of Student Conduct that seems to suggest materials will be made available 7 days in advance." Meisel then quoted the language of the Code to support this view, prompting Dean Castillo to concede "(w)e can take a look at clarifying that language for the future." Exhibit 53 (Castillo Deposition Exhibit 88).

Third, Dean Bova acknowledged the complexity of the medical records when he exclaimed during the hearing "I'm on Page 97 and in the middle of the page, diagnosis, active. I don't understand what all that means." Exhibit 54 (SCB Tr. 158/ Brown 2005).

It cannot be disputed that four days was an insufficient amount of time for a 19-year-old student to review and analyze such records, and thereafter be able to formulate a meaningful response. The medical records disclosed on November 17 alone would independently warrant allowing John Doe at least 7 days to prepare a response. Yet, Dean Castillo summarily denied Doe's request and misstated the Code, claiming that the timetable she provided was "the normal course of our process." Exhibit 24 (Brown 1597).

Given the severe implications that a finding of responsibility for sexual misconduct would have on his future, there is no question that a student in John Doe's position would reasonably expect to be given more than four days to review witness statements and complex medical records, based on the Code's guarantee that the student shall be afforded a "reasonable length of time" to respond to the charges.

### G. Brown violated its Code of Student Conduct when it deprived John Doe of the opportunity to articulate relevant concerns and offer all relevant evidence

Brown's Code provides that an accused student will be given "every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer." Exhibit 16 (Code, p. 7). Notwithstanding, Brown violated its Code of Student Conduct when it deprived John Doe of the opportunity to offer all evidence relevant to his defense including: (i) Facebook photographs of Jane Doe taken the night after the alleged incident; (ii) text messages exchanged immediately prior to the sexual encounter; and (iii) witness statements attesting to John Doe's character.

First, John Doe submitted to Dean Castillo publicly displayed Facebook photographs of Jane Doe taken on the day after the alleged assault. The photographs were irrefutably relevant as they clearly displayed Jane Doe's face and portions of her neck and arms, areas that she claimed to have sustained injury as a result of her interaction with John Doe. In fact, Dean Castillo acknowledged, "I looked at the photos. I thought they were relevant to the case and included them in the [hearing] packet." Exhibit 20 (Castillo Deposition, p. 327:10-12) She further explained, "(t)hey were being provided by [John Doe] as a way of countering some of what [Jane Doe] was saying in her allegations so I felt it was important to be part of the record and reviewed

by the people who would be making those decisions about responsibility." Exhibit 20 (Castillo Deposition, p. 327:14-18).

Despite the Case Administrator's determination that the photographs were relevant, Dean Bova berated John Doe for offering them as exhibits during the hearing. Dean Bova confronted John Doe, stating, "And why are you putting the pictures---I'm sorry to cut you off. Why are you showing me all the pictures of her in a tiara?" Exhibit 54 (SCB Tr. 197/ Brown 2044). When John Doe explained that the allegations involved injuries purportedly sustained by Jane Doe and the pictures, which were taken the night after the encounter, refuted such claims, Dean Bova dismissed this evidence out of hand, noting the hospital records (which did not include any photographs) told a "very different stor[y]". Exhibit 54 (SCB Tr. 202/Brown 2049). The disregard of this critical evidence violated John Doe's right to "every opportunity" to present relevant evidence to the hearing body.

Second, John Doe was deprived of every opportunity to offer evidence before the hearing body when Brown failed to obtain text messages sent by Jane Doe shortly before her interactions with John Doe. The witness statements collected revealed that Jane Doe had sent a group text message to some of her friends on the evening of the alleged incident, stating "she might be about to hook up with [John Doe]". Exhibit 3. Though Jane Doe agreed to forward all relevant text messages to Detective Peck (Exhibit 56), she selectively provided only those text messages that corroborated her account. Curiously, Jane Doe indicated that she would "have to go back kind of far" to find the messages exchanged on the night of the incident, even though she readily provided the text messages exchanged approximately 12 hours later, the following morning. (Exhibit 56) Notwithstanding, neither Detective Peck nor Dean Castillo followed up with Jane

Doe or any of the witnesses identified to obtain these messages. Exhibit 20 (Castillo Deposition, p. 181:2-182:20).

Understanding the significance of this text message exchange, on November 15, 2014, John Doe requested that Dean Castillo provide him with, "copies of any of the text messages sent by [Jane Doe] which are referenced in the witness statements of [K.R.], [L.S.], [D.G.] and [C.L.]" Exhibit 57 (Brown 1526). Dean Castillo did not respond to this request. Instead, upon receiving the packet of case materials to be submitted to the Student Conduct Board, John Doe discovered that the text messages previously requested had not been included in the hearing packet. Exhibit 24 (Brown 1597-98). While claiming that such text messages were unavailable, Dean Castillo conceded that she in fact made no effort to follow up with Jane Doe or any of the witnesses identified to obtain these messages. Exhibit 20 (Castillo Deposition, p. 181:2-182:20).

Third, Brown denied John Doe the opportunity to offer evidence before the hearing body when Dean Castillo arbitrarily redacted portions of L.B.'s statement, a character witness who described John Doe as "one of the most reliable, trusting, and trustworthy people I know." Exhibit 58 (Brown 1560). Attributing her authority to the Code's provision regarding relevant evidence, though "it does not explicitly speak to redaction." Exhibit 20 (Castillo Deposition, p. 366:12-14). Dean Castillo testified that in her role as Case Administrator, it was within her discretion to "decide what's relevant and when to move forward." Exhibit 20 (Castillo Deposition, p. 366:13).

Significantly, while the redacted portion of L.B.'s character statement concerned L.B.'s view that John Doe was a respectful partner during an intimate encounter, Brown readily accepted character witness statements that refuted this view. For instance, Witness K.R. was permitted to testify during the hearing concerning her reaction to a prior event in which she was

71

not involved; the Student Conduct Board accepted her statement that John Doe was "someone who was involved in something that made me uncomfortable, regarding sexual behavior" which Professor Schultz then characterized as "predatory behavior." Exhibit 54 (SCB Tr. 91/Brown 1938). Not only did the consideration of character witness statements unfavorable to John Doe, and the redaction of character statements favorable to John Doe, represent an inequitable process, but it also demonstrated a clear breach of Brown's policies.

The cavalier manner in which Dean Castillo approached her role as an investigator and her utter disregard for collecting extraordinarily relevant, and potentially exculpatory, evidence denied John Doe of his opportunity "to offer a relevant response" as well as his right to have "every opportunity to…offer evidence before the hearing body or officer." A reasonable jury could not find otherwise**.**

### H.   Defendant violated Plaintiff's contractual right to two (2) days advance notice of changes in the Student Conduct Board hearing panel

Finally, Brown irrefutably violated the following provision of its Code of Student Conduct:

> A respondent or complaining witness may request, in writing, that a member of a hearing body be disqualified from hearing a case. The request will be made by 9:00 AM no more than two (2) days after receiving the charge letter and the Request to Disqualify Form and will include an explanation as to why the member is unable to render an impartial decision in the case."

Exhibit 16 (Code, p. 9).

On November 19, 2014 at 4:39 p.m., Dean Castillo notified John Doe by email that "there has been a change in the composition of the panel for the hearing" and that Dean Richard Bova had been selected to serve on the Student Conduct Board. Exhibit 59 (Brown 1610). Brown cannot dispute that this notification was provided to John Doe less than 48 hours prior to the hearing, which was scheduled to proceed on November 21 at 9:00 a.m. Consequently, John Doe

was not afforded the requisite two-day period after receiving this notice to consider whether to object to the participation of Dean Bova. Brown cannot refute that it violated this provision of its Code.

## I.    Brown's numerous violations of its Code of Student Conduct during Plaintiff's disciplinary process caused direct and proximate harm to John Doe

The third element of a breach of contract claim under Rhode Island law is causation; specifically: "the plaintiff must prove that the defendant's breach was the 'but for' cause of the alleged damages." *Doe v. Brown Univ.,* 210 F. Supp. 3d 310, 330 (D.R.I. 2016), *citing Wells v. Uvex Winter Optical, Inc.,* 635 A.2d 1188, 1191 (R.I. 1994). As detailed below, each of the foregoing breaches were material in that they contributed to Brown's erroneous finding of responsibility and the imposition of a disproportionate 2.5-year suspension.

### 1.    Brown's failure to afford John Doe a presumption of innocence precipitated the finding of responsibility

Brown's failure to presume John Doe not responsible of any alleged violations prior to the appropriate student conduct hearing directly damaged John Doe in that he was burdened with the task of proving his innocence. Upon being notified of Jane Doe's complaint, the administrators responsible for carrying out Brown's disciplinary process took particular actions calculated to confirm their belief that Jane Doe's narrative was more credible. For instance, as discussed *supra,* Brown evidenced a presumption of guilt against John Doe when: (i) Vice President Klawunn ordered his immediate removal from campus prior to speaking with either party, interviewing witnesses, or conducting any investigation whatsoever; (ii) Dean Castillo and Vice President Klawunn decided to hold a hearing prior to speaking with John Doe or any of his witnesses; (iii) Dean Castillo denied his reasonable requests for a continuance of the hearing, under the pretext that proceeding on an expedited schedule would be for his own benefit; and (iv)

73

the decision makers involved in John Doe's case expressed their opinions that when someone reports incident of sexual assault, they must be telling the truth.

In presuming John Doe guilty from the outset, Defendant foreclosed the possibility of performing an objective and impartial investigation, making a finding of responsibility inevitable.

**2.      Brown's failure to respond to John Doe's requests for information precluded him from presenting a meaningful defense, resulting in the erroneous finding**

Brown's failure to respond to John Doe's requests during the prehearing phase of the disciplinary process deprived him of the ability to prepare a full defense, thus contributing to the erroneous finding of responsibility against him. For instance, as outlined at page 72 *supra*, Dean Castillo failed to respond to John Doe's request that he be provided copies of any text messages sent by [Jane Doe] which were referenced in the witness statements of [K.R.], [L.S.], [D.G.] and [C.L.], and copies of any additional witness statements. Exhibit 57 (Brown 1526). Given the potential exculpatory nature of the text messages in particular, it was critical that John Doe be afforded an opportunity to review this evidence. The failure to provide John Doe with this information directly damaged John Doe in that it hindered his ability to prepare a comprehensive and meaningful defense, again a substantial causal factor in the outcome of his case.

**3.      John Doe was directly damaged by Brown's failure to afford him an opportunity to articulate all relevant concerns and offer all relevant evidence**

Brown precluded John Doe from offering all relevant evidence when: (i) he was deprived of the opportunity to make a midpoint statement during the hearing; (ii) the Student Conduct Board failed to consider Facebook photographs of Jane Doe taken the night after the alleged incident, which refuted her claims that she suffered injuries to her lips and neck; (iii) Brown

failed to collect text messages sent by Jane Doe immediately prior to the sexual encounter that revealed her state of mind concerning her interactions with John Doe; and (iv) Dean Castillo unilaterally and arbitrarily redacted a witness statement attesting to John Doe's character.

It is irrefutable that the Student Conduct Board's failure to consider all pertinent materials directly impacted John Doe; had such materials been available and properly taken into account, it is reasonable to conclude that a different outcome may have been reached.

### 4. John Doe was directly damaged by Brown's failure to provide him with a reasonable length of time to prepare a response to the charges against him

There is no dispute that John Doe was damaged by Brown's failure to provide him with a reasonable length of time to prepare a response to the charges against him. As discussed *supra* at pages 27-28, less than four days before the Student Conduct Board hearing, Brown provided John Doe with a packet of extensive and complex materials including witness statements, addendums to these statements, medical records from Women and Infants Hospital of Rhode Island, and medical records from Brown Health Services. Exhibit 60 (Brown 602). John Doe emphasized the prejudicial nature of this belated disclosure when he requested a continuance of the hearing date, stating in part: "by [the hearing date], I will not have had an opportunity to provide the panel with comprehensive responses to the charges." Exhibit 24 (Brown 1597-98). In denying John Doe's reasonable request for additional time to review this new information, Brown directly damaged John Doe in that he was not able to fully prepare for the hearing.

For example, it was not until the evening of November 17 that John Doe received the Brown Health Services records from Jane Doe's office visit of October 15 (four days after her encounter with John Doe) that indicated her bruises were of different colors. *See* Exhibit 61 (Brown 103-04). Learning this less than four days before the hearing made it impossible for John Doe to consult with a physician to investigate whether this circumstance raised a doubt as

to whether the bruises were caused at the same time, or if it was likely that any of them were caused three days before the doctor visit at which they were observed.

Had he been afforded a reasonable length of time to review all relevant materials, and prepare a response to the charges against him, the erroneous outcome could have been avoided.

> **5.      John Doe was damaged when Brown violated its Code by depriving him of the ability to challenge the participation of a hearing panel member**

Finally, John Doe was directly damaged by Brown's failure to provide him with the requisite two-day time period within which to challenge the participation of a Student Conduct Board member. During the hearing, Dean Bova berated John Doe for offering photographic evidence and dismissed this potentially exculpatory evidence as irrelevant. Had John Doe been afforded sufficient time to object to Dean Bova's participation, it is possible that a different hearing panel member would have been selected; one that would fully and objectively consider the evidence available before making a determination of responsibility.

> **J.      John Doe is entitled to summary judgment with regard to liability on his contract claims, as well as a declaratory judgment that the Defendant's finding of responsibility was invalid**

Because the record of undisputed facts contains evidence of breaches of contract and causation (either individually or in combination), John Doe is entitled to partial summary judgment, including a finding of liability on his contract claims and declaratory relief holding that the sanction imposed by the University is invalid.  Should the Court grant this relief, the contract claims can move forward to an evidentiary hearing on damages.

## IV.    Conclusion

For these reasons, Plaintiff submits that the Court should (i) deny Defendant's motion for partial summary judgment as to the Complaint's First Cause of Action (Title IX erroneous outcome); and (ii) grant Plaintiff's cross-motion for partial summary judgment as to liability for

the Complaint's Third Cause of Action (breach of contract) and Seventh Cause of Action (declaratory judgment), part ii.  Should the Court grant the Motion, Plaintiff will seek a trial on additional relief related to this Cause of Action.

Respectfully submitted,

Plaintiff John Doe,
By his attorneys,

NESENOFF & MILTENBERG, LLP

*Attorneys for Plaintiff John Doe*

By: /s/ Andrew T. Miltenberg
Andrew T. Miltenberg, Esq. (admitted *pro hac vice*)
Tara Davis, Esq. (admitted *pro hac vice*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
tdavis@nmllplaw.com
February 9, 2018                                  amiltenberg@nmllplaw.com

                                                              -and-

local counsel for Plaintiff John Doe,

By: /s/ Samuel D. Zurier
Samuel D. Zurier, Esq. (Bar No. 3576)
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-0200
sdz@zurierlaw.com

February 9, 2018

## CERTIFICATE OF SERVICE

I hereby certify on this 9th day of February, 2018, I served a copy of this Memorandum on Defendant's counsel via the Court's CM/ECF system.

/s/Andrew T. Miltenberg
Andrew T. Miltenberg, Esq.