**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

```
-------------------------------------------------------------X
JOHN DOE,                                    :
                                             :
                            Plaintiff,       :
                                             :
            -against-                        :
                                             :
BROWN UNIVERSITY,                            :      Civil Action No. 1:15-cv-144
in Providence in the State of Rhode Island   :
and Providence Plantations,                  :
                                             :
                            Defendant.       :
-------------------------------------------------------------X
```

**PLAINTIFF JOHN DOE'S PRETRIAL MEMORANDUM**

Plaintiff John Doe submits this Pretrial Memorandum pursuant to this Court's Standard Pretrial Order (ECF No. 44).

    1a.   <u>Expected proof in Plaintiff's case</u>

        (a)   <u>Basic facts concerning John Doe's enrollment and suspension</u>

John Doe began his Brown University education in the Fall of 2013 as a member of the Class of 2017. He entered with a strong high school academic record with a career goal of becoming a neurosurgeon. He elected to major in neuroscience, and achieved perfect grades in his freshman year.

On the night of Saturday, October 11, 2014 (sophomore year), John Doe met Jane Doe at a party in their dormitory. They struck up a conversation and flirted. Later that night, they went to John Doe's bedroom where they became intimate. At one point, John Doe began to "finger" Jane, asking her whether she "liked" it. When she nodded affirmatively and verbally stated "yes", he continued, and she appeared to have an orgasm. She kissed John Doe and left.

1

The following day, Jane Doe's friend K.R. advised John Doe that Jane Doe was uncomfortable with what had happened, and that he should avoid her company until things cooled down.  John Doe followed K.R.'s advice.

The following Saturday night (October 18) at approximately 7:00 p.m., John Doe received a telephone call from Dean Yolanda Castillo-Appollonio, ordering him to remain in his dormitory room that night.  She also instructed him to attend a meeting the following morning, Sunday, October 19, in the office of Dean Maria Suarez.  At the meeting, the Deans informed John Doe that there were serious allegations of sexual misconduct based on his encounter the previous Saturday night with Jane Doe. They informed him that he could not remain at Brown, but had to return to his home in Texas.  Devastated and shocked, John Doe asked to telephone his parents.  He reached his father, James Doe, who arranged to fly immediately to Providence that day.

On Sunday night, October 19, John and James Doe met with Dean Castillo and Vice President Margaret Klawunn. Vice President Klawunn presented John Doe with a letter ordering his immediate removal from the Brown University campus.   Based on her telephone conversation with John Doe's father James Doe subsequent to the October 19 morning meeting, Vice President Klawunn had modified the initial removal order, which required John's complete banishment from Brown's campus, to permit John Doe limited access to the campus for the sole purpose of attending classes.  He was ordered to move out of his dormitory, and he rented a room at a downtown hotel.

The following day, October 20, Defendants sent John Doe a letter informing him that he was being investigated on charges of sexual misconduct and illegal alcohol possession. Defendant failed to provide useful responses to questions from John and James Doe concerning

the investigatory process and his rights as a respondent. This letter notified John Doe for the first

time that he had the right to an advisor throughout the investigation process. John Doe contacted

Marylou McMillan to serve as his adviser.

The next day (October 21), John Doe received a copy of Jane Doe's report made to the

Brown University Department of Public Safety and her Campus Incident Complaint against him

alleging sexual misconduct. The two accounts were dramatically different from John Doe's

recollection of how the night transpired, and both contained numerous inconsistencies, both

within each account itself and between the two accounts. The Department of Public Safety report

also indicated that Jane Doe had failed to provide critical text messages, including one in which

she stated to a group of friends that she was about to "hook up with [John Doe]."

On October 29, John Doe submitted his personal written statement describing what

occurred, along with a list of witnesses.  John Doe attached to his statement some photographs

that Jane Doe and her friends had publicly posted on Facebook from the night following the

alleged incident, which showed her neck had not been bruised in the way described in her

statements to the University and the campus police. The Brown Health Services report dated

October 15, 2014 also noted "no marks on neck seen."

One week later, on November 5, 2014, Brown University sent John Doe a "Notice of

Charges" stating that he was formally charged with four violations of the Code of Student

Conduct, and that a Student Conduct Board would hear his case on November 14.[1]  Attached to

the Notice were some witness statements. Though the Notice of Charges letter indicated Brown

was providing the "current evidence" collected in the case, Defendant failed to include medical

records in their possession from Jane Doe's treatment at Women and Infants Hospital.  When

---

[1] Though both John Doe and Jane Doe admitted to consuming alcoholic drinks earlier in the evening, only John Doe was charged with illegal possession or use of alcohol.

John Doe asked for additional time so that his mother who was recovering from surgery could travel to Providence to support him, the hearing date was only extended by one week, to Friday November 21. In actuality, this extension was granted for the benefit of Brown as the officials involved in this case, including the Department of Public Safety and Brown's General Counsel, were attempting to obtain additional evidence that would purportedly support Jane Doe's claims. Around this time, John Doe made his own request to Brown University for the missing text messages exchanged among Jane Doe and her friends. That request went unanswered.

On Monday, November 17, Defendant provided John Doe with a packet of 79 pages of additional material that would be part of the Student Conduct Board hearing record, including 29 pages of medical records from Women and Infants Hospital that Defendant had obtained more than two weeks before. When John Doe asked for additional time to prepare (a request his adviser supported), he was informed that the University would follow ordinary procedure and move forward with the hearing, even though it had waited at least two weeks before releasing the medical records to John Doe, and even though the hearing was scheduled to take place more than three weeks earlier than was required under the Code and/or more quickly than was normally scheduled in the University's other cases.

Professor Gretchen Schultz was the Chair of the Student Conduct Board that heard John Doe's case on November 21. The Board treated Jane Doe sympathetically, and John Doe harshly. He was not permitted to make a "mid point" statement when it was his turn to present his case, in contrast to the rights referenced in the hearing outline. The Student Conduct Board ultimately found John Doe "responsible" on all four counts. After his appeal was denied, John Doe was suspended from Brown University for a term of 2.5 years beginning after the

conclusion of the Fall 2014 semester, a sanction that was exceptionally harsh when compared to past precedent.

John Doe went home to Texas in December 2014 with his hopes and dreams in ruins.  In the Fall of 2015, he applied to several other undergraduate programs as a transfer student.  His applications were not successful.  He spent the following year trying to come to terms with what had happened, gaining some income from miscellaneous employment.  He re-applied as a transfer student in the Fall of 2016, and gained admission to University B.  He enrolled in the Fall of 2017, and majored in neural science.  He graduated in May, 2018 with a straight-A average.  He also achieved an eye-popping score of 525 out of 528 on the Medical College Admissions Test (MCAT), placing him in the 100th percentile.  Following graduation, he continued his thesis research in neuroscience.  He is contemplating an application to medical school next summer, which would, if successful, allow him to enroll in the Fall of 2020, three years later than he originally planned.

    (b)    <u>Breach of contract claims (Code of Student Conduct)</u>

At this trial, John Doe will present evidence to establish that several aspects of the University's treatment of his case, beginning with his removal from campus and continuing through the Student Conduct Board's hearing, violated his due process rights under the Code of Student Conduct, including the following:

- Defendant decided to order John Doe's removal from campus prior to hearing his account of what happened, denying him of his right to be presumed not responsible of any violations of the Code prior to a hearing.

- Vice President Klawunn lacked authority to order John Doe's removal from campus.

- Defendant decided to hold a hearing on the charges against John Doe without conducting an investigation.

- Defendant failed to respond to John Doe's requests for information about the hearing process and the charges against him during his pre-hearing preparations.

- Defendant expedited the hearing in violation of John Doe's right to have a reasonable time to prepare his defense to the charges made against him.

- Defendant deprived John Doe of his right to "offer a relevant response" when it did not allow him to make a "midpoint statement."

- Defendant violated Plaintiff's contractual right to two (2) days advance notice of changes in the Student Conduct Board hearing panel.

    (c)    <u>Title IX Claim (Erroneous Outcome)</u>

At the August 23 hearing, the Court took under advisement Defendant Brown University's motion for summary judgment on Plaintiff's Title IX claim. If the Court rules that Plaintiff is entitled to a trial on that claim, the evidence supporting the claim will be as follows:

Plaintiff claims that the Student Conduct Board decision produced an erroneous outcome which was motivated by gender bias.  To make that claim, Plaintiff first will rely upon the evidence described herein to "cast some articulable doubt on the outcome of the disciplinary proceeding," *see Yusuf v. Vassar College,* 35 F.3d 709, 714-15 (2d Cir. 1994). The *Yusuf* court described this evidentiary burden as follows:

> [T]he pleading burden in this regard is not heavy. For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof.

*Id.*

Plaintiff will present evidence to cast doubt on the Student Conduct Board finding that his interaction with Jane Doe was nonconsensual.  Examples of that evidence include the following:

- In written statements they submitted as part of Defendant Brown University's investigation, both John Doe and Jane Doe stated that he asked her if she "liked" the fingering, to which she responded with a nod and verbal "Yes."

- In the same two written statements, both parties acknowledge that after Jane consented verbally, she told John to continue the fingering.

- In a supplemental statement to the hearing board panel, Jane Doe stated that her boundary for the evening was "referring to sex," indicating that the alleged activity was within the acceptable bounds of behavior for her.

- Jane Doe texted her friends before entering John Doe's room that she was about to "hook up" with John Doe.

In addition, Plaintiff will demonstrate that the litany of alleged contractual violations referenced above further cast doubt on the accuracy of the disciplinary proceeding.

Plaintiff will also present three categories of evidence that demonstrate gender bias was a motivating factor in this erroneous outcome:

1. ***Statements by University officials, including those of Professor Gretchen Schultz.***

Professor Schultz was Chair of the Student Conduct Board that heard Plaintiff's case. Her statements demonstrate a predetermined view that Brown's fraternities were infected by a "sense of entitlement to sexual conquest," that fraternity members "used alcohol, female students intoxicated and -- in order to more easily sleep with them", that "some boys grow into manhood learning around them that it's okay to -- get pussy in any way possible," and that female complainants are more likely than not to be telling the truth. These innate biases were reflected in the manner in which she chaired John Doe's hearing and issued the finding of responsibility.

2. ***Pretext for Discrimination.***

Both Vice President Klawunn and Dean Castillo offered false explanations for their decision to expedite and/or refuse to continue the date of the Student Conduct Board hearing, and those false explanations were pretexts for discrimination. More specifically:

a.   Vice President Klawunn testified, after the fact, that the process was accelerated in accord with the University's "commitment to that student and his parents, who were extremely concerned about his academic progress, was to do the hearing in as timely way as possible so that he could resume his studies as a normal student if we got through the hearing and he was found not responsible." Her testimony was contradicted by her actions at the time; specifically, she denied John Doe's request for an extension based upon her presumption that he would be found responsible for the charges and was therefore "trying to get in the whole semester";

b.   After providing John Doe with 79 pages of new material fewer than four days before the hearing (which included complex medical records that Brown University had received more than two weeks before), Dean Castillo refused John Doe's request for additional time because it departed from the "normal course of the process," even though Defendant had made the decision to withhold the materials from Plaintiff until the last minute, and had departed from prior practice in imposing an aggressively fast schedule on the proceedings.

### 3.   *University actions in response to criticism.*

Plaintiff also will present evidence that the University acted "in favor of the accusing female and against the defending male [student] in order to avoid further fanning the criticisms that [Defendant] turned a blind eye to such assaults", *see Doe v. Columbia University*, 831 F.3d 46, 57-58 (2d Cir. 2016) by proving the following three elements:  (1) "substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students," (2) a University administration that "was cognizant of, and sensitive to, these criticisms," and (3) statements and actions by the University's leadership (especially President Paxson) that support the inference that Brown's officials "were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault."

Plaintiff will trace the criticisms and the University's response to an event that happened six months before the disciplinary proceedings against John Doe and the fallout that resulted.  On

April 22, 2014, a Brown student named Lena Sclove held a press conference to publicly discuss what she viewed as Brown's improper handling of her sexual assault complaint. Ms. Sclove claimed that she was a victim of a violent sexual assault by a fellow male student and although a Brown University Student Conduct Board panel found him "responsible," the resulting one-year suspension was inadequate, as it would end that fall, while she was still a student at Brown.  She expressed her fear of his return to campus.

Ms. Sclove presented this as a gender-based issue.  With the help of an organization called Legal Momentum, also known as the Women's Legal Defense Fund, Ms. Sclove filed a complaint with the United States Department of Education, Office for Civil Rights.  She alleged that she was the victim of gender discrimination because while the Student Conduct Board Panel initially recommended a two-year suspension of the male student, the Senior Associate Dean for Student Life reduced the sanction to one-year, which reduction was upheld on appeal to the Vice President for Student Life (Ms. Klawunn).

The press conference ignited an unusually vigorous protest, extensively reported in the local and national media. The protests drew the attention of Brown University's President, Christina Paxson.  The day after the press conference (April 23, 2014), President Paxson attended a meeting of the Brown University Community Council (which she chaired).  At this meeting, students expressed their concerns regarding how issues of sexual violence were being handled by the University and a particular concern about the Lena Sclove case which had gained local and national media attention.

On April 26, President Paxson sent a campus-wide email acknowledging the press conference, assuring the community that the respondent in Ms. Sclove's case had decided not to

return to the University that fall, and announcing that the University was accelerating its review of student conduct policies.

The April 26 email did not satisfy the protesters. One group organized under the banner of "Imagine Rape Zero."  They based their name on an "Imagine Brown 250" campaign the University had organized to celebrate this anniversary at Commencement later that Spring.  On April 30, this group issued a Petition, which called upon President Paxson, Vice President Klawunn, Provost Mark Schlissel, and Senior Associate Dean J. Allen Ward to publicly endorse a list of 16 "Demands."  The group gave the University officials a deadline of May 9 to respond.

President Paxson continued to be personally engaged.  On May 2, 2014, she sent a campus wide email announcing her decision to create a Sexual Assault Task Force.  She noted the Task Force was "charged with undertaking a comprehensive review of Brown's current practices, policies and procedures around issues of sexual assault and sexual misconduct." Specifically, President Paxson instructed the Task Force to focus on (i) sexual assault prevention; (ii) student support and advocacy; and (iii) policies and procedures for sexual misconduct.

These two campus-wide emails began a twelve-month campaign by President Paxson to use her "bully pulpit" to influence discussion and action regarding the issues raised by Lena Sclove and her protester allies.  Her extensive engagement with the Lena Sclove protesters and the Brown University at large on this issue went far beyond her involvement in any other campus life issue, either before or since.

President Paxson's next email came one week later, on May 9, 2014, the deadline that Imagine Rape Zero had posted for her to respond to their list of demands.  Although she recognized privately that some of these demands were inconsistent with the University's anti-discrimination policies and contained inflammatory language, she publicly thanked the group

"for the carefully researched and comprehensive list of recommendations you have developed," adding "We are taking a number of immediate steps that align with your recommendations." She also asked the Imagine Rape Zero group to post her letter on their Facebook page. President Paxson made a personal contribution of $2,500 to Imagine Rape Zero's fundraising efforts, which clearly listed her as a supporter of their cause.

The protesters made a dramatic and gender-based appearance at University commencement exercises, as graduating students placed a "IX" on their graduation caps to bring attention to sexual assault policy reform.  Students involved with the Imagine Rape Zero group handed out flyers protesting the University's handling of Lena Sclove's case in particular, and its sexual assault policies more generally.  In her commencement address, President Paxson addressed the issue of "how to make members of our community safe from the threat of sexual assault", and presented the issue of sexual assault to the University Corporation at its meeting.

By the fall of 2014, the membership of the Sexual Assault Task Force had been fully established. President Paxson appointed Executive Vice President for Planning and Policy Russell Carey to serve as Co-Chair of the Sexual Assault Task Force along with Dr. Michelle Cyr, Associate Dean for Academic Affairs in the Alpert Medical School.  Professor Gretchen Schultz, who had served as Chair of the Student Conduct Board that heard Ms. Sclove's case and which recommended a two-year sanction that the Associate Dean of Student Life reduced to one year, thus generating the protests, was also asked to serve as a member of the Task Force, a position she accepted.  While acting as a member of the Task Force, Professor Schultz also served as Chair for the board that heard John Doe's case, in the fall of 2014.

In addition to the appointed faculty members, the Task Force included the appointment of four undergraduate students, all of whom were active in either the Imagine Rape Zero group or

other sexual assault related protesting.  On October 29, 2014, the Imagine Rape Zero group met with the Task Force and presented a modified list of the demands previously submitted to President Paxson. While Russell Carey, Co-Chair of the Task Force, acknowledged that one of them (Item 16) was contrary to Brown's policies of non-discrimination the demands were nonetheless included as an appendix, and thus incorporated into the Interim Report.

President Paxson continued her campaign of encouraging Brown to take a tougher stance on sexual assault through the Fall 2014 semester. By email dated November 17, 2014, President Paxson extended her strong support for the activists mobilized by Ms. Sclove's press conference when she discussed the steps taken to date to "change the culture and norms on our campus" and discussed how recent sexual misconduct complaints brought to the attention of the administration were being handled aggressively, including the one against John Doe.

During the Fall 2014 semester, the Sexual Assault Task Force worked to prepare an Interim Report that embodied the values and objectives espoused by President Paxson on behalf of Brown University. In doing so, the Task Force considered selective information skewed in favor of female complainants and issued a report tainted with an evident bias against male students accused of misconduct.

Setting the tone for the findings presented, the Task Force's cover letter to President Paxson recounted the University's experience with the gender-based "Rape List"-an incident that gained national attention in the fall of 1990 when female students wrote on the bathroom walls to warn others about male students they believed to be sexual predators.  At the time these events occurred, the University administration was concerned about the due process rights of accused male students; however, that part of the incident's history was not described in the Interim Report's introductory letter.

Analogizing the national attention and scrutiny received in response to the Rape List incident to the backlash from the Lena Sclove press conference, the Task Force noted the norms and culture at the University that it sought to change. For instance, it stated: "Social norms contribute to sexual harassment and sexual violence in a number of ways. Our larger culture is saturated with misogynistic and often violent representations of sex and sexuality" and "National studies and survey research at Brown has found that athletic team and male fraternal organization members drink alcohol in riskier ways than the general population. Risky alcohol use and conformity to masculinity norms are associated with sexual aggression.  …   In addition, Greek affiliation and athletic participation or males is associated with sexual aggression and rape myth acceptance."

The language and recommendations of the Interim Report demonstrated its objective to protect female students and take a tougher stance on sexual assault complaints. Nearly all of the research considered and cited to by the Task Force was provided by Dr. Lindsay Orchowski, which allowed her to inject her own views and biases into the Task Force's discussions, including her belief that many sexual assault perpetrators are repeat offenders, and though perpetrators comprise a "heterogeneous group," they are often angry, "hypermasculine" and see acquiring sexual partners "as a game."   While acting as a member of the Task Force, Dr. Orchowski was also directing a project that developed "a prevention program for college men and addresses the role of alcohol in sexual violence."

Dr. Orchowski selectively presented the information she deemed relevant to the members of the Task Force when she failed to address any controversies in the field of sexual assault research or present a view that differed from her own. Instead, she cited to such articles as "Fraternities and collegiate rape culture: Why are some fraternities more dangerous places for

women?"; "Young Men's Likelihood Ratings to Be Sexually Aggressive as a Function of Norms and Perceived Sexual Interest; "Examining masculinity norms, problem drinking, and athletic involvement as predictors of sexual aggression in college men" and "Athletic participation, fraternity membership, and sexual aggression among college men." The Task Force's recommendations also included some that tilted the scale in favor of assault victims.

### 4. *Connection between institutional action and Plaintiff's case.*

The factual record to this point has presented a general picture of gender-based protest and the extensive engagement of the University and its President through a gender-based perspective. Plaintiff will also present evidence that "connects the dots" between and among (1) the protesters and their demands, (2) the University's engagement campaign and (3) the specific circumstances in which Defendant treated Plaintiff unfairly.

Plaintiff submits there are at least three such direct connections which run from Imagine Rape Zero's petition of demands, through the President's messages and the Sexual Assault Task Force, to the unfair administration of Plaintiff's case, namely: (i) the order of immediate removal from campus; (ii) the rush to hold his student conduct board hearing before he could prepare a defense; and (iii) the length of the sanction imposed after he was found responsible. In all three of these instances, John Doe received harsh treatment beyond the University's stated policies and precedents in ways that were urged by the Imagine Rape Zero petition that President Paxson endorsed in the Spring of 2014, portions of which were ultimately adopted by the Sexual Assault Task Force, in the issuance of their Interim Report. We consider each in turn.

First, Demand No. 13 of the Imagine Rape Zero petition highlighted the issue of interim removals, stating the following:

13.     Meet and prioritize the needs of the victim with respect to housing and academic accommodations beginning as soon as the incident is brought to the attention of University personnel, as required by federal law.

Brown University, with the encouragement of President Paxson, initially sought to achieve complete compliance with this demand in Plaintiff's case. On October 19, 2014, Dean Castillo presented John Doe with a letter, signed by Vice President Klawunn, informing him that "effective immediately, Sunday, October 19, 2014, you are removed and barred from the Brown University on an interim basis."  The letter informed him that the removal was for "an indefinite period of time" and that if he set foot on the campus he "will be considered trespassing and subject to additional action."   John Doe objected, stating that he wanted at least to be able to complete his course work.  On reconsideration, Vice President Klawunn realized her initial order was too drastic, and decided to allow John Doe to continue attending class, provided that he found lodging off campus and limited his appearances on campus to attending class.

In this way, Vice President Klawunn took a more moderate approach in handling Plaintiff's case than did President Paxson. Before seeking the original, most severe interim remedy imaginable, Vice President Klawunn corresponded with President Paxson, wherein she proposed the following course of action:

Our plan would be to issue a no contact order tonight, for deans to meet with him tomorrow morning, we would notify his parents, and fly him home tomorrow. Okay with you? Call me if you would like.

At that time, Vice President Klawunn had not spoken to either the Complainant or John Doe concerning the alleged events, had not reviewed any evidence and had not even received a written complaint. Indeed, Dean Castillo corresponded with Vice President Klawunn at 9:02 p.m. on October 17, 2014 about serving the removal letter the following day, prior to receiving Jane Doe's formal complaint at 9:03 p.m. The removal letter referred to injuries allegedly sustained

by the Complainant, though medical records had not yet been collected or reviewed. Even more egregious, Vice President Klawunn did not have the authority to issue such a removal order. Notwithstanding, later that night, Vice President Klawunn informed Dean Castillo that President Paxson approved their removal plan.

In her deposition, President Paxson took a more balanced position on the issue of interim removal, stating the following:

Q.    Do you believe that the most severe form of removal should be applied in all cases?

A.    Absolutely not.

Q.    And how instead do you believe the University should proceed in making these decisions?

A.    I think that the important thing to remember is that you are balancing the need to maintain a safe environment with the desirability of letting people stay in school.

Q.    And is it fair to say that the second – the second half of the balance is the rights and interests of the respondent?

A.    Yes.

Q.    Do you know -- and is it your view that the most -- that the University should impose the least restrictive type of removal consistent with preserving the safety of the campus?

A.    Yeah.  I think that's a fair statement.

Once again, however, President Paxson's official actions and public statements at the time do not match these views, as she authorized the most drastic remedy possible when given the opportunity. Evidencing a presumption of guilt against John Doe, she then made a point of using one of her campus emails to bring up John Doe's removal as an indication of how Brown was getting tough on sexual assault, stating "More generally, we have seen an increase in reporting of sexual assault reporting this academic year.  In several [2] cases, the evidence was strong enough to warrant immediate removal of the alleged perpetrators from campus."

Through this messaging campaign, the entire Brown University community, including those responsible for processing and deciding Plaintiff's case, were a clear directive from their President that it was time to change Brown's "culture and values" and get tough on male students accused of sexual assault.

Second, Demand Number 5 of the Imagine Rape Zero activists was to "[e]xpedite the current timeline for Student Code of Conduct hearings." In John Doe's case, the University took this demand to heart, pushing his hearing ahead far faster than its policies required, far faster than cases normally took, and against his repeated requests for additional time to deal with complicated material that was submitted at the last moment, delays that themselves violated the Code of Student Conduct.

As noted above, Defendant reduced the interval between the filing of Jane Doe's complaint and the Student Conduct Board hearing from the 60 days prescribed by the Code of Conduct and/or the historical median time of 61-62 days and average time of 82 days to a miniscule 35 days, notwithstanding Defendant's "document dump" of the hospital records at 5:17 p.m. on the Monday before the Friday hearing date.  Plaintiff also described Vice President Klawunn's stated, vengeful reason at the time, that she opposed Plaintiff "getting in the whole semester" and the other counterfactual reasons she and Dean Castillo constructed after the fact. Plaintiff submits a jury could find that the true reason Vice President Klawunn was motivated to throw Plaintiff's concerns under the bus was Demand No. 5 of the Imagine Rape Zero petition, a copy of which had been sent to her in April of that year, and which remained part of the public debate in the months that followed.

Finally, Brown University departed from precedent in order to accommodate Demand Number 1 from the Imagine Rape Zero petition, which read as follows:

1.     Require all students found culpable of sexual misconduct be, if not expelled, suspended from the University for at least two years, or until the victim in question graduates, whichever is longer.

This, of course, was at the heart of Lena Sclove's protest in the Spring of 2014. The Task Force recognized this concern in its Interim Report, noting: "[t]here is a widely shared perception that penalties are too lenient," a consideration that was taken into account in imposing a sanction on John Doe.  In her role as Chair of the Student Conduct Board, Professor Schultz, who criticized the sanction imposed in Ms. Sclove's case as being too lenient, proposed a 2 ½ year sanction, which was adopted by Vice President Klawunn.

This sanction departed from the pattern of prior decisions. In pretrial discovery, Brown University produced a chart that listed the disposition of Student Conduct Board cases during 2011-15 that included a charge of sexual misconduct (Sections III, IIIa and/or IIIb).  In this data set there are 18 cases involving violations of Code Sections III, IIIa or IIIb that were decided prior to the Fall semester of 2014, the first one following the Lena Sclove protests that Spring. Reviewing the sanctions for those 18 cases, 15 of them were for suspensions of 1 year or shorter (or less drastic forms of punishment).  One was for 2 years (still less than Plaintiff's) and two were for expulsions (admittedly harsher than Plaintiff's sanction). Of particular note is Case No. 10, based on a Fall, 2013 Student Conduct Board hearing in which the respondent was found responsible on four Code charges including IIIa and IIIb, and subjected to suspension until the fall of 2014. This case was Lena Sclove's case, as it was the only one decided that semester with that sanction, which in her complaint to OCR, Ms. Sclove described as too lenient.  In denying Ms. Sclove's appeal, Vice President Klawunn explained her decision this way:

The Senior Associate Dean sets the sanction by reviewing cases with similar findings and benchmarking the sanction against other cases while also factoring in the specific circumstances that might suggest a different determination even if the violations are the same.  In some instances the respondent might have previous violations that would need

to be considered in setting the sanction.  In this particular case, the precedent of similar cases needed consideration.  Dean Ward set the sanction at a one-year suspension after his review of the sanction imposed in other sexual misconduct cases that included suspension from the University.

In the Fall of 2014, when Vice President Klawunn reviewed the precedents for John Doe's sanction, she had essentially the same database she reviewed the previous spring when deciding the appeal in Lena Sclove's case, adding only the 1-year suspension from Lena Sclove's case itself and two other cases from that semester, one of which had a deferred suspension and the other of which had a 1.5 year suspension (Cases 8, 9). In short, there was not a reasonable basis in precedent for the 2.5 year suspension Brown imposed on John Doe. A reasonable jury could find that Professor Schultz and Vice President Klawunn departed from precedent when imposing this lengthy suspension on John Doe, and that the departure was linked to the campus outcry that resulted from Vice President Klawunn's correct application of precedent in Lena Sclove's case the previous spring.

(d)     Expert testimony concerning liability

If there is a trial on Plaintiff's Title IX claims, Plaintiff will present the testimony of two experts supporting his theories of liability under Rhode Island contract law and damages.

Linda Fairstein, J.D. is expected to testify concerning Brown's investigatory procedures, as measured against the standards of the Code of Student Conduct and against industry norms. She is expected to identify several stages at which Brown failed to meet its own standards, thereby wrongfully exposing John Doe to a hearing based on an incomplete (and prejudicial) record.

Brett Sokolow, J.D. is expected to testify concerning the standards for Title IX student disciplinary procedures established by the Department of Justice, Office of Civil Rights, the agency responsible for enforcing the law.  He is expected to identify those ways in which Brown

University's disciplinary process, both as designed and as applied to John Doe's case, failed to meet the requirements of Title IX, as dictated by both federal guidance and industry standards.

(e)   Evidence of damages

Plaintiff will present three experts concerning damages.  The first expert, Suzanne Miller, M.D., is expected to state her opinions concerning the impact of Defendant's disciplinary sanction upon John Doe's chances of gaining admission to medical school.  She is expected to testify that, prior to his suspension, John Doe was highly likely to gain admission to medical school, but because of the suspension, it is now unlikely he will gain admission to medical school.  She also will testify concerning how a judicial expungement will improve his chances.

Plaintiff's second expert, Nicholas Theodore, M.D. is expected to provide expert testimony concerning John Doe's pre-suspension chances for gaining admission to a neurosurgery residency.  He is expected to state his opinion that, prior to the suspension, John Doe was highly likely to gain admission to a neurosurgery residency.

Plaintiff's third expert, Robert Sandy, Ph.D. is expected to testify concerning John Doe's expected lifetime income (with the neuroscience bachelor's degree he has earned) under three scenarios: (1) a career in which he is not a doctor ("No MD"), (2) a career in which he is a doctor ("MD") and (3) a career specifically as a neurosurgeon.  He is then expected to construct different expected lifetime earnings projections both pre-suspension and post-suspension based on the probabilities developed during the expert testimony of Doctors Miller and Theodore.

2.   Supporting law

(a)   Rhode Island contract law

In *Doe v. Brown Univ.,* 210 F. Supp. 3d 310 (D.R.I. 2016) (referred to below as the "John Doe 2 case") this Court held that the Brown Code of Student Conduct defined a contractual

relationship between students and the University, based on the parties' "reasonable expectations," and provided that any "[a]mbiguities in a contract must be construed against the drafter of the document." *John Doe 2*, 210 F. Supp. 3d at 330.  In a contract case brought by a student against a university, the court may look to a combination of university documents to define the terms of the contract. *See, e.g., Lyons v. Salve Regina College*, 565 F.2d 200, 201 (1st Cir. 1977) (reviewing contract consisting of College Manual and Academic Information Booklet).

Under Rhode Island law, "it is well settled that a court may award damages for breach of contract to place the injured party in as good a position as if the parties fully performed the contract." *Riley v. St. Germain*, 723 A.2d 1120, 1122 (R.I. 1999) (affirming award of consequential damages resulting from breach of purchase and sale agreement, citing *Wells v. Uvex Winter Optical, Inc.,* 635 A.2d 1188 (R.I. 1994) and *Rhode Island Turnpike and Bridge Authority v. Bethlehem Steel Corp.,* 119 R.I. 141, 166, 379 A.2d 344, 357 (1977) (awarding consequential damages against contractor for using defective paint on construction project)).

    (b)    <u>Title IX law</u>

Congress enacted Title IX of the Education Amendments of 1972 to supplement the Civil Rights Act of 1964's ban on racial discrimination in the workplace and in universities. "Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the case law interpreting Title VII." *Yusuf v. Vassar Coll.,* 35 F.3d 709, 714 (2d Cir. 1994). Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf*, 35 F.3d at 715.

In *Yusuf*, the Second Circuit held that a plaintiff's challenge to a university disciplinary proceeding on grounds of gender bias can proceed in two principal ways, namely (i) erroneous outcome; or (ii) selective enforcement.  In its decision on Brown University's Motion to Dismiss, *Doe v. Brown University,* 166 F.3d 177 (D.R.I. 2016) (referred to below as "MTD Decision"), the Court defined the elements of a Title IX "erroneous outcome" case in this way:

> A plaintiff making an erroneous outcome claim must first "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id*. Once the plaintiff has established doubt concerning the accuracy of the proceeding, they must next "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id*. (citations omitted). The *Yusuf* court noted that "[s]uch allegations might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id*.

*Doe v. Brown University*, 166 F.Supp. 3d 177, 185 (D.R.I. 2016) citing *Yusuf, supra*.

The *Yusuf* standard has gained broad acceptance nationally.  *See Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016); *Doe v. Columbia Univ*., 831 F.3d 46, 53 (2d Cir. 2016); *Plummer v. Univ. of Houston*, 860 F.3d 767, 777 (5th Cir. 2017), as revised (June 26, 2017).

In *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), the Second Circuit applied by analogy the framework of shifting burdens of proof of discriminatory intent that courts apply in Title VII employment cases, stating the following:

> We also adopted Title VII's requirement of proof of discriminatory intent, and stated that "[a]llegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases." *Id*. at 714–15. *Yusuf* made clear that Title VII cases provide the proper framework for analyzing Title IX discrimination claims. We therefore hold that the temporary presumption afforded to plaintiffs in employment discrimination cases under Title VII applies to sex discrimination plaintiffs under Title IX as well.

> Thus, a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination.

*Columbia University*, *supra,* 831 F.3d at 54-55.  *See also* MTD Decision*,* 166 F.Supp. 3d at 184

(noting analogy to Title VII).  As "smoking gun" proof of discrimination is rare, a plaintiff

ordinarily uses circumstantial evidence to meet the test set out in *McDonnell Douglas*. *See*

*Chadwick v. WellPoint, Inc.,* 561 F.3d 38, 46 (1st Cir. 2009) ("[a] plaintiff is entitled to prove

discrimination by circumstantial evidence alone.")

In *Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018), the First Circuit

acknowledged it would "turn to Title VII for guidance on Title IX claims." *See id.*, 892 F.3d at

92, n. 18 (citing *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002) *and Wills v.*

*Brown Univ.*, 184 F.3d 20, 25, n.3 (1st Cir. 1999).

The First Circuit defines the Title VII employment discrimination framework espoused in

*McDonnell Douglas Corp. v. Green* in this way:

> In evaluating a claim of discriminatory hiring under Title VII, we apply the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), where, as here, there is no direct evidence of discrimination. Under that framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *Id.* at 802. To establish a prima facie case, the plaintiff must show the following: (1) he is a member of a protected class; (2) he was qualified for the position to which he applied; (3) he applied to that position and was not hired; and (4) the position to which he applied was filled by a person possessing similar or inferior qualifications. *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010). If a plaintiff establishes a prima facie case, then the burden of production shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for the challenged hiring decision. *Id.* If the employer articulates such a reason, then the burden of production reverts to the plaintiff, who must offer evidence tending to prove that the reason offered by the employer is a pretext for discrimination. *Id.*

*Cruz v. Mattis*, 861 F.3d 22, 25 (1st Cir. 2017).

In describing the third element (pretext), the First Circuit (in *Gomez-Gonzalez v. Rural*

*Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010)) stated:

> Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its

action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (internal quotation marks and citations omitted).

*See also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 2108 (2000) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination"); *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 29 (1st Cir. 2015) (citing and applying *Gomez-Gonzalez* to vacate district court summary judgment in favor of employer and remand for trial).

In *Doe v. Columbia University*, 831 F.3d 46, 57-58 (2d Cir. 2016), the Second Circuit described how institutional responses to campus protests may provide evidence of gender discrimination, stating the following:

> As outlined above, the Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students.  It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue. Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault.

> Columbia argues that the pleaded facts do not support an inference of intentional sex discrimination. It argues that the criticism of the University was for not taking student complaints of sexual assault seriously, and that any motivation on the part of the panel to demonstrate that it takes such complaints seriously is not the same thing as a motivation to discriminate against an accused male student. The district court stated that any bias in favor of Jane Doe "could equally have been — *and more plausibly was* — prompted by lawful, independent goals, such as a desire (enhanced, perhaps, by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape

24

on campus seriously and to treat complainants with a high degree of sensitivity." *Doe v. Columbia Univ.*, 101 F.Supp.3d 356, 371 (S.D.N.Y. 2015). This reasoning fails to recognize the court's obligation to draw reasonable inferences *in favor of* the sufficiency of the complaint. *Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible.

The Complaint alleges that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes. There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults.

(emphasis in original, footnote omitted.)

With regard to damages under Title IX, the United States Department of Justice has published a Title IX Legal Manual (updated 4/13/17, available online at https://www.justice.gov/crt/title-ix ) in which it states the following:

As noted above, in addition to agency enforcement mechanisms, private individuals have an implied right of action under Title IX and damages may be available in such lawsuits. In Cannon, 441 U.S. 677, a female applicant who was denied admission to two medical schools brought a private lawsuit against the schools alleging violations of Title IX. The Supreme Court in Cannon reasoned that since Title IX had been patterned after Title VI and Title VI had previously been construed to allow a private right of action, that Congress intended similar remedies to be available under Title IX.  .  .  .  In addition, the Supreme Court has ruled that monetary damages are an available remedy in private actions brought to enforce Title IX for alleged intentional violations. See Franklin, 503 U.S. at 72-75, Consolidated Rail Corp. v. Darrone, 465 U.S. 624 at 630-31 (1984).

Franklin contains a detailed discussion on the merits of allowing monetary damages for intentional violations of Title IX. Id. at 71-76. The Court placed great reliance on the "longstanding rule" that where a federal statute provides (expressly or impliedly) for a right to bring suit, federal courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." Id. at 66.  The Court found no congressional intent to abandon this presumption in the enforcement of Title IX. Accordingly, the Court concluded that private individuals may obtain damages in appropriate cases.

Throughout its opinion, the <u>Franklin</u> Court broadly referred to the relief being sanctioned as "monetary damages." Although the Court did not define this term, it specifically rejected limiting Title IX plaintiffs to monetary relief that is equitable in nature, such as backpay. See Id. at 75-76.

In the case at bar, Plaintiff's Title IX claim alleges intentional discrimination.  If proven, Plaintiff has a right to "all appropriate remedies," *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 74-5 (1992).  In the case at bar, Plaintiff seeks declaratory and/or injunctive relief either declaring the "institutional action" on his transcript null and void or removing it from his record in addition to compensatory damages.  With that said, as Dr. Miller is expected to testify, a judicial declaration and/or injunction will only provide partial relief, as Plaintiff will still have to report what happened on his medical school application, and that report (even with the benefit of judicial relief) will reduce his chances of admission. In this way, Plaintiff's situation is significantly different from a wrongfully terminated employee, for whom a judicially-ordered reinstatement can provide an effective substitute for future damages.  In contrast, in the case at bar, a court order to clear Plaintiff's record is a partial and complementary remedy to be awarded along with compensatory damages.

     3.    <u>Estimated probable length of trial</u>

Plaintiff expects to require 8-9 days to present his full case if the Title IX claims are included, and 5-6 days if the trial is limited to his contract claims.

     4.    <u>Other matters</u>

At the August 23 hearing, the Court indicated it was considering whether to bifurcate the trial into separate phases for liability and damages.  The Court also indicated that it may schedule *Daubert* hearings for one or more of Plaintiff's damages experts.  Plaintiff's experts have competing obligations that cannot be rescheduled, such as conferences.  As a result, Plaintiff will

work with Defendant and then seek accommodations from the Court should it be necessary for one or more of these witnesses to testify out of turn.

If the Court rules that Plaintiff is entitled to a trial on his Title IX claims, Plaintiff expects to introduce brief video excerpts of some of the student activities during the Spring of 2014 concerning the Lena Sclove protests and the University commencement events that acknowledged those protests.  Counsel will work together to resolve evidentiary issues, and will report promptly to the Court in the event the Court's assistance is requested.

Respectfully submitted,

Plaintiff John Doe,
By his attorneys,

NESENOFF & MILTENBERG, LLP

*Attorneys for Plaintiff John Doe*

By: /s/ Andrew T. Miltenberg
Andrew T. Miltenberg, Esq.(admitted *pro hac vice*)
Tara Davis, Esq. (admitted *pro hac vice*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
tdavis@nmllplaw.com
August 29, 2018          amiltenberg@nmllplaw.com

-and-

local counsel for Plaintiff John Doe,

By: /s/ Samuel D. Zurier
Samuel D. Zurier, Esq. (Bar No. 3576)
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-0200
August 29, 2018          sdz@zurierlaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 29th day of August, 2018, I served a copy of this Memorandum on Defendant's counsel via the Court's CM/ECF system.

/s/     Andrew T. Miltenberg, Esq.